

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| MICHAEL SANDERS | ) |
| PLAINTIFF | ) |
| | ) 09-3207 |
| v. | ) |
| | ) |
| ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES | ) |
| DEFENDANT | ) |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO BAR DEFENDANT FROM ARGUING CERTAIN DEFENSES

### INTRODUCTION

Now comes the pro se Plaintiff Michael A. Sanders (Sanders) and states as follows in support of the following motions:

On 7/2/05, resultant from an ongoing series of harassing actions directed toward him, Sanders replied to an E-Mail from his immediate supervisor Victor Puckett (Puckett) and informed him that he (Puckett) was racist and in need of mental health treatment.

Defendants management staff, with the full cooperation of DHS AFSCME union steward Jayme Lebshier (Lebshier), immediately began plotting to place Sanders on Administrative Leave of Absence and/or send Sanders for a medical evaluation [EXHIBITS A1-A8 WITH ATTACHED TIMELINE].

On May 25th, 2010 Sanders filed a "FIRST SET OF SUPPLEMENTAL INTERROGATORIES TO DEFENDANT". On July 9, 2010 Defendant filed its "ANSWER". Interrogatory 6 and its answer follow:

6. Explain in Detail why CMS manager Debby Cowan, in a July 5, 2005 email, questioned the Plaintiff's mental ability to perform his job duties and suggested that Plaintiff posed a danger to the safety of other employees.

ANSWER: After giving direct orders to Mr. Sanders on numerous occasions and his consistent refusal to follow them, Ms. Cowan was unable to discern whether Mr. Sanders could not understand her directions or whether he felt as though he did not have to follow her orders merely because he did not wish to do so. Ms. Cowan was also aware that CMS employees expressed safety concerns about working with Ms. Sanders.[1]

Continuing, on 8/26/05 Sanders was nearly assaulted by Puckett at the worksite. On 8/27/05 Sanders contacted the Illinois State Police regarding Puckett's conduct on 8/26/05. On 8/27/05, while the State Police were present at the worksite, Puckett sent an E-Mail to his supervisors implying that nothing of any significance had happened on 8/26/05.

Sometime prior to 8/29/05 Defendants management staff contacted Puckett and directed him to write a statement regarding what occurred on 8/26/05. On 8/29/05 Puckett submitted 2 written statements to Defendants management staff which directly contradicted the content of his 8/27/05 E-Mail and which, coincidently, mimicked and aped Sanders complaint to the Illinois State Police. [SEE EXHIBIT A9 FOR 3

---

[1] 1st, Debby Cowan was on some type of leave and did not report to the worksite until late June 2005, thus had no opportunity to issue Sanders any orders whatsoever. 2nd, the record does not contain any order issued by Debby Cowan directly to Sanders. 3rd, Debby Cowan worked the 8 AM-4 PM shift while Sanders worked the 4 PM-12AM shift. Finally, Sanders argues that the temporal proximity of his July 2, 2005 E-Mail (to Puckett) and Cowan's July 5, 2005 response indicates her comments were retaliatory in nature. [See timeline m-y].

PUCKETT STATEMENTS]

Defendant used the 8/29/05 statements submitted by Puckett to initiate a workplace violence investigation of Sanders by the Office of the Executive Inspector General (OEIG). [SEE EXHIBIT A10].[2]

On 9/9/05 Defendant conducted a Pre-Disciplinary meeting based upon Puckett's fraudulent version of the events of 8/26/05. Sanders left the Pre Disciplinary meeting and met with DHS AFSCME union steward Jayme Lebshier outside of the Harris building.

On 9/9/05, immediately after speaking with Sanders outside the Harris Building, Lebshier fraudulently reported to Defendant that Sanders had threatened to physically harm Puckett[3] [SEE EXHIBIT A11 & A12]. Defendant placed Sanders on Administrative Leave of Absence on 9/9/05 and Sanders remained on Administrative Leave of Absence until June 2009.

Defendant ordered Sanders to attend 6 separate Independent Medical Examination (IME) which were to be conducted by psychiatrist Dr. Terry Killian. The dates of those psychiatric examinations were 10/5/05, 10/12/05, 4/19/06, 1/30/07, 6/13/07, and 9/5/07.

---

[2] On Jan 4, 2007 OEIG concluded that the workplace violence allegations against Sanders were "UNFOUNDED", however, Defendant continued to order Sanders to attend IME's.

It should be noted that the two statements submitted to Defendants management by Puckett on 8/29/05 appear to be E-Mails and reflect dates and times but are not actual E-Mails. These two statements bear dates of 8/25/05 & 8/26/05.

[3] Lebshier testified before the Illinois Civil Service Commission (Commission) on Jan 23, 2008 that Sanders did not threaten to physically harm Victor Puckett. Lebshier also testified that Sanders was unaware that she had provided written statements to Defendants management accusing Sanders of threatening to physically harm Puckett. (see transcript page 147-156). Lebshiers statements mimicked and aped Sanders complaint to the State Police. Not until July 11, 2007 did Defendant provide Sanders with copies of the statements written by Lebshier in 2005.....Shortly before Sanders 10/17/07 discharge.

Sanders was illegally discharged by Defendant on 11/23/05 for refusing to attend the 10/05/05 & 10/12/05 IME's. Sanders was reinstated on 2/1/06 as a result of a determination by the Illinois Attorney General that the discharge blatantly violated the State Personnel Code.[4]

After his 2/1/06 reinstatement Defendant continued to order Sanders to attend IME's. On 4/07/06 Sanders legal counsel HAND DELIVERED a letter to Defendant requesting to be provided the rationale for the continued IME's and the statute/rule/regulation Defendant relied upon in ordering Sanders to attend IME's.

Prior to responding to the 4/07/06 inquiry from Sanders legal counsel, Defendant ordered Sanders to attend IME's scheduled for 4/19/06 & 1/30/07. Defendant responded to Sanders legal counsel inquiries on 5/14/07, 14 months after the inquiries were made.

Sanders was suspended from 8/1-30/07 for refusing to attend the 6/13/07 IME. Sanders was discharged on 10/17/07 for refusing to attend the 9/5/07 IME.

In the wake of his discharge Sanders filed an appeal with the Illinois Civil Service Commission (Commission). After a full evidentiary hearing, the Commission concluded that:

".....CMS WAS NOT REASONABLE IN ORDERING MICHAEL SANDERS TO ATTEND AN IME BECAUSE THERE IS NO CREDIBLE EVIDENCE THAT SANDERS EVER PHYSICALLY THREATENED ANYONE AT ANY TIME...."

---

[4] Defendant claimed its authority to schedule the 10/5/05 & 10/12/05 IME arose from personnel rule 303.145 (Disability Leave). That rule, however, requires an employee to request disability leave and Sanders had not done so. Thus, Sanders was reinstated to employment. Dr. Terry Killian was specifically requested to perform a disability determination with respect to these IME's.

Defendant appealed this decision to the Sangamon County Circuit Court which affirmed the decision of the Commission on 1/24/09.

This case arises from Sanders 10/17/07 discharge from employment by Defendant and asserts that Defendant violated 42 USC 12112(d)(4)(A) of the Americans With Disabilities Act. Sanders asserts that Defendant required him to submit to an IME either to determine if he was disabled and/or to determine the nature and severity of his disability when such examination was neither job related nor consistent with business necessity.

The issue in dispute in this case turns upon whether Defendants orders to Sanders that he submit to an IME was job related and consistent with Defendants business interests.

This instrument seeks to bar Defendant from utilizing certain defenses in any trial, plea, motion and/or proceeding before this Court.

## MOTION TO BAR DEFENDANT FROM UTILIZING ANY DEFENSE RELATED TO SANDERS ABILITY TO PERFORM JOB FUNCTIONS AND/OR ALLEGATIONS THAT SANDERS POSED A DANGER TO WORKPLACE SAFETY

During proceedings before the Commission, Defendants Deputy General Counsel, Jeff Shuck, admitted he was the individual who made the decision to order Sanders to attend the 6 separate IME's.

On December 12, 2008 Defendant filed an instrument with the Sangamon County Circuit Court entitled *"PLAINTIFFS BRIEF IN OPPOSITION TO ADMINISTRATIVE DECISION".*[5] [SEE EXHIBIT A13] This document is replete with assertions identifying

---

[5] The aforementioned brief was filed after the Defendant received the 1/23/08 testimony of DHS AFSCME union steward, Jayme Lebshier, in which she stated that Sanders had not verbally threatened to physically harm Victor Puckett on 9/9/05.

the rationale utilized by Defendants Deputy General Counsel, Jeff Shuck, in ordering Sanders to attend IME's:

Page 11: "There is no dispute that Defendant Sanders was sent to an IME out of concerns for the safety of the workplace."

Page 12 "There is no dispute that CMS was acting out of fears for public safety by requiring Defendant Sanders to attend an IME."

Page 14 "Mr. Shuck received specific information about a threat made by Defendant Sanders, against the very person that Defendant did not get along with. This information provided to Mr. Shuck provides a basis for CMS to require Defendant Sanders to attend an IME."

Page 15 "No evidence suggests that Mr. Shuck had an unreasonable basis for his decision, such as bias against Defendant Sanders or a desire to harass him. Instead the evidence showed that Mr. Shuck acted solely out of concern for the safety of the workplace."

Defendant clearly established that the IME's it ordered Sanders to attend were based upon its concerns for workplace safety and not based upon concerns regarding the ability of Sanders to perform the functions of his job.[6]

Defendant made the same workplace safety argument before the Commission which subsequently identified the "threat" attributed to Sanders as a "threat to contact the police" if Sanders was again harassed by Victor Puckett and recommended reversal of Sanders discharge.

---

[6] Sanders job title is Data Processing Technician. Sanders does not work in a position of public safety, does not carry a gun, and does not operate machinery except for a keyboard. Sanders was rated as exceeds in "job knowledge" and "efficiency" in the last annual evaluation he received immediately prior to working with Puckett.

Defendant made the same workplace safety argument to the Illinois Department of Employment Security which subsequently halted Sanders unemployment compensation resulting in the liquidation of his pension with the State of Illinois. [SEE EXHIBIT A14]

In summary, Defendants repeated claims that Sanders poses a threat to the safety of the workplace have been refuted by (sequentially listed) OEIG [SEE EXHIBIT 15], recanted by DHS AFSCME union steward Jayme Lebshier [SEE EXHIBIT A12], refuted by ALJ of the Commission [SEE EXHIBIT A16], refuted by the full Commission [SEE EXHIBIT A16], refuted by the Sangamon County Circuit Court [SEE EXHIBIT A16]which affirmed the decision of the Commission and refuted by the Springfield Police Department[7].

Due to the fact that its workplace safety argument has been repeatedly defeated Defendant now seeks an alternative rationale in order to justify Defendants actions in ordering Sanders to attend IME's.

On August 13, 2009 Sanders filed a *"COMPLAINT"* with this Court.  On October 30, 2009 Defendant filed an *"ANSWER"* to Sanders complaint.

In its *"ANSWER"* Defendant included the following *"AFFIRMATIVE DEFENSES"* as it's rationale for scheduling the IME's:

1. The Defendants actions were job related and consistent with business necessity.

2. By scheduling the independent medical examinations, Defendant was attempting to make an inquiry into the ability of Plaintiff to perform job-related functions.

---

[7] This is a reference to the fraudulent 2/26/09 telephone "bomb threat" which Defendant utilized in an attempt to surreptitiously overturn the various findings and court orders reinstating Sanders to employment. Resultant from this fraudulent "bomb threat" the worksite was evacuated, traffic was rerouted away from the work site, bomb sniffing dogs were deployed, and Sanders was arrested. The Springfield Police Department determined that no phone call had actually been made to Defendant.

On May 25, 2010 Sanders filed an instrument entitled *"FIRST SET OF SUPPLEMENTAL INTERROGATORIES TO THE DEFENDANT"*. On July 9, 2010 Defendant filed *"DEFENDANTS ANSWERS TO PLAINTIFFS FIRST SET OF SUPPLEMENTAL INTERROGATORIES"*. Interrogatory number two and its answer follow:

> 2. Explain in detail the functions of his job that CMS believes Plaintiff was not able to perform or had difficulty performing which necessitated the need for independent medical examinations.
>
> ANSWER: Mr. Sanders continually refused to take instruction or direction from any of his supervisors. This refusal or inability to accept supervision and follow direction, and his statements and behavior in relation to his supervisory staff, caused concern about his fitness for duty.

Sanders argues that Defendant should not be permitted to utilize its AFFIRMATIVE DEFENSE No. 2 because it clearly indicated, in its 12/12/08 filing before the Sangamon County Circuit Court, it's rationale for ordering Sanders to attend IME's. In that filing Defendant clearly indicated that the rationale for ordering Sanders to attend the IME's rested upon the issue of workplace safety and not upon Sanders ability to perform functions of his job.

Furthermore, Sanders argues that Defendant should also be prohibited from utilizing the rationale that the IME's were necessary due to concerns regarding workplace safety because on 1/23/08 Defendants Deputy General Counsel, Jeff Shuck, provided the following testimony before the Commission:

**1/23/08 TESTIMONY OF DEPUTY GENERAL COUNSEL JEFF SHUCK [EX. A17]**

| | |
|---|---|
| TR 183-185: | ANSWER: "Yes. One of the questions that was brought to me was, you know, that proper handling of that situation. They had suspended the continuation of that pre-disciplinary meeting in order to address the situation that occurred in the hallway, and it was basically a two-fold thing." |

"One, was to refer what we perceived as threats made by Mr. Sanders against his supervisor to the office of the OEIG for their investigation and disposition, and the second was to address the matter of his employment going forward."

"One of the issues that's connected to that is whether it was appropriate and safe to have Mr. Sanders, you know, go back to the work site given the fact that he had just made verbal, very specific verbal threats about his supervisor, and, you know, the folks in Internal Personnel come to me for advice about that."

QUESTION: "And as far as determining whether or not it was safe or appropriate to allow Mr. Sanders back into the workplace given those threats, were you approached concerning what the options would be?"

ANSWER: "Yes, yes. And I determined that it would be appropriate to send Mr. Sanders for an independent medical evaluation to determine whether or not a medical professional felt that Mr. Sanders was capable of performing the duties of his position or not."

"When this issue came up, you know, I inquired as to, well, what's the history here, because it's, you know, it's a common question we ask. You need to understand some of the background, some of the situation that may have led up to whatever, you know, situation that's presented."

"And it was my understanding that there had been some friction between Mr. Sanders and the supervisor in the past. Situations of Mr. Sanders essentially getting in his supervisor's face, being very reluctant to take supervision, you know, being defiant, and those sort of things."

"Which when considered in the light of what was reported to have occurred during this predisciplinary meeting, led me to believe that we needed that medical determination to see whether it was safe to have him continue."

| | |
|---|---|
| TR 195-196: | QUESTION: "Okay. And we've heard earlier testimony about an OEIG investigation into some actions by Mr. Sanders I think relating to these threats. Are you familiar with that investigation?" |

ANSWER: "Yes, I am."

QUESTION: "Okay. And was it your understanding that that investigation came back as unfounded?"

**1/23/08 TESTIMONY OF DEPUTY GENERAL COUNSEL JEFF SHUCK [EX. A17]**

        ANSWER: "That is my understanding, yes."

        QUESTION: And given that knowledge, you still determined that an IME was necessary?

        ANSWER: "Yes, because we're talking about two completely separate issues. The OEIG investigation was or the referral to OEIG was for the purpose of their determination whether there had been any violation of the rules sufficient to warrant discipline with respect to his conduct at that pre-disciplinary meeting. Okay. That addresses a set point in time."

"And the issue regarding the IME is with respect to going forward. It's a completely separate issue. One is regarding discipline appropriate for what occurred here. The other question with the IME is, well, what do we do now. It's completely independent. If there was discipline or if there was not, either way doesn't answer the question of whether or not Mr. Sanders was fit to perform his duties"

TR 210-211:    QUESTION: "Okay. The letter that you wrote July 31, do you have a copy of that?"

        ANSWER: "Yes, I do."

        QUESTION: "Do you see in the second full paragraph of that letter when you suggest that a history of friction between Michael and Victor evidences an inability on Michael's part to accept supervision from a supervisor?"

        ANSWER: "Yes."

        QUESTION: "And then you go on to assert that, well, essentially, if I summarize that letter, are you saying that the IME is justified because Michael is unable to accept supervision from Victor Puckett?"

        ANSWER: "No. What I was indicating here is that the decision to send Mr. Sanders for an IME was based upon his conduct at the pre-disciplinary hearing......"[8]

---

[8] In furtherance of Sanders motion to bar Defendant from utilizing a defense of "inability to perform job function" arguments it is noted that in this exchange that Defendants Deputy General Counsel, Jeff Shuck, disavows the contents of his July 31, 2007 letter to Sanders legal counsel.

Shucks July 31, 2007 letter to Sanders legal counsel explicitly enunciates that "inability to accept supervision" was the rationale for ordering Sanders to attend IME's.

Defendants Deputy Attorney General, Jeff Shuck, clearly indicates through the above testimony that he differentiated the basis of the IME's from the basis of the OEIG investigation of the alleged workplace violence issue[9].  On 1/4/07 the OEIG investigation concluded as follows:

*"The Office of the Executive Inspector General (OEIG) recently investigated a complaint alleging misconduct by CMS employee, Michael Sanders (Sanders).  The OEIG has concluded its investigation in this matter and determined that the allegation that Sanders violated proscriptions against violence in the workplace by making threats against his supervisor is UNFOUNDED i.e., there was insufficient evidence to establish that a violation occurred.  This concludes the OEIG's review of this matter."* [ EXHIBIT A15]

Defendants argument that the IME was based upon the "ability of Sanders to perform job duties" has been effectively negated by defendants 12/12/08 filing in Sangamon County Circuit Court with cited "workplace safety" as the basis of the IME.

Defendants argument that the IME was based upon "workplace safety" has been effectively negated by (and in sequential order) the determination of OEIG, the recantation of DHS AFSCME union steward Jayme Lebshier, the order of the ALJ, the order of the full Commission, the order of the Sangamon County Circuit Court, Defendants filing in this Federal Court.

Sanders argues that he is being subjected to litigation by Defendant which is at once arbitrary, capricious and malicious.

Inherent in the order of the Commission, which is a final order, lies the fact that Sanders was ordered by Defendant to attend the IME's based upon Defendants concerns regarding workplace safety. The Commission concluded:

---

[9] The Court should note that despite this acknowledged differentiation, Defendant did in fact file the 12/12/08 "PLAINTIFFS BRIEF IN OPPOSITION TO ADMINISTRATIVE DECISION" in Sangamon County Court which cited workplace safety as the basis for ordering Sanders to attend the IME's.

".....CMS WAS NOT REASONABLE IN ORDERING MICHAEL SANDERS TO ATTEND AN IME BECAUSE THERE IS NO CREDIBLE EVIDENCE THAT SANDERS EVER PHYSICALLY THREATENED ANYONE AT ANY TIME...." [SEE EXHIBIT A16]

The net result of allowing Defendant to utilize its AFFIRMATIVE DEFENSE no. 2, or any alternate basis for ordering Sanders to attend IME's, is a deprivation of the rights afforded Sanders at the Commission. Defendant identified "workplace safety" as the basis of the IME at the Commission and in Sangamon County Circuit Court and this is what Sanders defended against. Defendant should not now be allowed to substitute that discredited rationale for another.

Further, Defendant has only tangentially raised the issue of "ability to follow instruction" and it clearly has not been the thrust of Defendants arguments during this litigation with began in 2005. Allowing Defendant to use its Affirmative Defense no. 2 creates a situation of double jeopardy for Sanders. Significantly, the double jeopardy arises out of the Defendants desire to alter the rationale it uses to justify ordering Sanders to attend IME's. This is an issue which Defendant admitted, in its 12/12/08 filing in Sangamon County Circuit Court, has not been in dispute.

## MOTION TO BAR DEFENDANT FROM UTILIZING ITS "GOING FORWARD" ARGUMENT AS A BASIS FOR ORDERING SANDERS TO ATTEND IME'S AND/OR ANY OTHER DEFENSE

On 1/23/08 Defendants Deputy General Counsel, Jeff Shuck, provided the following testimony before the Commission

TR 195-196:    QUESTION: "Okay. And we've heard earlier testimony about an OEIG investigation into some actions by Mr. Sanders I think relating to these threats. Are you familiar with that investigation?"

ANSWER: "Yes, I am."

QUESTION: "Okay. And was it your understanding that that investigation came back as unfounded?"

ANSWER: "That is my understanding, yes."

QUESTION: And given that knowledge, you still determined that an IME was necessary?

ANSWER: "Yes, because we're talking about two completely separate issues. The OEIG investigation was or the referral to OEIG was for the purpose of their determination whether there had been any violation of the rules sufficient to warrant discipline with respect to his conduct at that pre-disciplinary meeting. Okay. That addresses a set point in time."

"And the issue regarding the IME is with respect to going forward. It's a completely separate issue. One is regarding discipline appropriate for what occurred here. The other question with the IME is, well, what do we do now. It's completely independent. If there was discipline or if there was not, either way doesn't answer the question of whether or not Mr. Sanders was fit to perform his duties"

Page 20 of ALJ's order, in the section titled "FINDINGS OF FACT", contains the following observation:

*"The petitioner added that, although the OEIG determined that allegations of threatening behavior against Sanders were unfounded, CMS was "saddled with the duty to ensure that Respondent was fit for duty."*

Obviously, this rationale by Defendant was considered and rejected by the Commission as evidenced by the Commission's order which inherently determined that workplace safety was the cause of Defendant ordering Sanders to attend IME's[10]. Thus, Sanders requests this Court to bar Defendant from attempting to utilize this defense as a basis for ordering Sanders to attend IME's.

For the reasons cited above Sanders petitions this court to grant his motion to bar

---

[10] Defendant also rejected it's own argument by virtue of its 12/12/08 filing in Sangamon County Circuit Court. which indicates the IME was based upon concerns regarding workplace safety.

Defendant from utilizing either of the aforementioned defenses in any plea, motion, proceeding and/or trial before this Court.

## CONCLUSION

The issue in dispute in this case turns upon whether Defendants orders to Sanders that he submit to an IME was job related and consistent with Defendants business interests. That issue was the same issue that was litigated before the Commission. The Commission, in part, concluded:

".....CMS WAS NOT REASONABLE IN ORDERING MICHAEL SANDERS TO ATTEND AN IME BECAUSE THERE IS NO CREDIBLE EVIDENCE THAT SANDERS EVER PHYSICALLY THREATENED ANYONE AT ANY TIME...."

Federal courts are required to give state court judgments the same preclusive effect that those judgments would be given in the state from which they emerge provided the litigants had a full and fair opportunity to litigate the claim or issue [see Allen v. McCurry, 449 U.S. 90,96,66 L.Ed.2d 308 (1980); Lolling v. Patterson, 966 F.2d 230, 235 (7th Cir.1992); and 28 U.S.C. 1738

On February 17, 2010 Sanders filed a "REQUEST TO ADMIT" with this court. On March 19, 2010 Defendant filed its "ANSWER". Via Defendants "ANSWER" it has admitted that it had a full and fair opportunity to litigate the claims and issues involved in the matter before this Court.

Thus, the issue raised in this proceeding has been previously adjudicated and CMS is bound by it under the issue preclusion rule.

The principal of res judicata is applicable in this matter because the Commission, *after considering Defendants basis for ordering Sanders to attend an IME*, determined that

Defendants order to Sanders was unreasonable.

The principal of res judicata is applicable in this matter because SINCE the Commission, *after considering Defendants basis for ordering Sanders to attend the IME,* adjudicated the order as unreasonable the IME then cannot be found to be job related and consistent with business necessity as required by USC 12112(d)(4)(A) which in pertinent part states:

*"A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job related and consistent with business necessity."*

Further, due to the Commissions adjudication, Defendant also necessarily violated 42 USC 12112(d)(1) because it discharged Sanders for his refusal to submit to a medical examination.

Should this Court grant Sanders motions to bar Defendant from utilizing the aforementioned rationales as the basis for ordering Sanders to attend an IME then Sanders motions this Court to grant him Summary Judgment and requests that any trial be limited to the issue of damages. Sanders supports his motion for Summary Judgment with the July 18, 2007 letter from the law firm of Gates, Wise and Schlosser.

In conclusion, Sanders request the Court to note a final issue: The Commission concluded that the "threat" Defendant attributed to Sanders was actually a "threat to call the police". Defendants reaction to this "threat" (attempts to force Sanders to attend an IME) was not job related nor was it consistent with business necessity, however, it does constitute an infringement upon Sanders civil liberties and in and of itself constitutes a criminal offense. Furthermore, through its actions, Defendant clearly conditioned Sanders continued employment upon acceptance of harassment by Puckett.

# CERTIFICATE OF SERVICE

Pro se plaintiff, Michael A. Sanders, herein certifies that on October 19, 2011 he has served a copy of the foregoing instrument with all attachments, VIA HAND DELIVERY, upon:

Amy Petry Romano

Illinois Attorney Generals Office

500 South 2nd Street

Springfield, Illinois 62702

-----------------------------------------------------------------------------------------------------------------

Questions or concerns may be directed to:

*[signature]*

Michael A. Sanders

400 E Jefferson #205

Springfield, Illinois 62701

(217)-361-2237


ATTACHED TO THIS INSTRUMENT ARE THE FOLLOWING DOCUMENTS:

- A TIME LINE OF SIGNIFICANT EVENTS FROM 6/14-7/10/05

EXHIBIT A1:     FALSE TIME RECORDS
EXHBIT A2:      ROOM POLICY
EXHIBIT A3:     REFUSAL TO DISCIPLINE PUCKETT DOCUMENT
EXHBIT A4:      SANDERS DISCIPLINE AFTER COMPLAINING ABOUT

PUCKETT

| | |
|---|---|
| EXHIBIT A5 | PUCKETTS INCORRECT COMPLAINTS ABOUT SANDERS JOB PERFORMANCE |
| EXHIBIT A6,1 | EVENTS DIRECTLY RELATED TO IME |
| EXHIBIT A6,2 | EVENTS DIRECTLY RELATED TO IME |
| EXHIBIT A6,3 | EVENTS DIRECTLY RELATED TO IME |
| EXHIBIT A6,4 | EVENTS DIRECTLY RELATED TO IME |
| EXHIBIT A6,5 | EVENTS DIRECTLY RELATED TO IME |
| EXHIBIT A7 | DEFNDANTS RETALIATORY PLANNING OF IME |
| EXHIBIT A8 | PUCKETTS INCORRECT COMPLAINTS ABOUT SANDERS JOB PERFORMANCE |
| EXHIBIT A10 | LABOR RELATIONS INITIATION OF OEIG INVESTIGATION |
| EXHIBIT A11 | LEBSHIER STATEMENTS WITHHELD UNTIL July 11, 2007 |
| EXHIBIT A12 | LEBSHIER PARTIAL TRANSCRIPT |
| EXHIBIT A13 | DEFENDANTS BRIEF IN OPPOSITION |
| EXHIBIT A14 | IDES BOARD OF REVIEW DECISION |
| EXHIBIT A15 | OEIG INVESTIGATION |
| EXHBIT A16 | COMMISSION ORDERS AND COUNTY ORDERS |
| EXHIBIT A17 | SHUCK PARTIAL TRANSCRIPT |