**E-FILED**
Friday, 21 October, 2011  03:14:39 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A11

# THIS EXHIBIT DOCUMENTS THE STATEMENTS OF JAYME LEBSHIER WHICH WERE ALLEGEDLY WRITTEN IN 2005 BUT NOT RELEASED TO SANDERS UNTIL JULY 11, 2007.



ILLINOIS · Rod R. Blagojevich, Governor
DEPARTMENT OF CENTRAL MANAGEMENT SERVICES
Maureen T. O'Donnell, Acting Director

# FAX COVER PAGE

TO: BRAD WILSON
FAX NUMBER: 522-9020
DATE: 7-11-07
SUBJECT:

LEBSHIER
DOCUMENTS

FROM: JEFF SHUCK
CMS DEPT: LEGAL
PHONE: 782-5778
PAGES INCLUDING COVER PAGE: 4

NOTES:

Brad –

Here are the documents
Mr. Sanders requested this
afternoon.

Thanx.

PRIVILEGED & CONFIDENTIALITY NOTICE: This facsimile transmission (and/or the documents accompanying such) may contain privileged/confidential information. Such information is intended only for the use of the individual or entity named above. If you are not the named or intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of such information is strictly prohibited. If you have received this transmission in error, please immediately notify the sender by telephone to arrange for the secure return of the documents.

720 Stratton Office Building, 401 South Spring Street, Springfield, IL 62706
Printed on Recycled Paper

## REPORT OF INCIDENT WITH MICHAEL SANDERS

ON FRIDAY, 9 SEPTEMBER, AFTER ATTENDING A PRE-
DISCIPLINARY HEARING FOR MICHAEL SANDERS(IN MY POSITION
AS UNION STEWARD), I APPROACHED HIM OUTSIDE DEB COWAN'S
OFFICE IN I/O TO FIRM UP PLANS FOR HIS REBUTTAL AND TO MAKE
SURE HE WAS ALRIGHT.  MICHAEL SEEMED VERY UPSET AND
HYPER.  WHEN I INQUIRED AS TO WHETHER HE WOULD BE OK TO
SERVE HIS SHIFT, HE INFORMED ME THAT HE HAD "90 DAYS",
"90 DAYS".  I ASKED HIM WHAT HE MEANT AND INSTEAD OF
ANSWERING THAT QUESTION, HE TOLD ME THAT HE WAS TIRED OF
THESE PEOPLE PICKING ON HIM AND THAT HE HAD HAD IT.  HE
THEN WENT ON TO EXPLAIN TO ME THAT THE STATE POLICE HAD
INFORMED HIM WHEN HE HAD CALLED THEM ON SATURDAY, 27
AUGUST THAT IF VICTOR PUCKETT "TRIED ANYTHING, JUST TO
CALL THEM AND THEY WOULD PLACE HIM IN HANDCUFFS AND
REMOVE HIM (VICTOR) FROM THE BUILDING."  I TOLD MICHAEL TO
PLEASE BE CAREFUL AND NOT PLACE HIMSELF IN A POSITION THAT
COULD BE MORE HARMFUL TO HIS CAREER.  MICHAEL THEN TOLD
ME "I AM GOING TO GET HIM, HE IS NOT GOING TO DO THIS TO
ME.  ALL I HAVE TO DO IS CALL THE STATE POLICE AND THEY
WILL TAKE CARE OF IT."  I TOLD MICHAEL THAT WE WOULD
HANDLE IT AND TO PLEASE NOT DO ANYTHING THAT WOULD GET
HIM INTO MORE TROUBLE.  I ADVISED HIM TO JUST KEEP HIS HEAD
DOWN, DO HIS JOB, FOLLOW HIS SUPERVISOR'S INSTRUCTIONS
AND IF THERE WAS ANY PROBLEMS TO CALL ME ON MY CELL
PHONE.  MICHAEL WAS BECOMING EVEN MORE VISIBLY UPSET AND
WAS SHAKING NOTICEABLY.  MICHAEL BECAME MORE
THREATENING IN BOTH ATTITUDE AND SPEECH AND INFORMED ME
THAT "I AM GOING TO GET PUCKETT.  SATURDAY NIGHT I AM
GOING TO SET HIM UP.  IT WILL BE JUST ME AND PUCKETT AND I
AM GOING TO GET HIM."  AT THIS POINT, I BECAME VERY
CONCERNED AND FRANKLY, SCARED OF WHAT MIGHT HAPPEN IN
I/O ON SATURDAY NIGHT AS IT WOULD ONLY BE VICTOR AND
MICHAEL WORKING.  I TOLD MICHAEL WE NEEDED TO GO OUTSIDE
FOR A FEW MINUTES TO DISCUES THIS AND COOL DOWN, HE
AGREED AND I TOLD HIM I HAD TO LET VICTOR KNOW WE WERE
GOING OUTSIDE.  I WENT TO VICTOR AND WHISPERED TO HIM THAT
MICHAEL HAD JUST THREATENED HIM TO ME AND TO BE VERY
CAREFUL AND TO GO INTO DEB COWAN'S OFFICE AFTER I TOOK
MICHAEL OUT AND LET STEVE PETRILLI, DEB COWAN, AND DEB
STOUT KNOW WHAT MICHAEL HAD SAID AS I TOOK IT TO BE A
CREDIBLE THREAT.

AT THIS POINT, MICHAEL AND I HEADED OUT OF I/O TO GO OUTDOORS. HE LEFT ME IN THE HALL AND AT THIS POINT I SAW GERRY MITCHELL COMING DOWN THE HALL. I MOTIONED TO HIM, AND HE APPROACHED ME. AT THIS TIME, I INFORMED HIM THAT MICHAEL HAD MADE SERIOUS THREATS TO SET VICTOR PUCKETT UP ON SATURDAY NIGHT WHEN THEY WOULD BE WORKING ALONE TOGETHER AND MICHAEL'S PLAN TO CALL THE STATE POLICE. GERRY WAS VERY CONCERNED AND ASKED WHAT HE COULD DO. I TOLD HIM WHO WAS STILL IN DEB'S OFFICE AND TO PLEASE GET THE WORD TO THEM REGARDING THESE THREATS AND THAT I WAS TAKING MICHAEL OUTSIDE TO TALK TO HIM.

MICHAEL AND I WENT OUTSIDE AND AGAIN IN THE COURSE OF OUR CONVERSATION HE MADE THE SAME THREATS TO SET UP VICTOR WHEN THERE WOULD BE "NO WITNESSES" AND THAT HE "HAD HAD IT". I TOLD MICHAEL TO PLEASE NOT TALK LIKE THAT AND TO PLEASE NOT ACT ON THIS THREAT, BUT HE CONTINUED TO INSIST THAT HE WAS "GOING TO GET PUCKETT" AND THAT NO ONE WAS GOING TO TREAT HIM LIKE THIS. I TOLD MICHAEL AGAIN, TO STOP TALKING ABOUT THIS IN FRONT OF ME AND THAT IF MANAGEMENT ASKED ME, I WOULD HAVE TO WRITE A STATEMENT REGARDING THE THREATS HE HAD MADE AGAINST VICTOR. IT DID NOT STOP HIM AND I TOLD MICHAEL THAT HE HAD TO STOP MAKING THREATS AND THAT WE WOULD HANDLE THE REBUTTAL AND DISCIPLINE ISSUES NEXT WEEK, BUT FOR NOW HE NEEDED TO CALM DOWN AND FOCUS ON GETTING THROUGH HIS SHIFT WITHOUT INCIDENT. MICHAEL DID NOT RESPOND TO THIS AND LET ME KNOW THAT SATURDAY NIGHT WAS GOING TO BE HIS NIGHT AND THAT HE WAS REALLY LOOKING FORWARD TO SEEING THE STATE POLICE ESCORT VICTOR PUCKETT OUT OF THE BUILDING IN HANDCUFFS. BY THIS TIME MICHAEL WAS VERY NERVOUS, SHAKING VISIBLY AND IN MY FACE. THE VIOLENT TONE OF HIS VOICE AND HIS VERY CLOSE PROXIMITY TO ME FRIGHTENED ME AND CONVINCED ME THAT THE ONLY THING I COULD DO WAS ESCORT HIM BACK INTO I/O WITH THE SAME ADMONISHMENT TO PLEASE THINK ABOUT HIS ACTIONS AND TO JUST DO HIS JOB AND GET THROUGH THE NIGHT. I THEN RETURNED MICHAEL TO I/O.

JAYME CARTER LEBSHIER                    10 SEPTEMBER 2005

# Shewmaker, Christy

| | |
|---|---|
| **From:** | Shewmaker, Christy |
| **Sent:** | Thursday, June 15, 2006 8:11 AM |
| **To:** | PETRILLI, STEVE |
| **Cc:** | Tozer, Veronica |
| **Subject:** | RE: Fwd: STATEMENT REGARDING MICHAEL SANDERS CALL |

Thanks, Steve.

Jayme forwarded this statement to Ronie Tozer earlier yesterday also. This was forwarded to the OEIG.
We are currently working with our legal staff on the IME issue - in fact, we were meeting yesterday afternoon when you sent your email. He has not yet had the IME but I am hoping that the legal opinion that we can indeed require him to have the IME will be rendered soon. It appears that there is case law that will allow us to direct him to go.

Finally, yes the OEIGs recommendation will be reviewed by CMS Personnel, Labor Relations in addition to External CMS Labor Relations. Unfortunately, the OEIG investigations seem to take a long time. My hope is that we can get this finalized soon.

Thanks for the information. Please keep us posted of any future contacts Mr. Sanders may make with Jayme or other CMS staff.

**Christy Shewmaker**
Human Resource Director, CMS Internal Personnel Office
505 Stratton Office Building
(217) 782-7638   Fax (217) 782-3366

E-Mail christy.shewmaker@Illinois.gov

*Missing  4/19/06*
*Bill*

---

**From:** STEVE PETRILLI [mailto:STEVE.PETRILLI@illinois.gov]
**Sent:** Wednesday, June 14, 2006 4:12 PM
**To:** Shewmaker, Christy
**Cc:** Cowan, Debby; Moscardelli, Julie; Spence, Kelly; Tozer, Veronica
**Subject:** Re: Fwd: STATEMENT REGARDING MICHAEL SANDERS CALL
**Importance:** High

Please see the attached statement from Jayme Lebshier (union steward @ the Harris bldg). Is this something which needs to be forwarded to the OEIG?

What is the status of Mr. Sanders? In a few more months he will have been on AL with pay for a year. Is there any way we can ascertain when investigation and decision from the OEIG will be rendered?

Has he ever had the IME (to ascertain if he is mentally fit for duty)? If not, when will one be scheduled?

You may have advised me already, but I did not not make note of it. Would the Mr. Sanders issue need to be reviewed by external labor relations once something comes from the OEIG?

We do not know why Mr. Sanders continues to contact Jayme because she had to excuse herself from representing him due to the written statement she provided last year which was one of the items used as the basis for putting Mr. Sanders on AL to begin with. He has to realize it because I am sure her statement from

last year has been provided to him more than once.

Thanks.

Steve P.

Steve Petrilli, Manager
CMS BCCS Enterprise Production Operations Services
100 South Grand Avenue East
Springfield, IL   62704

Phone 217-785-9628  Fax 217-558-4117  Pager  1-800-602-5134
E-Mail: Steve.Petrilli@Illinois.Gov

"If you tell the truth, you don't have to remember anything."
    Mark Twain (1835-1910); US writer and journalist.

"To learn something new, take the path that you took yesterday."
    John Burroughs (1837 - 1921); US author, naturalist.

Defend America -  www.defendamerica.mil

This message is for the designated recipient(s) only and may contain privileged,
proprietary, or otherwise private information.  If you have received it in error,
please notify the sender immediately and delete the original.  Any other use
of the email by you is prohibited.

>>> Jayme Lebshier 6/14/2006 3:02 PM >>>
FYI

>>> Jayme Lebshier 06/14/06 2:55 PM >>>
Good Afternoon !
Please find attached my written statement regarding the phone call I received from Mr. Michael Sanders on 13
June 2006.

If you need further information, please do not hesitate to call on me.

Thank you,

Jayme Carter Lebshier
(217)558-2180

: 00574

## Statement regarding contact by michael sanders

On 13 June 2006 at approximately 8:00 PM, I received a phone call from Mr. Michael Sanders. Having made two written statements to the oeig previously regarding Mike's threats(made in my presence) against victor Puckett I certainly did not expect to hear from him.

The call consisted of Mr. Sanders questioning me regarding what was going on in our building(Harris Bldg.)

In particular what was happening with Victor Puckett

IE: Is he still working there, Has he been disciplined, etc. I tried to change the direction of the conversation, but to no avail. Mike continued to take the conversation back to Victor. Mike's fixation on Victor each time I have spoken with him has gotten more intense making me increasingly concerned about what could happen. Mike indicated to me during the course of the latest call that he was not going to "let victor get away with what he did to him". I became concerned enough that I called Jim Davis - Mike and Victor's supervisor to inform him of Mike's call and its content. I also informed Mr. Steve Petrilli; Ms. Debby Cowan and Ms. Veronica Tozier of Michael's call and the content of that call.

Thank you,

Jayme Carter Lebshier

(217)558-2180

# EXHIBIT A12

# THIS EXHIBIT DOCUMENTS A PARTIAL TRANSCRIPT OF THE TESTIMONY OF JAYME LEBSHIER BEFORE THE COMMISSION ON 1/23/08

146

1    Michael of using the term Spick.

2        A.    That's correct.

3        Q.    And you said that that was racist and that

4    was a problem for you.

5                   Where in this written statement is

6    there any indication that Michael used the term

7    Spick?

8        A.    That was not necessary.  The statement was

9    regarding only the threats made towards Mr.

10   Puckett.  I felt that was incendiary and then --

11       Q.    And it's -- it's your testimony that while

12   you were outside you kept telling Michael, please

13   calm down, please calm down, or I'm going to have

14   to write you up or write a statement?

15       A.    That's correct, sir.

16       Q.    Okay.  Can you turn to the second page of

17   your --

18       A.    Yes, sir.

19       Q.    According to this, you see where you said,

20   I told Michael again to stop talking about this in

21   front of me, that if management asks me, I would

22   have to write a statement regarding the threats you

23   had made against Victor?

24       A.    That's correct.

1     Q.   Is that what you told Michael?

2     A.   That's correct.

3     Q.   You actually reported Michael's conduct to

4   Victor Puckett before you even exited the building,

5   right?

6     A.   Mr. Victor Puckett was not acting as

7   management.  That's not the management I would

8   report this to, sir.

9     Q.   He wasn't his supervisor?

10    A.   He is the immediate.  He would have no, no

11  hand in the outcome.

12    Q.   So you're representing Michael.  You're

13  acting as his union steward?

14    A.   That is correct.

15    Q.   And Michael is making statements to you?

16    A.   Yes, sir.

17    Q.   And before you give him any warning, you

18  turn around and tell Victor Puckett that Michael

19  has threatened him, right?

20    A.   Yes, sir.

21    Q.   And you told Victor to let Steve Petrilli,

22  according to your written statement?

23    A.   That's correct, sir.

24    Q.   Steve Petrilli, Deb Cowan, and Deb Stout

148

1   to know what Michael had said?

2       A.   That's correct, sir.

3       Q.   Would Steve Petrilli, Deb Cowan, and Deb

4   Stout constitute the management that you would

5   report this to?

6       A.   Well, yes, sir.

7       Q.   So before you even went outside, before

8   you allegedly told Michael calm down or I'm going

9   to have to write a statement to management if

10  asked, you'd already reported to Victor and told

11  him to go ahead and tell management?

12      A.   I had asked for an intercession, that's

13  correct.

14      Q.   Michael didn't, during the conversation on

15  September 9th, Michael didn't say he was going to

16  jump Victor Puckett, did he?

17      A.   No, sir.

18      Q.   Didn't say he was going to attack Victor

19  Puckett, did he?

20      A.   No, sir.

21      Q.   Michael didn't say he planned on

22  committing any act of physical violence, did he?

23      A.   No, sir.

24      Q.   Okay.  I just want to finish up.  You had

149

1  a few questions that you were asked regarding

2  subsequent phone conversations you had.

3          Do you recall in those, and you also

4  indicated you gave written statements to OEIG about

5  those phone conversations.

6          First, what questions -- let me strike

7  that.

8          Did OEIG ask about the September 9,

9  2005 incident, this conversation you had after the

10 predisciplinary hearing?

11 A.   I was never approached by the OEIG

12 directly.  I approached them.  I was recommended

13 that I file statements with the OEIG because I was

14 being contacted by someone I had represented who

15 was currently on leave.

16          Our Legal recommended, if I was

17 concerned, I should contact the OEIG, which I.

18 Q.   Who is your Legal?

19 A.   Our Legal Department at DHS, our Labor

20 Relations people.  I talked to --

21 Q.   Not -- so DHS's management legal counsel

22 was giving you advice?

23 A.   No, sir.  I contacted my agency as I had

24 concerns.

# EXHIBIT A13

# THIS EXHIBIT IS A COPY OF THE PLAINTIFFS BRIEF IN OPPOSITION TO ADMINISTRATIVE DECISION FILED ON 12/12/08

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT
SANGAMON COUNTY

| | | |
|---|---|---|
| ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES, | ) ) ) | |
| Plaintiff, | ) ) | |
| -vs- | ) ) | No.  08-MR-551 |
| THE ILLINOIS CIVIL SERVICE COMMISSION; CHRIS KOLKER, in his official capacity as Chairman of the Illinois Civil Service Commission; RAYMOND W. EWELL, in his official capacity as Commissioner of the Illinois Civil Service Commission; BARBARA J. PETERSON, in her official capacity as Commissioner of the Illinois Civil Service Commission; ARES G. DALIANIS, in his official capacity as Commissioner of the Illinois Civil Service Commission; BETTY BUKRABA, in her official capacity as Commissioner of the Illinois Civil Service Commission; and MICHAEL SANDERS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO ADMINISTRATIVE DECISION**

NOW COMES the Plaintiff, the ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES ("Department" or "CMS"), by and through its attorney, Lisa Madigan, Attorney General of the State of Illinois, and hereby submits this brief in opposition to the administrative decision in the above-captioned matter. In support thereof, Plaintiff states as follows:

**I. INTRODUCTION**

Defendant Michael Sanders was employed as a Data Processing Technician for CMS. Defendant Sanders was discharged for refusing to attend a September 5, 2007 independent medical exam (IME) scheduled by Plaintiff. The IME was ordered after a union steward reported to the

-1-

employer that Defendant Sanders had threatened his supervisor. Defendant Sanders appealed his discharge to the Civil Service Commission ("Commission"). Hearings on this matter were held before the Commission on January 23, 2008; February 28, 2008; and March 18, 2008. On August 8, 2008, Administrative Law Judge (ALJ) Andrew Barris, who was presiding over this matter, issued a recommended decision overturning Defendant Sanders' discharge. The ALJ found that the union steward who reported the threats was not credible. Because of this, the employee was not entitled to demand an IME. On August 21, 2008, the Commission affirmed and adopted the ALJ's recommendation, in a 3-2 decision. On September 26, 2005, CMS filed the instant complaint seeking administrative review of the Commission's decision.

The Commission's decision should be reversed. There is no dispute that Defendant Sanders failed to attend the IME, and was insubordinate in doing so. The Commission has effectively held that an employer cannot demand an IME as a means of protecting the safety of the workplace unless it is able to make an ex ante determination as to how the Commission will later determine the credibility of witnesses who report potential dangers. For these reasons, as well as those more fully set forth below, Defendant Sanders' discharge should be upheld.

## II. SUMMARY OF THE EVIDENCE

Defendant Sanders was employed at CMS in an entry-level position as a data processing technician. (R. 126-127, 709-710). In this position, Defendant Sanders was responsible for following the production processing schedules for several state agencies. (R. 707-708). Defendant Sanders described his job duties as monitoring computer programs and correcting them if the programs failed to run correctly. (R. 126-127, 164-165). The programs he monitored process a variety of information, including recording vital statistics for the state, LINK card benefits, pharmacy information used by mental health facilities, cash benefits, and personnel payroll. (R. 177-178, 726,

728).  Patients, clients, and state employees are affected by the processing work performed by this unit.  (R. 725).

In February, 2005, Victor Puckett became Defendant Sanders' supervisor.  (R. 69, 70).  At hearing, Defendant Sanders testified that his working relationship with Mr. Puckett was difficult, and that Mr. Puckett created "friction" between them.  (R. 167).

On August 26, 2005, Defendant Sanders got into a disagreement with Mr. Puckett.  (R. 167, 176).  According to Defendant Sanders, a software program he was monitoring shut down.  (R. 167, 182).  Defendant Sanders testified that this was a frequent occurrence, and there are specific instructions on how to restart a program.  (R. 165, 181, 182).  Despite this, Defendant Sanders does not believe it is necessary for him to follow the protocols for fixing software established by his supervisory staff.  (R. 177, 179, 475).  At hearing, Defendant Sanders admitted that he had been disciplined before for his programming methods.  (R. 477).  If an employee uses a different methodology or different job control language to fix a program, problems may result weeks later or the unauthorized method could effect other software programs.  (R. 727-728, 731-732).  If an employee does not follow the Department's instructions when fixing a program, it would be the responsibility of the employee's supervisor to bring the error to the employee's attention.  (R. 729-730).

On this occasion, Defendant Sanders did not follow the instructions for restarting the program.  (R. 176-177, 509, 811).  Mr. Puckett attempted to discuss this with Defendant Sanders.  (R. 167-168, 177, 182).  Defendant Sanders stated that Mr. Puckett was falsely accusing him of doing something wrong, and that Mr. Puckett's discussion with him was ignorant, unimportant, irrelevant, and unnecessary.  (R. 461, 476, 488-489, 496, 497).  Defendant Sanders testified that Mr. Puckett threatened to remove him from the building, and Defendant Sanders responded by repeatedly

-3-

telling Mr. Puckett that he would not leave. (R. 169, 452, 811). According to Defendant Sanders,

Mr. Puckett was cussing him out, yelling, and screaming. (R. 168, 185). These allegations were not

confirmed by Defendant Sanders' own witness, a co-worker who was on duty at the time of the

incident. (R. 511, 811). Defendant Sanders told Mr. Puckett that he was tired of listening to his

instructions, and that Mr. Puckett should discuss the matter with higher-level supervisors. (R. 168,

182).

After the conversation, Mr. Puckett and Respondent worked together for at least two hours

before their shifts ended. (R. 512-513). They had no other confrontations for the remainder of their

shifts. (R. 512).

Defendant Sanders testified that he was so disturbed by this incident that he dialed 911 and

asked for the State Police. (R. 169-170, 171). However, he waited until the following day, while

at work, to contact the State Police. (R. 170, 171, 184). Defendant Sanders contacted the State

Police because he believed Mr. Puckett's conversation with him the previous day was criminal, and

an attempt to incite violence. (R. 170-171, 184-185). The State Police did not arrest Mr. Puckett,

or even speak with him. (R. 185). But, according to Defendant Sanders, the State Police informed

him that, in the future, all he had to do is call them and they would arrest Mr. Puckett. (R. 172).

As a result of his conduct during the August 26, 2005 incident, Defendant Sanders faced

discipline. (R. 261). He was charged with insubordination, discourteous treatment, and conduct

unbecoming a CMS employee for failure to follow the direction and instructions of management.

(R. 197, 261-262). Mr. Sanders was not disciplined for contacting the State Police about Mr.

Puckett. (R. 262). A pre-disciplinary hearing was held on September 9, 2005. (R. 174, 469).

Defendant Sanders was represented at the hearing by Jayme Lebshier, his union representative. (R.

197). The hearing began at approximately 4:00 p.m. (R. 200). During the hearing, Defendant

-4-

Sanders became increasingly agitated and difficult with management. (R. 200). He voiced his disagreement with management, which is not customary at a pre-disciplinary hearing. (R. 201, 265, 270). Management took exception to Defendant Sanders' statements, telling him that his statements were neither relevant nor pertinent to the charges. (R. 271).

Before the hearing was over, Defendant Sanders announced that he had enough, and angrily left the hearing. (R. 204, 263, 271-272, 275-276). Ms. Lebshier then left the meeting to speak to Defendant Sanders. (R. 204, 275-276). Defendant Sanders testified that he was upset while talking to Ms. Lebshier. (R. 161). Defendant Sanders told Lebshier that he was working alone with Mr. Puckett the following day, a Saturday. (R. 205). Defendant Sanders stated that during the time they were working alone, he was going to "get" Mr. Puckett. (R. 205). Ms. Lebshier reported Defendant Sanders' threats to supervisory staff. (R. 211).

Jeff Shuck is Deputy General Counsel for the Department's Legal Department, overseeing personnel matters. (R. 279). Mr. Shuck was notified by the Department's Internal Personnel of Defendant Sanders' statements to his union steward, and that the union steward was concerned enough to report the statements. (R. 279-280). It is Mr. Shuck's understanding that Ms. Lebshier observed Defendant Sanders become visibly upset and make threats against his supervisor. (R. 280, 322-323, 328, 791-792). Internal Personnel brought this matter to Mr Shuck's attention to receive legal advice regarding this situation. (R. 280). Mr. Shuck initially learned of the situation late on a Friday afternoon, and since Defendant Sanders' threats focused on the following day, a Saturday, a decision was made to immediately place him on paid administrative leave. (R. 335, 343, 344-345, 346).

As part of his job duties, Mr. Shuck determined whether it was appropriate and safe to have Defendant Sanders return to work given the verbal threats. (R. 281). Mr. Shuck took into consideration the history between Defendant Sanders and Mr. Puckett. (R. 282). He learned that

there was a history of friction between Defendant Sanders and his supervisor, Defendant Sanders had

previously acted aggressively towards his supervisor, and that he was defiant towards Mr. Puckett.

(R. 282, 308, 309-310). Considering this background information, along with the threats Defendant

Sanders made to Ms. Lebshier, Mr. Shuck decided that it would be appropriate to send Defendant

Sanders to an IME. (R. 281-282, 308, 322-323).

Mr. Shuck also considered that Defendant Sanders made threats regarding his supervisor to

his union steward, a person who was assigned to represent his best interests. (R. 326, 336-337). Ms.

Lebshier reported that Defendant Sanders was going to get Mr. Puckett, and set him up when they

would be working alone together and there would be no witnesses. (R. 327, 328, 791-792). Ms.

Lebshier attempted to calm Respondent down, but he was not listening and his demeanor frightened

Ms. Lebshier. (R. 328, 329, 791-792). He considered Ms. Lebshier's statement in its entirely, and

noted that she took Defendant Sanders' statements to be a credible threat. (R. 324-326; 335, 791-

792). Mr. Shuck felt Defendant Sanders' behavior was escalating to the point that needed to be

addressed, and he, too, found Defendant Sanders' threats to be credible. (R. 308-309, 329). The

purpose of the IME would be to determine if Defendant Sanders was capable of performing his job

duties. (R. 281-282). Safety concerns weighed heavily upon Mr. Shuck's decision to send

Defendant Sanders to an IME. (R. 282). Mr. Shuck considered the safety of Defendant Sanders, Mr.

Puckett, their co-workers, and any members of the public that might be in the building. (R. 282-283,

285). Mr. Shuck testified that he needed the advice of a medical professional to determine if

Defendant Sanders' anger was merely momentary or presented an ongoing threat to others. (R. 283).

Since the decision was made to request an IME, CMS has scheduled a total of six IMEs for

Respondent. (R. 457-458). He has refused to attend any of them. (R. 133-134). When scheduling

an IME, an employee is compensated for his or her time and travel expenses, and the state pays the

doctor's fees. (R. 315). Defendant Sanders was initially discharged in 2005 for failing to attend an

IME, but was ultimately returned to the payroll and placed on administrative leave. (R. 141, 142).

In June, 2006 Defendant Sanders contacted Ms. Lebshier to see if any disciplinary action had been taken against Victor Puckett. (R. 455). Mr. Shuck was aware that while Respondent was on administrative leave, he made several telephone calls to Ms. Lebshier inquiring about Mr. Puckett. (R. 363-364, 796). This behavior was consistent with Mr. Shuck's decision to send Respondent to an IME. (R. 363-364).

Prior to the discharge at issue, the most recent IMEs for Defendant Sanders were scheduled for June 13, 2007 and September 5, 2007. (R. 783, 784). Defendant Sanders admits that he received letters from the Department advising him of the date and time of the IMEs scheduled for June and September, 2007. (R. 128-129, 783, 784). These letters warned him that his failure to attend the IMEs would be grounds for discipline, up to and including discharge. (R. 128-129, 783, 784).

Since 2006, Defendant Sanders has been sending letters to Dr. Terry Killian, the individual selected to perform the IME. (R. 90-94). In these letters, Defendant Sanders makes various threats against Dr. Killian while demanding that the IME appointments be cancelled. (R. 90-94). In his Recommended Decision, the Administrative Law Judge characterized Defendant Sanders' letters as "irate". (R. 1002).

Defendant Sanders received a 30 day suspension for failing to attend the June 13, 2007 IME. (R. 128, 129, 133, 618, 619). Defendant Sanders was discharged for failing to attend the September 5, 2007 IME. (R. 127, 133, 620). Defendant Sanders' failure to attend violated the Department's Policy Manual on Ethical Standards, and the Department's Rules of Conduct. (R. 617). Because he was on paid administrative leave when CMS requested he attend the IME, Defendant Sanders' conduct violated Departmental rules providing that employees shall perform his or her duties during working hours, as well as obey government laws, ordinances, rules, and regulations. (R. 437, 440-444, 620-621). Defendant Sanders' conduct also violated Departmental rules prohibiting

-7-

insubordination, failure to perform a duty, abuse of state working time, and conduct unbecoming a

CMS employee. (R. 437, 621).

Defendant Sanders appealed his discharge to the Commission. (R. 1). In his Recommended

Decision, the ALJ determined that Ms. Lebshier was not a credible witness. (R. 1000). On August

21, 2008, the Commission found the Department was not reasonable in requiring Defendant Sanders

to attend an IME, and overturned the discharge in a 3-2 decision. (R. 1059-1060).

### III. STANDARD OF REVIEW

The scope of review in an administrative review proceeding is set forth by statute. Section

3-110 of the Illinois Code of Civil Procedure provides, in pertinent part:

> The hearing and determination shall extend to all questions of law and of facts
> presented by the entire record before the court. No new or additional evidence in
> support of or in opposition to any finding, order, determination, or decision of the
> administrative agency shall be heard by the court. The findings and conclusions of
> the administrative agency on questions of fact shall be held to be *prima facie* true and
> correct.

735 ILCS 5/3-110.

The Illinois Supreme Court has identified three questions that a court may encounter on

administrative review. *See City of Belvidere v. Illinois State Labor Relations Board,* 181 Ill.2d 191

(1998), *Cinkus v. Village of Stickney Municipal Officers Electoral Board,* 228 Ill.2d 200 (2008).

The applicable standard of review is dependant upon which question is presented for review. The

standard of review is based upon whether the issue presents a question of fact, question of law, or

mixed question of law and fact. *Cinkus,* 228 Ill.2d at 210, *quoting American Federation of State,*

*County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board,* 216 Ill.2d 569,

577 (2005).

For questions of fact, it is well-settled that a court cannot disturb the factual findings and

conclusions of an administrative agency unless they are contrary to the manifest weight of the

evidence. *Robbins v. Board of Trustees of the Carbondale Police Pension Fund,* 177 Ill.2d 533, 538

-8-

(1997), *S.W. v. Department of Children and Family Services,* 276 Ill. App. 3d 672, 681 (1995).

While questions of fact are reviewed under a manifest weight of the evidence standard, questions

of law that arise in an administrative review are subject to *de novo* review.   *City of Belvidere,* 181

Ill.2d at 205.  If, however, the issue presented cannot be accurately characterized as either a pure

question of fact or a pure question of law, it will be treated as a mixed question, subject to an

intermediate, clearly erroneous standard of review.  *Carpetland U.S.A., Inc. v. Illinois Department

of Employment Security,* 102 Ill.2nd 251, 369 (2002).

 A mixed question of law and fact is one in which the historical facts are admitted or

established and the rule of law undisputed. Consequently, the only issue is whether the facts satisfy

the settled statutory standard, or whether the rule of law as applied to the established facts is or is

not violated. *Cinkus,* 228 Ill.2d at 211; *AFM Messenger Service, Inc. v. Department of Employment

Security,* 198 Ill.2d 380, 391 (2001), *quoting Pullman-Standard v. Swint,* 456 U.S. 273, 289 n. 19

(1982).

 The issue in this matter presents a mixed question of law and fact.  There is no dispute that

Defendant Sanders failed to attend the IMEs scheduled by Plaintiff, which ultimately led to his

discharge.  The only issue for this Court to determine is whether discharge is an appropriate remedy

for Defendant Sanders' conduct.  Applying the standard set forth by the Illinois Supreme Court in

*Cinkus* and *AFM Messenger Service,* the issue in this case is correctly characterized as a mixed

question of law and fact subject to the clearly erroneous standard.

 The clearly erroneous standard of review is "between a manifest weight of the evidence

standard and a *de novo* standard so as to provide some deference to the [agency's] experience and

expertise." *City of Belvidere,* 181 Ill.2d at 205.  Although appellate courts must afford deference to

the Department's experience and expertise, courts will reverse the Department's ruling "when

although there is evidence to support it, [we are] * * * left with the definite and firm conviction that

a mistake has been committed." *JM Aviation, Inc. v. Department of Revenue*, 341 Ill.App.3d 1, 9,

quoting *AFM Messenger Service*, 198 Ill.2d at 393, *and United States v. United States Gypsum Co.*,

333 U.S. 364, 395 (1948).

# IV. ISSUES AND ARGUMENTS

## The decision by the Commission to overturn Defendant Sanders' discharge is clearly erroneous.

The facts contained within Defendant Sanders' charges for discharge are not in dispute. (R.

437). Defendant Sanders was discharged for failing to attend an IME. He freely admits that he did

not attend the IME in question, or any of the IMEs scheduled by CMS. Defendant Sanders was

discharged because his behavior violated rules prohibiting insubordination, abuse of state working

time, failure to obey rules, and failure to perform his duties.

The Rules of the Civil Service Commission define a cause for discharge as "some substantial

shortcoming which renders the employee's continuance in his position in some way detrimental to

the discipline and efficiency of the service and which the law and sound public opinion recognize

as good cause for the employee no longer holding the position." Ill. Admin. Code tit. 80, §1.170.

The Department has established cause to discharge Defendant Sanders. Through Defendant Sanders'

own admissions, the Department has proven the charges. However, the Commission found that the

charges were not proven because CMS was not reasonable in requiring Defendant Sanders to attend

an IME. The Commission acted outside the scope of their authority in making their decision.

Further, the Commission misapplied the reasonableness standard previously set forth by the

Commission in requiring the IME. Nonetheless, should this Court determine that the reasonableness

standard was correctly applied, the Department satisfied this standard. Finally, the Department has

the authority and a duty to require the IME. The Commission's decision is clearly erroneous.

A.   **The Commission acted outside the scope of their authority in its ruling.**

There is no dispute that Defendant Sanders was sent to an IME out of concern for the safety

of the workplace. This concern included the safety of Defendant Sanders, his co-workers, and the

public who would visit Defendant Sanders' workplace. (R. 282-283, 285). The Department does

not have any rules which would prohibit it from requiring an IME in this situation. (R. 312). Also,

the CMS rules are not an exhaustive listing as to what CMS is allowed to do. (R. 312). In adopting

the ALJ's Recommended Decision, the Commission ruled that CMS failed to take certain affirmative

measures, the absence of which caused the discharge to be overturned. (R. 1003). Specifically, the

Commission found that CMS should have conducted an investigation into Defendant Sanders'

threatening statements about his supervisor, should have conducted an interview of Michael Sanders,

and should have considered "other relevant facts or statements" before scheduling an IME. (R.

1003). The Department asserts that requiring Defendant Sanders to attend an IME falls within their

discretionary authority, which the Commission does not have jurisdiction to dictate.

The jurisdiction of the Civil Service Commission is limited, and it can only assert the

authority provided to it by statute. *Brown v. Department of Corrections*, 199 Ill. App. 3d 648, 651

(1990). The Personnel Code ("Code") outlines the powers of the Commission, which include

hearing and determining written charges filed seeking the discharge of an employee. 20 ILCS

415/20. However, the powers of the Commission do not extend to placing limitations upon the

ability of the employing agencies to take actions believed to be necessary for protecting the safety

of the workplace, by demanding IMEs of employees or taking other actions deemed necessary. In

this case, the Commission did not address whether or not Defendant Sanders' conduct violated the

rules found in the charges for discharge. Instead, the Commission outlined what procedures the

Department must follow in requiring an employee to attend an IME. As such, the ruling is improper.

-11-

Although the authority of administrative agencies is limited, such authority can be expanded to include duties "found, by fair implication and intendment, to be incident to and included in the authority expressly conferred for the purpose of carrying out and accomplishing the objective for which the agency was created." *Illinois Department of Public Aid v. Brazziel*, 61 Ill. App. 3d 168, 172 (1978). In *Brazziel*, the validity of the Commission's rule allowing a party the right to interview State employees on State property during working hours was challenged. *Id.* at 169. The Court found that although the Commission did not have the express authority within the Code to promulgate such a rule, the Commission's authority to do so could be fairly implied from the sections in the Code which grant the Commission the authority to hold discharge hearings. *Id.* at 172. In addition, the Court found that this authority is consistent with the Code's requirement that State employees must furnish any records or information to the Commission upon request. *Id.* The Court also found that the rule allowing interviews of State employees "aids the Commission in accomplishing the objectives for which it was created, which is the protection of the public and in carrying out that purpose the protection of civil service employees." *Id.*

Unlike the situation in *Brazziel* where the Court was willing to imply the authority to take action to ensure a fair hearing, there is no basis for implication of authority to place limitation upon the power of another agency to adopt measures necessary for the safety of the workplace. There is no dispute that CMS was acting out of fears for public safety by requiring Defendant Sanders to attend an IME. Requiring state agencies to satisfy several requirements before they can take action to protect the public and its own employees is detrimental to the effective functioning of state employers, as well as public safety. The Commission does not have the authority to determine the circumstances in which an agency is authorized to order an IME. Therefore, the Commission's decision is clearly erroneous.

-12-

B.   **CMS acted in a reasonable manner when it ordered Defendant Sanders to attend an IME based upon the information it received.**

The Commission has previously addressed the issue of discipline for failure to attend an involuntary IME in *Department of Human Services v. Carolyn Bottoms*, Civil Service Commission Case No. DA-47-00. (R. 1027-1056). Carolyn Bottoms was employed as an office assistant with the Department of Human Services. (R. 1028). Carolyn Bottoms engaged in behavior which called into question her ability to perform her duties and she was ordered to attend a fitness for duty evaluation. Among other things, Ms. Bottoms acted hostile, agitated, threatening, refused to meet with her supervisor, contacted the police complaining about her supervisor, and, ultimately, hit an employee in the arm with her office door. (R. 1033, 1034, 1037, 1041, 1053, 1054). The Department determined that Ms. Bottoms posed a safety risk at the workplace. (R. 1038). Ms. Bottoms was ordered to attend a fitness for duty examination by Dr. Brunner, a dual-licensed physician and psychiatrist, who was the administrator of the facility where Ms. Bottoms worked. (R. 1035, 1036). Dr. Brunner did not interview Ms. Bottoms prior to ordering her to attend an IME. (R. 1035, 1047). Ms. Bottoms refused to attend three separate IMEs because she "was concerned about the confidentiality of the results of the exam...". (R. 1029-1030). Ms. Bottoms was discharged for her insubordinate behavior in refusing to attend the IMEs. (R. 1028).

In his Recommended Decision, the Administrative Law Judge determined that the operative question in the *Bottoms* case was whether Dr. Brunner acted in a reasonable manner in ordering Ms. Bottoms to attend an IME, based upon the information provided to him about Ms. Bottoms' behavior. (R. 1054). Throughout the hearing, evidence was presented regarding Ms. Bottoms' poor conduct on numerous occasions. (R. 1030, 1031, 1032, 1033, 1034, 1036, 1037, 1038, 1039, 1040, 1041, 1042, 1045,1046, 1053, 1054). The ALJ determined that the Department did not bear the burden of proving that all the incidents were true, only that Dr. Brunner acted reasonably requiring

-13-

Ms. Bottoms to attend an IME based upon the information available to him. (R. 1054). Ms. Bottoms' discharge was affirmed by the full Commission.

1.    **The Department satisfies the *Bottoms* standard.**

According to the standard set forth in *Bottoms*, the appropriate focus to determine whether CMS acted reasonably in requiring Defendant Sanders to attend an IME should be upon what information was provided to CMS, and how they responded to this information. CMS Deputy General Counsel Jeff Shuck made the decision to send Defendant Sanders to an IME. (R. 279, 281-282, 308, 322-323). Prior to making that decision, Mr. Shuck received information that Defendant Sanders' union steward observed Defendant Sanders become visibly upset and make threats against his supervisor. (R. 280, 322-323, 328, 791-792). Mr. Shuck received a report that Defendant Sanders was going to get Mr. Puckett, and set him up when they would be working alone together and there would be no witnesses. (R. 327, 328, 791-792). The report indicated that Defendant Sanders could not calm down during this threatening behavior, and his demeanor was frightening to his union steward. (R. 328, 329, 791-792).

Mr. Shuck also had information that Defendant Sanders did not get along with his supervisor, Mr. Puckett. (R. 282). Mr. Shuck knew that Defendant Sanders had previously acted aggressively towards Mr. Puckett, and that he was defiant towards Mr. Puckett. (R. 282, 308, 309-310). Mr. Shuck received specific information about a threat made by Defendant Sanders, against the very person that Defendant Sanders did not get along with. This information provided to Mr. Shuck provides a basis for CMS to require Defendant Sanders to attend an IME. This request is certainly reasonable given the evidence presented to CMS. They were faced with a problem employee with a history of insubordination and issues taking supervisory direction who was making threats against his supervisor. No evidence suggests that Mr. Shuck had an unreasonable basis for his decision,

-14-

such as bias against Defendant Sanders or a desire to harass him. Instead, the evidence showed that Mr. Shuck acted solely out of concern for the safety of the workplace.

2.    **The ALJ placed additional requirements upon CMS, over and above the requirements found in *Bottoms*.**

In his Recommended Decision, which was adopted by the Commission, the ALJ found that CMS was not reasonable in requiring Defendant Sanders to attend an IME because CMS did not engage in an investigation of the matter, did not interview Michael Sanders, and did not consider "other r elevant facts or statements" before scheduling an IME.  (R. 1003).  However, the Commission in *Bottoms* did not place such requirements upon the State when determining whether an IME request is reasonable.  For example, the decision to require Ms. Bottoms to attend an IME was made by Dr. Brunner, who did not personally interview Ms. Bottoms prior to making his decision.  (R. 1035, 1036, 1047).  His decision was solely based upon an investigatory report complied by someone else.  (R. 1036).

It appears what the ALJ is recommending in this case is to heighten this reasonableness standard established in *Bottoms*.  In the matter at hand, the ALJ made a finding that the Department's decision to send Respondent to an IME was not reasonable due to the ALJ's belief that Defendant Sanders did not threaten physical harm when he said he was going to "get" Mr. Puckett.  (R. 1000).  This contradicts *Bottoms*, where the Commission also noted that the Department does not have the burden of proving that all of the reported incidents of inappropriate conduct levied against Ms. Bottoms were true when ordering her to attend an IME.  (R. 1054).  Essentially, the ALJ has made a secondary, post-event determination, disagreeing with CMS' interpretation of Defendant Sanders' statements.  The ALJ'S finding places a burden upon the agency to prove that the information it relied upon was true, a standard that *Bottoms* clearly rejects.  Notably, the *Bottoms* standard is consistent with judicial decisions holding that the courts will not second guess the business decisions

-15-

of employers, even if those decisions are wrong or bad when the employer acted in good faith or an honest belief at the time the employer made such decisions. *Green v. National Steel Corp.*, 197 F.3d 894, 899 (7th Cir. 1999); *Kariotis v. Navistar Int'l Transportation Corp.*, 131 F.3d 672, 677 (7th Cir. 1997).

Contrary to ALJ Barris' finding, the courts have specifically found an employer is under no obligation to investigate as long as the employer's belief was honest at the time it made the employment decision. As held in *Kariotis*, although the company may well have been mistaken in its beliefs about its employee and perhaps should have conducted a more thorough investigation, there was insufficient evidence from which to conclude that the employer did not honestly believe that the employee had committed fraud. *Id.*

The facts in the case at bar indicate the Department in good faith relied on the information it had available at the time of Defendant Sanders' threatening conduct. Notably, the ALJ did not find that the Department, at any time, acted in bad faith or did not legitimately believe that a threat had been issued by Defendant Sanders. Instead, the ALJ makes a subjective finding that, in his opinion, the Department should have conducted a more thorough investigation, and another subjective finding that the verbal threats uttered by Defendant Sanders were not threats of physical violence directed towards his supervisor. This is a judgment that should have been made by a qualified psychologist or psychiatrist through an IME.

Unlike *Bottoms*, the decision to send Defendant Sanders to an IME was not made by a doctor. CMS does not have any trained psychiatrists on its staff and they cannot substitute their non-professional judgment for that of a specialist in the field. Thus, in furtherance of its investigation as to Defendant Sanders' fitness for duty, the Department reasonably elected to have an independent medical doctor assess the situation and determine whether he was fit for duty. When an agency receives information concerning a threat made by one of its employees, they are put on notice of the

-16-

problematic conduct for liability purposes. There is no amount of investigatory thoroughness that would satisfy CMS' requirement to diligently protect its employees absent a finding that the employee is fit for duty.

The ALJ's recommendation places every agency of the State of Illinois in a situation where they are precluded from relying on the information before them, and would place an additional burden upon the agencies to conduct an in-depth investigation prior to sending an employee to an IME. Instead, untrained Departmental staff would be required to investigate an employee's mental state prior to sending them to an IME. It is problematic that the ALJ's decision does not establish any parameters as to what is considered a reasonable investigation or what information the Department would need before it to make the Department's decision reasonable to send Respondent to an IME.

Further, it is important to note the ALJ recognizes that the decision to send an employee to an IME is not an adverse employment decision in which the Department is taking a disciplinary action. (R. 1003). Instead, the decision to send an employee to an IME is merely a part of the Department's investigation in assessing an employee's fitness for duty. The simplest and most neutral way to assess whether or not Defendant Sanders was a threat to his supervisor or anyone else at CMS was to have him submit to an IME. This bypasses the obvious conflicting statements an investigation would inevitably expose. If anything, an IME would be the best possible scenario for an employee because it would allow a completely neutral arbiter to assess his mental condition and his fitness for duty. The investigation of the threatening statements would not resolve whether Defendant Sanders was fit for duty, and an IME would be the most expedient and reliable means to do so. CMS acted in good faith by reasonably relying upon the information available to it.

Finally, it is important to note that ALJ Barris notes in his recommendation that an employer has the authority to order an employee to attend an IME and an employee cannot refuse to attend an

IME. However, the ALJ's decision, that the employer must first conduct some sort of investigation, rather than rely in good faith on the information before the Department at the time, limits the employer's authority to send an employee to an IME. The Commission effectively ruled that Defendant Sanders' insubordination was justified by an after the fact determination by the Commission that the witness who reported the misconduct was not credible. The Commission has created an insurmountable obstacle to employer demands for an IME. The Commission has held that an employer's demand for an IME is not reasonable unless the employer correctly guesses how the Commission will later rule on the credibility of witnesses. Defendant Sanders' reported refusals to comply with his employer's demands for an IME were equally insubordinate, whether or not the Commission later determined that the complaining witness was credible. The undisputed facts before the Commission were that facially valid orders were given to Defendant Sanders and he refused to comply with those orders. The facts, thus, establish that Defendant Sanders was guilty of insubordination.

**C.    CMS has a duty to require an IME to protect its employees from a known danger.**

Even if CMS is found to have acted in an unreasonable manner by requiring Defendant Sanders to attend an IME, CMS bears a responsibility to protect its employees from a known threat. Illinois courts recognize a cause of action for negligent hiring and negligent retention against employers who knew or should have known that an employee was unfit for the job which created a foreseeable danger to others. *Luss v. Village of Forest Park*, 377 Ill. App. 3d 318, 335 (2007) *citing MacDonald v. Hinton*, 361 Ill. App. 3d 378, 387 (2005); *Easley v. Appollo Detective Agency, Inc.*, 69 Ill. App. 3d 920. 931 (1979).

Mr. Shuck testified that he recognized CMS' legal duty to protect its employees from the coworker making the threats. (R. 284). Mr. Shuck explained that it would be a very dangerous situation if an employer could be held liable for the harm caused by an employee when the employer

-18-

received notice that the employee might pose a danger to others, but the employer was powerless to address the danger. (R. 287-288). Such a situation would open the employer to significant liability. (R. 313). Because Mr. Shuck found Defendant Sanders' threats to be very specific, and due to the history of friction between Defendant Sanders and Mr. Puckett, he felt an IME was necessary to ensure that Defendant Sanders did not pose any danger to himself or anyone else. (R. 284-285). Mr. Shuck believed sending Respondent to an IME would limit possible liability for the state. (R. 313-314).

CMS was aware that Defendant Sanders had a history of insubordination towards his supervisory staff, and received a report that he had threatened to harm his immediate supervisor. This conduct could result in a cause of action against CMS, if Defendant Sanders should act upon his threats. The decision to send Defendant Sanders to an IME recognized this potential liability. Without a determination as to Defendant Sanders' fitness for duty, the concern remains that CMS will be subject to additional litigation.

**D.     CMS has the authority to require Defendant Sanders to attend an IME.**

During his hearing before the Commission, Defendant Sanders argued that CMS does not have a rule which would require Defendant Sanders to attend an IME. It should be noted, however, that the Department does not have any rules which would prohibit it from requiring an IME in this situation. (R. 312). Also, the CMS rules are not an exhaustive listing as to what CMS is allowed to do. (R. 312). Along with the reasonableness standard and the liability issues discussed above, the AFSCME contract supports CMS' decision to require an IME for Defendant Sanders.

Defendant Sanders is a union employee, a member of AFSCME. (R. 194). The contract between AFSCME and the State of Illinois recognizes that CMS has the ability to send its employees for IMEs, providing as follows:

-19-

> When the Employer has requested a fitness for duty evaluation which determines the employee is unfit for duty and the employee's physician certifies the employee is fit for duty, the Employer may rely upon the decision of the impartial physician as to the employee's fitness for duty. Such examination shall be paid for by the Employer. (R. 794).

Through this provision, the AFSCME contract acknowledges that the State of Illinois has the authority to require its employees to attend fitness for duty evaluations. (R. 286, 287, 793). As a member of AFSCME, Defendant Sanders is bound by the terms of the union's contract, which formalizes by reference the State's ability to require IMEs.

**E.      The OEIG investigation did not resolve Defendant Sanders' fitness for duty.**

The record contains evidence that Defendant Sanders' threats toward Mr. Puckett were referred to the Office of the Executive Inspector General ("OEIG") for investigation, and that the allegations were determined to be unfounded. (R. 281, 292, 346, 347). The ALJ bases his decision, in part, upon the OEIG's finding. (R. 1001-1002). However, the record contains no evidence regarding the methodology used by the OEIG during their investigation. There is no evidence identifying all who were interviewed by the OEIG during this investigation, what was stated during these interviews. It is also unknown whether the OEIG considered written statements or other documents. No evidence was introduced explaining what the OEIG relied upon in making their determination.

Further, the findings of the OEIG investigation do not relieve CMS of its duty to ensure a safe work environment. In this case, an IME was still necessary, because the IME and OEIG investigation addressed separate issues. (R. 292-293, 349-350, 537-538). The OEIG investigation determined whether Defendant Sanders violated any rules for which discipline would be appropriate. (R. 293, 349-350). By contrast, an IME is used to get a medical opinion whether an employee is fit for duty going forward in time. (R. 341). If Respondent attended a scheduled IME and the doctor

found him fit for duty, Respondent would have been put back to work. (R. 291-292, 315). If the doctor found Respondent unfit, that would not necessarily lead to Respondent's discharge. (R. 316).

These are independent issues: regardless of whether or not the OEIG investigation came back as founded, the OEIG would not address whether Defendant Sanders was fit to perform his job duties. (R. 293, 351). The decision to send Defendant Sanders to an IME was made prior to receiving the OEIG's results. (R. 351-352). Defendant Sanders was not disciplined for his threats directed at Mr. Puckett. (R. 351).

F.    **Defendant Sanders' insubordinate behavior makes discharge an appropriate remedy.**

Despite the fact that the crux of the discipline imposed upon Defendant Sanders related to his insubordination, the ALJ's recommended decision is silent as to the insubordination factor of Defendant Sanders in refusing to attend an IME. Irrespective of the ALJ's silence as to the issue, it is clear from the record that Defendant Sanders was insubordinate, and that his admitted behavior violates Departmental rules.

The Supreme Court of Illinois recognizes that even an employee's good-faith disagreement with the employer's opinion or judgment underlying a reasonable order does not justify the employee's refusal to follow the order. *Launius v. Board of Fire and Police Commissioners of the City of Des Plaines*, 151 Ill.2d 419, 436 (1992). Further, in an unreported decision, federal courts have opined that the refusal to follow an order is conduct which threatens office discipline and harmony in the day-to-day close working relationships with immediate superiors necessary for efficient office functioning. *Folstad v. Harmon*, 1987 WL 6581 (N.D. Ill, 1987).

The ALJ explicitly found that employees may not refuse to attend IMEs. (R. 1003). Defendant Sanders was ordered to attend numerous IMEs and he adamantly refused to attend any one of them. Defendant Sanders was progressively disciplined for his refusal to attend the scheduled IMEs until he was finally discharged for his insubordinate behavior, as it was clear that he had no

-21-

inclination to correct said insubordinate behavior. (R. 617, 620-622).   Defendant Sanders chose to

completely disregard this order because he disagreed with it, even in the face of repeated

correspondence between CMS and Defendant Sanders' attorney, where CMS specifically outlined

why they felt an IME was necessary and what authority they were relying upon in ordering the IME.

(R. 145, 146-147, 148, 158-160, 809-810)

Defendant Sanders offers a variety of reasons why he did not attend the September 5, 2007

IME. First, he felt the appointment would violate his medical privacy. (R. 143). Second, Defendant

Sanders testified that he did not attend the IME because Dr. Killian had a conflict of interest, but he

does not explain this alleged conflict of interest. (R. 143).   Third, Defendant Sanders testified that

since an OEIG investigation into his conduct was unfounded, he feels he did not need to attend an

IME. (R. 151-152, 153, 808).   However, Defendant Sanders admits that he does not know the

rationale for OEIG's finding. (R. 155). Defendant Sanders also admitted that he reviewed a letter

from Mr. Shuck explaining that the OEIG investigation did not address whether Defendant Sanders

was fit for duty, which was the reason for scheduling an IME. (R. 158-160, 809-810).   Fourth,

Defendant Sanders also testified that the "entire issue" as to why he did not attend the IME was

because no one from CMS explained why the appointments were necessary. (R. 144-145).   But

Defendant Sanders testified that CMS has provided multiple explanations. (R. 138).   He also

admitted that he did learn why CMS scheduled the IME through correspondence between his

attorney and CMS before the IME at issue was scheduled. (R. 145, 146-147, 148, 158-159).

Despite his numerous and ever-changing reasons for why he did not feel he should have to

attend an IME, Defendant Sanders does not possess the authority to simply disregard a direct order

from his superiors because he disagrees with it.   Defendant Sanders' insubordinate behavior is

glaring and inescapable.   Irrespective of whether or not the ALJ agrees with the reasonableness of

CMS' order for Defendant Sanders to attend an IME, it remains clear that Defendant Sanders chose

to disregard a lawful order given to him by his superiors. Defendant Sanders has established a blatant disregard for supervisory instruction, which is key to the performance of his duties at the Department.

Along with insubordination, the ALJ is silent on Defendant Sanders' other conduct found in the charges for discharge-misuse of state working time and conduct unbecoming a CMS employee. In all, Defendant Sanders' conduct demonstrates a lack of good judgment, which constitutes a substantial shortcoming in his job performance. Thus, the Department established good cause to discharge Defendant Sanders.

## V. CONCLUSION

The evidence presented establishes that discharge is the only acceptable remedy to Defendant Sanders' behavior and actions. As outlined above, the Commission acted outside the scope of its authority in making its decision. CMS was reasonable in requiring Defendant Sanders to attend an IME. Further, CMS has a duty and obligation to protect its employees from harm, reduce its exposure to liability, and ensure that its employees are fit to perform their duties. Defendant Sanders' erratic and disruptive behavior, as well as his threats toward his supervisor, place a burden upon CMS to ensure that he is fit for duty. CMS has repeatedly attempted to obtain assurances that Defendant Sanders is fit for duty by ordering him to submit to an IME. Defendant Sanders has adamantly and defiantly refused to submit to any of his many scheduled IMEs, thereby prohibiting CMS from obtaining obligatory assurances as to his fitness for duty. CMS cannot, in good faith, return Defendant Sanders back to his position without the assurance that he is fit for duty. Defendant Sanders refuses to allow CMS to obtain this assurance. This refusal creates a substantial shortcoming which renders the employees continuance in his position detrimental to the discipline and efficiency of his service to CMS, and therefore, the Commission's decision returning Defendant Sanders to the workplace is clearly erroneous.

-23-

WHEREFORE, for the reasons stated above, Plaintiff, the Illinois Department of Central Management Services, respectfully requests the Court enter an Order overturning the administrative decision in this matter.

Respectfully submitted,

ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES,

Defendant,

LISA MADIGAN, Attorney General, State of Illinois,

Attorney for Defendant,

Amy Petry Romano, #6270427
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-9056

By: _Amy Petry Romano_
AMY PETRY ROMANO
Assistant Attorney General

## CERTIFICATE OF SERVICE

Amy Petry Romano, Assistant Attorney General, herein certifies that she has served copies of the

foregoing Plaintiff's Brief in Opposition of the Administrative Decision, upon:

Mr. Jay Rammelkamp
Assistant Attorney General        (by hand-delivery)
500 South Second Street
Springfield, Illinois 62706

      and to:

Mr. Bradley Wilson
Attorney at Law                (by mail, as set forth below)
1231 South Eighth Street
Springfield, IL   62703

by mailing a true copy thereof to the address listed above in an envelope duly addressed, bearing proper first

class postage, and deposited in the United States mail at Springfield, Illinois on December 12, 2008.

Amy Petry Romano
Assistant Attorney General

Amy Petry Romano, #6270427
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
Ph. (217) 782-9056
Fax (217) 782-8767

# EXHIBIT A14

# THIS EXHIBIT IS A COPY OF THE IDES BOARD OF REVIEW DECISION REGARDING SANDERS AND CONFIRMS THAT WORKPLACE VIOLENCE WAS CAUSE OF IME'S

ABR-08-1078                                                    Page 4

## BOARD OF REVIEW

*J. Hunt Bonan*

_____
**J. HUNT BONAN, Chairman**

*Stanley L. Drassler Jr.*                    *William J. Nolan*

_____                _____
**STANLEY L. DRASSLER, JR.**                **WILLIAM J. NOLAN**
**Member**                                   **Member**

*Constantine Zografopoulos*

_____
**CONSTANTINE M. ZOGRAFOPOULOS**
**Member**


Dated and Mailed on   APR 2 1 2008   at Chicago, Illinois

### NOTICE OF RIGHTS FOR FURTHER REVIEW BY THE COURTS

## (ESTE ES UN AVISO IMPORTANTE RESPECTO A SUS DERECHOS A REPASAR POR LOS CORTES. SI NO LO ENTIENDE, BUSQUE UN INTERPRETE.)

If you are aggrieved by this decision and want to appeal, you must file a complaint for administrative review and have summons issued in circuit court **within 35 days** from the above mailing date.

You may only file your complaint in the circuit court of the county in which you reside or in which your principal place of business is located. If you neither reside nor have a place of business within Illinois, then you must file your complaint in the Circuit Court of Cook County.

Legal references:      o      Illinois Unemployment Insurance Act, 820 Illinois Compiled Statutes 405/1100

                       o      Administrative Review Law, 735 Illinois Compiled Statutes 5/3-101 et seq.

# EXHIBIT A15

# THIS EXHIBIT IS A COPY OF THE RESULTS OF THE OEIG INVESTIGATION INTO WORKPLACE VIOLENCE

*vcc 4*
*1-8-07*
*#0*



# OFFICE OF EXECUTIVE INSPECTOR GENERAL
## FOR THE AGENCIES OF THE ILLINOIS GOVERNOR

**ROD R. BLAGOJEVICH**
GOVERNOR

32 WEST RANDOLPH STREET, SUITE 1900
CHICAGO, ILLINOIS 60601

**JAMES A. WRIGHT**
EXECUTIVE INSPECTOR GENERAL

## CONFIDENTIAL

January 4, 2007

Paul Campbell, Director
Department of Central Management Services
James R. Thompson Center
100 W. Randolph, Suite 4-400
Chicago, Illinois 60601-3220

Re:   OEIG Case No. 05-00896

Dear Director Campbell:

The Office of Executive Inspector General (OEIG) recently investigated a complaint alleging misconduct by CMS employee, Michael Sanders (Sanders). The OEIG has concluded its investigation in this matter and determined that the allegation that Sanders violated proscriptions against violence in the workplace by making threats against his supervisor is UNFOUNDED *i.e.*, there was insufficient evidence to establish that a violation occurred. This concludes the OEIG's review of this matter.

Thank you for your cooperation. If you have any questions regarding this matter or otherwise require further assistance, please do not hesitate to contact Deputy Inspector General Kathryn Zeledon Nelson at 312-814-5600.

Very truly yours,

James A. Wright
Executive Inspector General

# EXHIBIT A16

# THIS EXHIBIT IS A COPY OF THE COMMISSION ORDERS AND THE ORDER OF THE SANGAMON COUNTY COURT

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT
SANGAMON COUNTY

| | |
|---|---|
| ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES,  )<br><br>Plaintiff,  )<br><br>-vs-  )<br><br>THE ILLINOIS CIVIL SERVICE COMMISSION; CHRIS KOLKER, in his official capacity as Chairman of the Illinois Civil Service Commission; RAYMOND W. EWELL, in his official capacity as Commissioner of the Illinois Civil Service Commission; BARBARA J. PETERSON, in her official capacity as Commissioner of the Illinois Civil Service Commission; ARES G. DALIANIS, in his official capacity as Commissioner of the Illinois Civil Service Commission; BETTY BUKRABA, in her official capacity as Commissioner of the Illinois Civil Service Commission; and MICHAEL SANDERS,  )<br><br>Defendants.  ) | No. 08-MR-551 |

**FILED**

FEB 2 4 2009   CIV-4

*[signature]*   Clerk of the
Circuit Court

## ORDER

THIS CAUSE comes before the Court on Plaintiff's Complaint for Administrative Review.

Plaintiff, the ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES, represented

by Illinois Attorney General Lisa Madigan, through Assistant Attorney General Amy Petry Romano;

and Defendants, the ILLINOIS CIVIL SERVICE COMMISSION and the individually-named

members of the ILLINOIS CIVIL SERVICE COMMISSION, represented by Illinois Attorney

General Lisa Madigan, through Assistant Attorney General Jacob Smith; and Defendant, MICHAEL

SANDERS, represented by counsel Bradley B. Wilson, and the Court, being fully advised in the

premises, and having considered the following:

-1-

A.  Arguments of counsel,

B.  All briefs and arguments contained therein submitted by the parties,

C.  Applicable law, and

D.  The administrative Record

## THE COURT FINDS AS FOLLOWS:

1.  The Civil Service Commission's finding that the written charges for discharge were not proven is not clearly erroneous.

## WHEREFORE, IT IS ORDERED THAT:

A.  The administrative decision of the State of Illinois Civil Service Commission is <u>AFFIRMED</u>.


_____
Date Entered        1.27.09

_____
Judge Patrick Kelley

BEFORE THE CIVIL SERVICE COMMISSION, STATE OF ILLINOIS

| | |
|---|---|
| ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES, | ) ) ) |
| Petitioner, | ) ) |
| vs. | )    CASE NO. DA-11-08 |
| MICHAEL A. SANDERS, | ) ) ) |
| Respondent. | ) |

## FINDING AND DECISION OF THE COMMISSION

THE UNDERSIGNED, HAVING READ THE RECOMMENDED DECISION OF THE ADMINISTRATIVE LAW JUDGE DATED AUGUST 8, 2008, HEREBY AFFIRM AND ADOPT SAID DECISION AND CERTIFY IT TO THE DIRECTOR OF THE ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES FOR ENFORCEMENT.

**FINDING:** IT IS HEREBY DETERMINED THAT THE WRITTEN CHARGES FOR DISCHARGE APPROVED BY THE DIRECTOR OF THE ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES HAVE NOT BEEN PROVEN BECAUSE, IN LIGHT OF THE CIRCUMSTANCES OF THIS CASE, CENTRAL MANAGEMENT SERVICES WAS NOT REASONABLE IN ORDERING MICHAEL SANDERS TO ATTEND THE INDEPENDENT MEDICAL EXAMINATION (IME) SCHEDULED ON SEPTEMBER 5, 2007. IN THE ABSENCE OF ANY DEPARTMENT OR PERSONNEL RULE DETAILING THE AUTHORITY OF CMS TO ORDER AN EMPLOYEE TO ATTEND AN IME WITHOUT CONSENT, CMS WAS NOT REASONABLE IN ORDERING MICHAEL SANDERS TO ATTEND AN IME BECAUSE THERE IS NO CREDIBLE EVIDENCE THAT SANDERS EVER PHYSICALLY THREATENED ANYONE AT ANY TIME. IN ADDITION, THERE IS NO EVIDENCE THAT CMS CONDUCTED AN INVESTIGATION INTO THE EVENTS SURROUNDING VICTOR PUCKETT AND MICHAEL SANDERS — OTHER THAN SOLELY RELYING UPON A WRITTEN STATEMENT BY LEBSHIER.

**DECISION**: THE UNDERSIGNED APPROVE THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION THAT THE CHARGES HAVE NOT BEEN PROVEN BECAUSE CENTRAL MANAGEMENT SERVICES WAS NOT REASONABLE IN ORDERING MICHAEL SANDERS TO ATTEND THE INDEPENDENT MEDICAL EXAMINATION.  THIS IS A FINAL ADMINISTRATIVE ORDER SUBJECT TO THE ADMINISTRATIVE REVIEW ACT.

_____          _____
Chris Kolker, Chairman                    Raymond W. Ewell, Commissioner


_____          _____
Barbara J. Peterson, Commissioner         Ares G. Dalianis, Commissioner


_____
Betty A. Bukraba, Commissioner            ENTERED THIS 21ST DAY
                                          OF AUGUST 2008.

WE RESPECTFULLY DISSENT FROM THE DECISION OF THE MAJORITY.

Chris Kolker
chairman                                  Ares Dalianis
                                          commissioner

Sanders
DA-11-08
Page 2 of 2



W 2

| Daniel Stralka | State of Illinois | Chris Kolker |
|---|---|---|
| EXECUTIVE DIRECTOR | **CIVIL SERVICE COMMISSION** | CHAIRMAN |

**State of Illinois**
**CIVIL SERVICE COMMISSION**
400 W. Monroe Street, Suite 306
Springfield, IL 62704-1801
PHONE (217) 782-7373
FAX (217) 524-3706
TTY (888) 261-2819
www.icsc.il.gov

**Daniel Stralka**
EXECUTIVE DIRECTOR

**Chris Kolker**
CHAIRMAN

**COMMISSIONERS**
Raymond W. Ewell
Barbara J. Peterson
Betty A. Bukraba
Ares G. Dalianis

August 8, 2008

Mr. Luke Ginder
Assistant Attorney General
500 South Second Street
Springfield, IL 62706

Mr. Bradley B. Wilson
Gates, Wise & Schlosser, PC
1231 South 8th Street
Springfield, IL 62703

     In re:  Illinois Department of Central Management Services, Petitioner vs.
          Michael A. Sanders, Respondent (DA-11-08)

Dear Counselors:

Attached is the recommended decision of the Commission's Administrative Law Judge in the above captioned appeal. Pursuant to the provisions of the Illinois Administrative Procedure Act, (5 ILCS 100/10-5, et seq.), either side now has an opportunity to respond to that recommendation before the Commission renders its final decision. Six copies of your written response must be filed by Tuesday, August 19, 2008 in the office of the Civil Service Commission located at 400 W. Monroe Street, Suite 306 Springfield, IL 62704-1801. Failure to file within the above time limitation, or to file the requisite number of copies, will result in your response not being considered. Proof that you served a copy of your written response on the opposing side must also be filed with the Commission.

The Commission intends to render a final decision on this matter at its open and public meeting on Thursday, August 21, 2008 at 160 North LaSalle Street, Suite S-901, Chicago, Illinois. You will be notified of that decision shortly thereafter.

                   Sincerely,

                   Daniel Stralka (bd)

                   Daniel Stralka
                   Executive Director

DS:bld:encl.

cc: Central Management Services

## BEFORE THE CIVIL SERVICE COMMISSION, STATE OF ILLINOIS

| | | |
|---|---|---|
| ILLINOIS DEPARTMENT OF<br>CENTRAL MANAGEMENT SERVICES, | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | No. DA-11-08 |
| | ) | |
| MICHAEL A. SANDERS, | ) | |
| | ) | Administrative Law Judge: |
| Respondent. | ) | *Andrew C. Barris* |

REPRESENTING PETITIONER:    Honorable Lisa Madigan, Illinois Attorney General, 500 South Second Street, Springfield, Illinois 62706; Luke Ginder, Assistant Attorney General.

REPRESENTING RESPONDENT: Gates, Wise, & Schlosser P.C., 1231 South 8th Street, Springfield, Illinois 62703; Mr. Bradley Wilson.

### PROCEEDINGS

This is the Respondent's, Michael Sanders (SANDERS), appeal of his discharge from his position as a Data Processing Technician with the Illinois Department of Central Management Services. A copy of the written Notice of Discharge is attached as Exhibit 1. A written request for hearing was made by SANDERS within 15 days and a hearing was scheduled within 30 days. Hearings on this matter were held January 23, 2008, February 28, 2008, and March 18, 2008. SANDERS, Jayme Lebshier, Jeffrey Shuck, and Melissa Riggins were called as witnesses by the Petitioner. SANDERS, Chris Lael, Veronica Tozer, and Christy Shewmaker were called as witnesses by the Respondent. Stephen Petrilli was called as a rebuttal witness by the Petitioner. At the conclusion of the hearings, the parties submitted written closing statements. On June 24, 2008, the parties presented oral argument on the closing statements[1].

---

[1] Prior to the first day of hearing, the Respondent filed a Motion in Limine. The Motion is denied.

## SUMMARY OF EVIDENCE PRESENTED

### Michael Sanders' Testimony

1. SANDERS worked for the State of Illinois since 1993. At the time of his discharge, SANDERS worked in the Bureau of Communication and Computer Services (BCCS) at the Department of Central Management Services (CMS). SANDERS was a Data Processing Technician. In sum, SANDERS was responsible for ensuring that certain computer programs ran without problems and then to detect and fix those problems as they arose. Prior to working at CMS, SANDERS worked at the Illinois Board of Education, the Department of Public Aid, and the Department of Human Services. In every position he has had with the State of Illinois, SANDERS' responsibilities involved data processing. SANDERS began working for CMS after the state wide re-organization of computer services.

2. SANDERS was discharged for failing to attend an independent medical examination (IME) scheduled for September 5, 2007. SANDERS previously received a 30 day suspension for failing to attend an IME scheduled for June 13, 2007.

3. SANDERS testified that Victor Puckett became his supervisor in February of 2005 after the re-organization. SANDERS worked under Victor Puckett from February 2005 until August of 2005. SANDERS testified that there was "friction" between the two.

4. SANDERS testified that on August 26, 2005 the two men had a disagreement about fixing a program that had shut down. SANDERS fixed the program and Victor Puckett disagreed with the manner in which it was fixed. In sum, SANDERS fixed the problem using "long form" and Victor Puckett argued that SANDERS should have used "short form." Using an analogy to explain the disagreement, SANDERS testified that it was the equivalent of writing out the word "Doctor" as opposed to using the abbreviation "Dr." SANDERS testified that

2

either way worked and that Victor Puckett's criticisms were irrelevant because the program worked.

5. SANDERS testified, "You know, I was to run the task for fixing the job. What I did was completely legitimate. And if what I did had not worked then, I mean, if it wasn't legitimate then it would not have worked. I want you to keep that in mind. This is a pass/fail environment. [Victor Puckett] comes over complaining that I've done something wrong when I know that I haven't and, again, that's not the first time that he's done that." SANDERS added, "Anything that I do, if I have a comma out of place, then the program won't work. If I have an extra character or a blank spot, that will shut the program down." SANDERS maintained that Victor Puckett's criticisms were not "legitimate" because SANDERS had fixed the problem.

6. SANDERS testified that he was sitting in his chair during the disagreement and that Victor Puckett was "leaning all over me, cussing me out, you know, calling me stupid, telling me how I fucked up everything." SANDERS testified that Victor Puckett threatened to "throw" SANDERS out of the building. SANDERS testified that Victor Puckett called the "Bureau Chief" and that Victor Puckett was told by the "Bureau Chief" to go into the hallway and calm down. SANDERS testified that the incident lasted for approximately half an hour. SANDERS testified that he was disturbed by the incident and that he called the Illinois State Police the next day from work. SANDERS testified that after the police arrived he talked to them in the hallway about the previous day's incident. SANDERS testified that the police told him to call again if it was necessary.

7. SANDERS testified that a pre-disciplinary meeting was scheduled after the incident with Victor Puckett. The meeting occurred on September 9, 2005. SANDERS was represented by Jayme Lebshier, an AFSCME union steward, at the pre-disciplinary meeting. Sanders left

3

the meeting before it was completely finished.   Approximately 15 or 20 minutes after

SANDERS walked out of the meeting and returned to his work station, he was given a memo

from Stephen Petrilli informing him that he had been placed on administrative leave and was

told to leave the building.   SANDERS was subsequently notified that he had to see Dr.

Killian for an IME.

8.   From 2005 to 2007, CMS scheduled six separate independent medical examinations for

SANDERS to see Dr. Killian.   SANDERS refused to go to all of them.   After refusing to

attend an IME in 2005, CMS discharged SANDERS but he was subsequently reinstated.   As

to why he would not attend any of the independent medical examinations, SANDERS

testified that he believed that CMS could not send him to a psychiatrist without providing a

"rationale" as to why he had to go.   SANDERS testified that the IME would constitute a

violation of his right to medical privacy because he never signed a consent form for the

disclosure of his mental health information.

9.   After the incident with Victor Puckett on August 26, 2005 and prior to the pre-disciplinary

meeting on September 9, 2005, no one from CMS asked SANDERS for his version of events

before he was confronted with the charges.     Prior to the decision to put him on

administrative leave and the decision to order an IME, no one from CMS asked SANDERS

about his version of events as to what happened on September 9, 2005.

10.   SANDERS testified that no one from CMS personally informed him that the purpose of the

IME was to get simply a "yes" or "no" answer as to whether SANDERS was fit to go to

work.

11.   SANDERS testified that he did not learn the reason that CMS was sending him to the

independent medical examinations until after SANDERS' attorney got involved in 2006 and

2007. In a letter to SANDERS' attorney, CMS explained that SANDERS was required to go to an IME because he posed a danger to the other employees of the agency.

12. SANDERS denied making threats towards Victor Puckett during his conversation with Lebshier at the pre-disciplinary meeting on September 9, 2005, other than stating he would call the police if Victor Puckett threatened him again.

13. SANDERS testified that he was interviewed by the Office of Executive Inspector General (OEIG) in February 2006 and that the investigators asked SANDERS questions regarding the allegation that he threatened Victor Puckett. SANDERS received a letter from the OEIG on January 19, 2007 stating that the OEIG had completed its investigation and determined the allegations against him as "unfounded."

### Jayme Lebshier's Testimony

14. Jayme Lebshier testified that she had been a union steward for AFSCME Local 2600 for 29 years. Lebshier represented SANDERS at his pre-disciplinary meeting on September 9, 2005. Regarding her experience as a union representative and SANDERS' potential discipline as a result of the incident on August 26, 2005, Lebshier testified, "Based on previous disciplinary steps, and we do have an incremental disciplinary, I anticipated no more than a three, at most, five day suspension, but no more than three was my feeling from what we were getting from management."

15. Lebshier testified that Debra Cowan, a supervisor, was present at the pre-disciplinary hearing as was Stephen Petrilli and Deb Stout from CMS. Lebshier testified that SANDERS was agitated and confrontational with management during the hearing. Lebshier testified that SANDERS was crouched in his chair. Lebshier testified, "A pre-D, you go in. They give you the charges. You arrange a date for when the rebuttal from the union and employee will be given, and that's about it. They ask if there is anything else you have to say. Usually it's

5

reasonable and customary that you don't get into, this isn't the time for discovery or for battles. This is, you're told what the discipline is. You're told that you can rebut, and pretty much thank you and you leave." Lebshier testified that SANDERS had a problem with "staying on point" and that he "injected," "disagreed with management," and "introduced the race issue." Lebshier testified that SANDERS took exception to the charges and that he walked out the door and left before the meeting was finished. As to the timing of SANDERS' departure, Lebshier testified, "We had not wrapped up. We had not had the conclusional wrap up, nor had we exchanged information about when rebuttals were due, when the hearing – when the disciplinary would be issued, etc., etc., etc., etc."

16. Lebshier testified that she spoke with SANDERS in the hallway after he left the room. Lebshier testified that SANDERS was very agitated, pacing, putting his fist in his palm while stating that he had had enough. Lebshier testified that SANDERS stated that he was going to "get" Victor Puckett the next day when they were working together. Lebshier testified that SANDERS called Victor Puckett a "spic." Lebshier testified that it was uncomfortable because Victor Puckett was standing 12 feet away. Lebshier testified that she asked SANDERS to stop and she tried to console him. Lebshier testified that the two of them went outside the building to smoke a cigarette and chat. As to the conversation outside the building, Lebshier testified, "He continued fisting, and he's going to get him, you know, he's going to get Mr. Victor Puckett. He was going to get him for what he did. Mr. Victor Puckett was racist and he was going to call the police. They were going to come and handcuff him. That they had told him, all he had to do is call the State Police and they would come and handcuff Mr. Victor Puckett and take him away."

17. Lebshier testified that she tried to get SANDERS to calm down because "this would not sit well with management, let's say that, and for Mr. Sander's own best, and as a union steward,

6

my job is to try and protect my union brother, and not put him in a position to harm himself."
Lebshier warned SANDERS that she would write him up if he did not cease.

18. Lebshier testified that before she walked into the building with SANDERS she "whispered"
to Victor Puckett that there was an issue about which she was concerned.   Upon entering the
building, she told Jerry Mitchell there was an issue with SANDERS and he instructed her to
meet Petrilli, Cowan, and Stout in Petrilli's office.   Lebshier testified that she told Petrilli,
Stout, and Cowan that she was concerned about SANDERS and Victor Puckett working
alone the next night and suggested that a management employee be assigned to the
workplace.   Lebshier testified that she was "worried about harm that Michael may incur
himself.  He may harm his status within the workplace, and I was also concerned about harm
to those present in the workplace with him."

19. After the pre-disciplinary meeting on September 9, 2005, Lebshier immediately provided a
written statement to CMS Labor Relations regarding the incident.   Although Lebshier
testified at the hearing that SANDERS used the racial slur "spic," Lebshier did not mention
this in her written statement.  After SANDERS was put on leave, Lebshier testified that she
subsequently received telephone calls from SANDERS about "forms" related to his
employment and during the calls he would also ask if Victor Puckett had received any
discipline.  Lebshier testified that as union steward it was common for her to receive calls
from employees regarding their termination.  Lebshier testified that she did not inform
SANDERS that she had provided a statement to CMS about the September 9, 2005 incident.
Lebshier testified that she contacted the legal department at CMS about SANDERS' phone
calls and the legal department told her to contact the Office of Inspector General.  She
voluntarily contacted the OEIG about SANDERS' telephone calls.  Lebshier also contacted

the Illinois State Police to pose the hypothetical: would the police come to the workplace if Sanders had called again about Victor Puckett.

20. Lebshier testified that she was removed as union steward after her representation of SANDERS at the pre-disciplinary meeting.

### Chris Lael's Testimony

21. Chris Lael testified that he is a Data Processing Specialist with CMS and that Victor Puckett was his supervisor. Lael testified that he was the only person who witnessed the incident between SANDERS and Victor Puckett on August 26, 2005. Chris Lael testified that he heard a disagreement between SANDERS and Victor Puckett that lasted less than half an hour. Lael testified that their argument gradually got more "heated." Lael testified that the two men were not yelling or screaming at each other. Although he could not hear the specifics of the conversation, Lael acknowledged that Victor Puckett was standing during the argument and SANDERS was sitting at his desk. Lael testified that the volume of the argument increased and that the increase in volume was caused by Victor Puckett. Lael acknowledged that he did not pay attention to the incident for the first 10 minutes and that he only "visually saw" a few seconds of the disagreement. Lael testified that Victor Puckett threatened to escort SANDERS from the building. Lael acknowledged that he did not hear Victor Puckett swear at SANDERS or see Victor Puckett put his face in close proximity to SANDERS' face.

22. Lael generally described Victor Puckett as a person who could be "hyper" and acknowledged that Victor Puckett could be disagreeable at times.

23. Lael testified that he was instructed by Stephen Petrilli to describe in a written statement the events he witnessed on August 26, 2005. Lael testified that he completed and submitted the statement to CMS within a day or two after the incident. According to Lael, SANDERS was

an experienced employee who understood how to do his job. When asked on cross examination about SANDERS' ability to take instruction from supervisory staff, Lael testified, "From what I could tell, he seemed to know his job pretty well and didn't really need a whole lot of direction. You know, in the short time we worked together, I don't really recall any incidents where any direction was needed to be given to him. He knew what he was doing at the time. That's the way the job worked is, you know, when the job needed done, we just did it, without having to wait for a supervisor to tell us to do it."

### Jeffrey Shuck's Testimony

24. Jeffrey Shuck testified that he was Deputy General Counsel in the Legal Department at CMS. Shuck testified that he was informed about SANDERS' "behavior" at the September 9, 2005 pre-disciplinary meeting. Shuck testified, "What was related to me, it was during the course of a pre-disciplinary meeting that Mr. SANDERS was agitated, and that a request was made to take a break, and Mr. SANDERS and his union steward stepped out in the hallway. And the union steward subsequently reported that it was during that break that Mr. SANDERS was, as she described it, visibly upset with clinched teeth and making threats against his supervisor. And obviously that was a matter that people in Internal Personnel wanted to get some advice about."

25. As the basis ordering for ordering an IME for SANDERS, Shuck testified that it was a "two-fold thing" including the allegation that SANDERS verbally threatened Victor Puckett. Shuck added that a history of SANDERS "getting in his supervisor's face," "being reluctant to take supervision," and "being defiant" led him to the decision that a medical determination was necessary for the safety of everyone in the workplace.

26. On cross examination, Shuck testified that he understood - from Lebshier's statement – that SANDERS said he was "going to get Victor Puckett" on Saturday night. Shuck did not

interview Lebshier or SANDERS about the incident. Shuck testified that he did not know if anyone interviewed SANDERS prior to the pre-disciplinary meeting or being placed on administrative leave and ordered to attend an IME.

27. Shuck testified that the decision to place SANDERS on administrative leave was made on September 9, 2005 in order to avoid SANDERS going to work the next day with Victor Puckett (Saturday). Shuck testified that the decision was made late in the day on a Friday and it was necessary to do so because they were working together on Saturday.

28. Shuck testified that the matter was sent to the OEIG for disciplinary purposes. Shuck did not know the details of the OEIG investigation other than the fact OEIG determined that the allegations against SANDERS were "unfounded." Shuck testified SANDERS' behavior might not violate any rules but that did not preclude the necessity of a medical evaluation. Shuck testified that he was not aware of the details of the OEIG investigation because the OEIG operates in a "cloak and dagger" fashion.

29. Shuck testified that CMS has the authority to order an IME to ensure safety in the workplace and avoid liability for the State of Illinois. Shuck testified that the authority relied upon in ordering the IME was Personnel Rule 303.145 and the "general legal duties" imposed on employers. Shuck testified that there had been an interpretation for "many years to encompass the very type of situation we're looking at here, and initially that was the authority that was cited by CMS in the first instance when Mr. SANDERS was instructed to attend an IME." Shuck added that it was necessary to stop someone in the act of going "postal."

30. Shuck testified that he received a letter from SANDERS' attorney dated April 7, 2006 regarding SANDERS' situation and the independent medical examinations. Shuck did not respond to the letter until May 14, 2007.

31. Shuck speculated that SANDERS would have been allowed to return to work if the IME revealed that SANDERS was "fit to perform his duties." Shuck added that if SANDERS had been put back to work, SANDERS and Victor Puckett would have been pulled aside and told to "work together" by giving them "a little pep talk."

32. Shuck testified that he did not review the statement submitted by Chris Lael regarding Lael's observations of the incident between SANDERS and Victor Puckett.

33. Shuck testified that ordering an employee to go to an IME is not a form of discipline. Shuck testified that if SANDERS had received a "negative" answer as to whether he was fit to perform his duties, SANDERS would have been offered disability leave or asked whether he wanted another medical opinion. Shuck testified that they were looking for simply a "yes" or "no" answer as to SANDERS' ability to perform at work.

34. Shuck testified that CMS did not ask that SANDERS fill out a consent form before ordering him to go to an IME.

### Veronica Tozer's Testimony

35. Veronica Tozer testified that she was a Public Service Administrator with CMS Labor Relations. Veronica Tozer testified that SANDERS was discharged in November of 2005 for failing to attend an IME but that he was later reinstated while he remained on administrative leave. Tozer testified that Christy Shewmaker and Melissa Riggins suggested that SANDERS attend an IME.

### Christy Shewmaker's Testimony

36. Christy Shewmaker testified that she was employed with CMS Human Resources from July 2005 until September 2006. Shewmaker testified that Jeff Shuck made the final decision to send SANDERS to an IME. As to her role (or her office's role) in ordering SANDERS to an IME, Shewmaker testified they were limited to "discussions and preparing the paperwork."

11

### Melissa Riggins' Testimony

37. Melissa Riggins testified that she was the Acting Human Resources Director at CMS from September 2006 to September 2007. Riggins testified that when she started in her position as Acting Human Resources Director in September 2006 she learned that SANDERS had raised objections and was not attending scheduled independent medical examinations.

38. Riggins testified that she sent a letter to SANDERS informing him to attend an IME on September 5, 2007. Attached as Exhibit 2 is the letter ordering Sanders to attend the IME. The letter includes the following paragraph:

> "Dr. Killian will forward me the evaluation and completed physician's statement from your examination; therefore, confidentiality between doctor and patient will **NOT** be in place."

39. Riggins testified that SANDERS was disciplined with a 30-day suspension for previously failing to attend an IME. Riggins testified that SANDERS' refusal to attend the IME violated the rules cited in the Notice of Discharge. Riggins testified that SANDERS would have been returned to work if he had attended the IME and it was determined that he was fit to return to work. Riggins testified that she did not request a consent form from SANDERS at any time. Riggins testified that she discussed with the CMS Legal Department the issue of sending SANDERS to the independent medical examinations.

### Stephen Petrilli's Testimony

40. Stephen Petrilli was called as a rebuttal witness by the Petitioner. Petrilli testified that he is the Manager of Enterprise Production Operation Services at CMS. Stephen Petrilli testified that, generally speaking, it is "critically important" for computer operators to follow established "schedules" when fixing a computer problem because there may be lingering

effects that might not be discovered until later.  Stephen Petrilli did not testify specifically as

to what SANDERS and Victor Puckett were arguing about on August 26, 2005[2].

### Victor Puckett

41. Victor Puckett is a supervisor at CMS.  He was not called to testify.


## FINDINGS OF FACT[3]

1. On August 26, 2005, Michael Sanders and Victor Puckett were working together and got into
   a disagreement regarding the correction of a computer program.   Although Sanders
   completed the task and fixed the program, Victor Puckett disagreed with the manner in which
   Sanders fixed the problem.  In fixing the problem, Sanders had used "long form" while
   Victor Puckett demanded that Sanders use "short form."  The argument lasted just under half
   an hour.  During the argument, Victor Puckett was standing over Sanders as Sanders sat at
   his desk.  Victor Puckett threatened to remove Sanders from the building.  Sanders felt that
   Puckett's threat of removal was physical and Sanders testified that Puckett swore at him and
   called him stupid.  Although Chris Lael - who witnessed the incident and subsequently
   submitted his observations in a written statement at the request of CMS - could not confirm
   or deny that profanity was used by Victor Puckett, Lael briefly saw the interaction and
   confirmed that Puckett was standing over Sanders as Sanders sat at his desk.  Lael confirmed
   that Victor Puckett was responsible for the increase in volume and/or intensity of the
   conversation.  Lael confirmed that Puckett threatened to escort Sanders from the building.

2. On August 27, 2005, SANDERS called the Illinois State Police because he was disturbed by
   the previous day's incident and felt threatened by Victor Puckett.  The Illinois State Police

---

[2] The Respondent's Motions to Strike during the testimony of Riggins and Petrilli are overruled.
[3] This section is a statement regarding relevant and/or contested facts at issue before the ALJ.  It is not an exhaustive summary of every fact relied upon in reaching this Recommended Decision.

showed up at the job site and spoke to SANDERS.  SANDERS was told by the police that he
could call in the future if necessary.

3.  As a result of the incident between SANDERS and Victor Puckett, a pre-disciplinary meeting
was scheduled to address potential discipline for SANDERS.  Charges had been levied
against SANDERS due to the August 26, 2005 incident.  Jayme Lebshier represented
SANDERS at the meeting and she felt that SANDERS would receive a 3-day or 5-day
suspension.  After the charges against SANDERS were discussed at the meeting, Sanders
became agitated.  He wanted to address the allegations Puckett made against him and he
confronted management about this issue.  When Sanders was denied an opportunity to do so
at that time, he angrily left the room before the meeting was completely finished.

4.  After leaving the meeting, SANDERS and Lebshier discussed his case both in the hallway
and outside of the building.  During these discussions, SANDERS stated that he was going to
"get" Victor Puckett by calling the police if Victor Puckett threatened him on Saturday.
Lebshier asked that SANDERS calm down.  However, after leaving SANDERS' presence,
Lebshier immediately told Victor Puckett about her conversation with SANDERS and then
discussed the incident with Stephen Petrilli.  Within the hour, SANDERS was placed on
administrative leave.

5.  There is no evidence that SANDERS made any threats of violence towards Victor Puckett
other than calling the police if treated by Victor Puckett in the same manner as before.

6.  After SANDERS was placed on administrative leave, he was subsequently ordered to attend
an IME with a psychiatrist named Dr. Terry Killian.  In fact, between 2005 and 2007,
SANDERS was ordered to attend six independent medical examinations.  In the notice
ordering SANDERS to attend the IME, it states, "Dr. Killian will forward me the evaluation

14

and completed physician's statement from your examination; therefore, confidentiality between doctor and patient will **NOT** be in place."

7.  Sanders refused to attend every scheduled IME. The basis for SANDERS' refusal was that he was never told why he had to attend the IME and that he also believed that it violated his right to medical privacy. SANDERS was discharged for failing to attend the IME(s) in 2005, but he was later reinstated while remaining on paid administrative leave.

8.  The testimony is unclear as to who had the final say on ordering the independent medical examinations, but it is clear that Shewmaker and then Riggins discussed the issue with Shuck. Shuck testified that CMS only wanted a "yes" or "no" answer as to SANDERS' fitness to return to work.

9.  In correspondence dated April 7, 2006, SANDERS' attorney sent CMS a letter requesting information about the authority relied upon in ordering the independent medical examinations. Through letters sent by Shuck to SANDERS' attorney dated May 14, 2007 and July 31, 2007, Shuck explained the reason why the independent medical examinations was necessary and the authority relied upon in ordering them.

10.  Shuck testified that employers (in this case CMS) have "general legal duties" to protect their employees and to avoid potential liability. Shuck testified that an independent medical examination was necessary to ensure the safety of the workplace because of a history of SANDERS "getting in his supervisor's face," "being reluctant to take supervision," and "being defiant."

11.  At the conclusion of its investigation, the OEIG determined that the allegation of threatening behavior on the part of SANDERS was "unfounded."

12.  On August 23, 2007, SANDERS was given notice to attend an IME on September 5, 2007.

15

13. SANDERS sent two letters to Dr. Killian, dated August 24, 2007, and September 5, 2007, requesting that the independent medical examination scheduled for September 5, 2007 be cancelled because SANDERS did not give his consent to the examination. In the letters, SANDERS threatened to take legal action against Dr. Killian and/or his professional license if the appointment was not cancelled.[4]

14. SANDERS' refusal to attend the IME scheduled for September 5, 2007 is the only alleged violation in the Notice of Discharge in this case.

15. SANDERS worked for the State of Illinois since 1993. The Notice of Discharge indicates that he had never received any form of discipline during his service – until Victor Puckett became his supervisor in 2005.

16. Victor Puckett did not testify.

## CONCLUSIONS OF LAW

1. Section 1.170 of the Rules of the Civil Service Commission sets forth the standard of cause for discharge appeals and states:

   a)   Cause for discharge consists of some substantial shortcoming which renders the employee's continuance in his position in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for the employee no longer holding the position.

   b)   In determining the appropriate penalty for an offense which the employee is found guilty, the Commission shall consider the employee's performance record and the employee's length of continuous service unless the offense would warrant immediate discharge.

---

[4] The Respondent's objection to the letters due to their "confidentiality" is overruled. Sanders never received any form of treatment from Dr. Killian. In fact, he explicitly refused any form of treatment; that is why this appeal is before the Commission. So it is unclear as to how Sanders could in any way be called a "recipient" whose unsolicited letters to Dr. Killian can in any way be considered "confidential." With that said, these letters were sent after the IME at issue was scheduled by CMS, therefore it cannot be argued that they were relied upon by CMS in ordering the IME fo. September 5, 2007. However, they were sent before the scheduled date of the IME that for which Sanders failed to appear.

16

2.  Section 1.232 of the Rules of the Civil Service Commission sets forth the burden of proof for

    appeals and states:

    a)   The proponent of any matter asserted shall have the burden of proof to
         establish by a preponderance of the evidence that the matter asserted is
         more probably true than not true.
    b)   When a party has the burden of proof and establishes the matter asserted
         by the required quantity of evidence, the party has made a prima facie
         case, and the burden of disproving the matter asserted goes to the
         opposing party by the same quantity of evidence.

3.  In the Notice of Discharge, it is alleged that SANDERS' failure to attend the IME scheduled

    for September 5, 2007 amounted to a violation of the following rules as stated in Chapter 1,

    Section 1 of the CMS Policy Manual, Ethical Standards:

    •   Efficiency...perform the duties during working hours scheduled;
    •   Lawfulness...obey government laws, ordinances, rules, and regulations.

4.  In the Notice of Discharge, it is alleged that SANDERS' failure to attend the IME scheduled

    for September 5, 2007 amounted to a violation of the following rules as stated in Chapter 1,

    Section 2 of the CMS Policy Manual, Conduct Rules:

    #1.    Failure to abide by CMS Rules and Regulations;
    #2.    Incompetency or inefficiency in the performance of a duty or
           inattention to or failure to perform a duty.
    #3.    Insubordination by disobedience to any order or directive or disrespect
           toward a supervisor.
    #8.    Misuse or abuse of state working time for personal gain or for any
           reason other than performing the employee's assigned duties.
    #17.   Conduct unbecoming a CMS employee.

5.  There is no explicit rule or policy that gives CMS the authority to order that SANDERS

    attend an IME.  Rather, according to Shuck and the arguments put forth by the Petitioner,

    there is a "general legal duty" to protect the employees from harm and to protect the state

    from liability.[5]  As to the claim of avoiding liability, the Petitioner cited Geise v. Phoenix

---

[5] Although Shuck explicitly testified that Section 303.145 of the Personnel Rules was relied upon as a rule that gave
CMS the authority to order Sanders to attend an IME, the Petitioner subsequently stipulated that Section 303.145 of

Co., 246 Ill.App.3d 441, 615 N.E.2d 1179 (2nd Dist.1993) and Easley v. Appollo Detective
Agency, Inc., 69 Ill.App.3d 920, 387 N.E.2d 1241 (1st Dist. 1979).  The Petitioner is correct
in asserting that both cases stand for the proposition that a cause of action can exist against
an employer for negligently hiring someone who the employer knew, or should have known,
was unfit for the position and the employee causes harm to a fellow employee.  However,
these cases do not directly address the issue in this case: under what authority, and, most
importantly under what circumstances, can an Illinois state agency order an employee to
undergo a medical examination without the employee's consent.

6.   The Petitioner also argues that the American with Disabilities Act (42 U.S.C § 12112 (d) (4)
(a), (ADA) authorized CMS to order the medical examination so long as it was reasonable to
doubt Sanders' capability of performing his job and the medical examination is limited to
that determination only.  In support of this position, the Petitioner cited Sullivan v. River
Valley School District, 197 F.3d 804.  However, Sullivan v. River Valley School District is
not entirely on point either.  In Sullivan, a teacher was ordered to attend a fitness for duty
examination after repeated confrontations with the school board.   Sullivan alleged
discrimination under the American with Disabilities Act.  The appellate court held that the
circumstances of the situation determined that the school board's decision to send Sullivan
to a fitness for duty examination did not violate the ADA.  In SANDERS' case, the ADA is
not at issue because SANDERS has not alleged that CMS discriminated against him.  With
that said, the court also stated that, under the ADA, "an employer's discretion to order
employees to undergo examinations is hardly unbounded."  Furthermore, after relying upon
the regulations of the Equal Employment Opportunity Commission for guidance, the court

the Personnel Rules v as not an authority that was relied upon.  In closing arguments, the Petitioner also referenced
"Section 15 of the AFSCME Contract" regarding fitness for duty evaluations.

stated that "an examination ordered by the employer must be restricted to discovering whether an employee can continue to fulfill the essential functions of the job" and that "it is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance." Sullivan, 197 F.3d 804, 811-812.

7.  In response to the Petitioner's arguments, the Respondent argued that CMS had no authority to order the IME, and, even if CMS did have the authority, it was not reasonable in exercising that authority. In support of this position, the Respondent cited Sangirardi v. Village of Stickney, 342 Ill.App.3d 1, 793 N.E.2d 787 (1st Dist. 2003), Haynes v. Police Board of the City of Chicago, 293 Ill.App.3d 508, 699 N.E.2d 794 (1st Dist. 1997) and McGreal v. Ostov 368 F.3d 657 (7th Cir. 2004). These cases involve police officers who were ordered to undergo psychological examinations. Based upon these cases, the Respondent argued that SANDERS should not be required to attend an IME because he was not in a position of public safety, he did not carry a gun as part of his job duties, SANDERS was not required to undergo a psychological examination when he started his job, and he did not consent to the disclosure of mental health information and, therefore, any such request violated the Mental Health and Developmental Disabilities Confidentiality Act (MHDDCA), (740 ILCS 110/1 et seq.). The Respondent's arguments are not persuasive. First, the courts in Sangirardi and Haynes found that police officers *can* be required to submit to a psychological examination. The cases do not stand for the proposition that an employee must be in a position of public safety, and have been subjected to a psychological examination prior to getting the job, in order for subsequent psychological examinations to be valid. In addition, the police officer in Sangirardi eventually saw the psychiatrist but then refused to release the results of the exam. In McGreal, the police officer gave his consent to

19

an examination, saw the psychiatrist, and the results of the examination were forwarded to the police chief. In the present situation, SANDERS has not received any form of treatment from Dr. Killian. There has been no examination. There has been no treatment information disclosed to or from Dr. Killian. SANDERS was not a "recipient." Because there is absolutely no information regarding treatment – thus making it impossible for Dr. Killian to provide any information to CMS, the MHDDCA does not apply. Put simply, the MHDDCA covers what information a treating physician may disclose to another party and, in the present situation, no information exists in this case that can be evaluated within the scope of the MHDDCA. However, it should be noted that in McGreal, the court stated the employer was not entitled to the "disclosure of anything other than the fitness for duty determination," nor could the employer "force the disclosure of the intimate and irrelevant details of McGreal's home life." McGreal, 368 F.3d 657, 690.

8. Despite the fact that issues in this case have been in contention since 2005, the only allegation in the Notice of Discharge is that Sanders refused to attend the IME scheduled for September 5, 2007 and for this refusal he was discharged. The Petitioner argues that the central issue in this case is simple: Did CMS act in a reasonable manner when it ordered SANDERS to attend the IME based upon the information it relied upon; and does CMS have the authority to order its employees to attend an IME? The Petitioner also claims that the August 26, 2005 incident between SANDERS and Victor Puckett had nothing to do with the charges in this case. The IME was based upon SANDERS' interaction with Lebshier on September 9, 2005; it was not based upon SANDERS' interaction with Puckett on August 26, 2005. The Petitioner added that, although the OIEG determined that allegations of threatening behavior against SANDERS were unfounded, CMS was "saddled with the duty to ensure that the Respondent was fit for duty."

20

9. As to the "reasonableness" of CMS ordering the IME, the Petitioner attempts to qualify the issue by claiming that CMS' decision should be based upon what information Melissa Riggins/Jeff Shuck relied upon in ordering the IME at that time. The Petitioner argues that Melissa Riggins and/or Jeff Shuck were informed that SANDERS threatened Victor Puckett and, therefore, it was reasonable – in the name of "safety in the workplace" – to order the IME to find out if SANDERS was "fit for duty." The Petitioner suggests that the Commission disregard additional facts – other than CMS's reliance on Lebshier's statement – in determining whether CMS was reasonable in ordering the IME. This argument is not persuasive, nor is it supported by the record. Not only did the Petitioner make reference to the history of the relationship between Sanders and Puckett in closing arguments, but Shuck testified that the "history" of friction between the two, and the fact that SANDERS had allegedly gotten in Victor Puckett's face, were factors considered in ordering the IME. In addition, CMS was in control of the investigation and had possession of collected information regarding the relationship between SANDERS and Victor Puckett i.e. CMS solicited a statement from Chris Lael that spoke directly to this relationship. Simply because CMS decision-maker(s) chose not to consider this information, or interview SANDERS about his version of events prior to ordering the IME, or even Lebshier, does not preclude the Commission from considering these facts. For this reason, the history of the relationship between the two men – and the events that transpired during this history – must be evaluated in determining whether CMS was reasonable in ordering the IME at issue for SANDERS.

10. In the Reply to Respondent's Post-Hearing Brief, the Petitioner cited the Civil Service Commission case <u>Department of Human Services v. Carolyn Bottoms</u> (DA-47-00). In <u>Bottoms,</u> the Administrative Law Judge (ALJ) determined that the Department of Human Services (DHS) had the authority to order an employee (Bottoms) to attend a fitness for duty

21

examination without the employee's consent so long as DHS "acted reasonably." The Civil Service Commission unanimously affirmed the Recommended Decision of the ALJ. Bottoms appealed the case to both the circuit and appellate courts, in addition to filing other federal lawsuits, and the Commission's decision was affirmed at every level.[6]

11. In Bottoms, Dr. James Brunner, a supervisor at Chicago-Read Mental Health Center (in addition to being a licensed physician, surgeon, and psychiatrist), interviewed Carolyn Bottoms after hearing reports from supervisors regarding Bottoms' hostile and inappropriate behavior at work which culminated in an incident in which Bottoms was accused of striking a co-employee in the arm with her office door. The employee's elbow was injured as a result of the incident with Bottoms. After reading an audit report addressing Bottoms' behavior and personally conducting an interview with Bottoms, Dr. Brunner ordered that Bottoms attend a fitness for duty examination. Bottoms refused to attend all scheduled examination appointments and she was subsequently discharged. In the ALJ's Recommended Decision, a litany of aggressive and hostile behaviors on the part of Bottoms was referenced. Without going into all of these behaviors, the following is a summary of some of the evidence the ALJ relied upon in determining that Dr. Brunner was reasonable in ordering the evaluation:

a. Marilyn Targos, Bottoms' direct supervisor, testified at the hearing. The ALJ stated that she was a credible witness. Her testimony indicated that Bottoms was hostile, rude and other employees were uncomfortable around her. In addition, Bottoms consistently and explicitly refused to attend supervisory

---

[6] The Petitioner provided several citations to the decisions of the circuit court, the appellate court and the federal district and appellate courts. However, these decisions were not published and/or did not address the issue regarding an agency's authority to order a medical evaluation. It should be noted that ALJ in this case was unable, after numerous attempts, to access the case at the following website provided by the Petitioner: http://www.ca7.uscourts.gov/tmp/EC0O55QK.pdf.

meetings scheduled by Targos, nor would she listen to or accept verbal instructions. Bottoms would only receive/accept instructions in writing.

b. The ALJ stated that the complaint of the injured employee struck by the door was credible.

c. An audit was conducted at Bottoms' office and it was reported that Bottoms' behavior was a "detriment to the workplace." The ALJ found this report to be credible.

d. The ALJ concluded that Dr. Brunner, the supervisor who personally interviewed Bottoms about her workplace behavior AND was responsible for ordering the examination, was "genuinely concerned about Respondent's mental health and wished to discover if her behavior was caused by a mental illness or by an emotional upset."

12. As to the application of Bottoms to the present situation, the Petitioner is correct in its assertion that the Civil Service Commission affirmed an agency's authority to order a fitness for duty evaluation without the employee's consent. The Petitioner is correct that Commission's decision was upheld on administrative review at every level. The Petitioner is correct in framing the issue in this case as to whether CMS was reasonable in ordering the IME. However, the Petitioner is far from correct in stating that the situation in Bottoms is "nearly identical" to the present situation. The evidence adduced at hearing in this case reveals the following about the events leading up to the IME scheduled for September 5, 2007:

a. SANDERS did not harm, or threaten to physically harm, any of his co-workers. Specifically, he did not threaten to physically harm Victor Puckett on August 26, 2005. The evidence indicates that Victor Puckett was the party

23

who made a threat: to physically remove SANDERS from the building. Victor Puckett was the party who stood over Sanders during the argument and got in his face. Victor Puckett was the party who raised the intensity level of the disagreement. Victor Puckett was the party that used profanity and called SANDERS "stupid." The testimony by SANDERS regarding this issue was credible and consistent and, for the most part, supported by Chris Lael, a credible and unbiased witness. There has been no testimony to rebut these facts because Victor Puckett did not testify. Furthermore, Shuck never reviewed the statement by Lael, or interview Sanders, before recommending the IME.

b. SANDERS did not threaten to harm Puckett on September 9, 2005 during his conversation with Lebshier. Rather, he threatened to call the police if Victor Puckett confronted him in the same manner as before. First, there is no doubt that SANDERS had called the police previously after he felt threatened by Victor Pucket. Second, and most importantly, Lebshier was not a credible witness. The demeanor and manner with which Lebshier responded to questions posed by the Petitioner, the Respondent, and the Administrative Law Judge severely undermined her credibility. Not only was she evasive and/or non-responsive to relevant questions posed to her, but many of her behaviors belied her own statements. In sum, Lebshier believed that SANDERS was a credible threat who jeopardized the safety of the workplace because Sanders was angry and pounding his fist in his hand while saying he was going to "get" Victor Puckett. However, both Lebshier's written statement to CMS and her testimony at the hearing indicates that the only

24

threat SANDERS made about Victor Puckett was calling the police on Saturday. In fact, after the September 9, 2005 incident, Lebshier took it upon herself to call the police. She did this to find out – for herself – if the police would come to the workplace if they were called. Therefore, Lebshier's own written statement submitted to CMS, her testimony at the hearing, and her actions after the incident indicate that SANDERS' behavior was more likely a threat to call the police if confronted by Victor Puckett again. Furthermore, the basic logic behind Lebshier's assertion is also questionable. Simply put, it is not reasonable to believe that SANDERS intended to physically harm Victor Puckett the next day in the work place AND call the State Police in the same instant.

c. No one from CMS management talked to SANDERS about his version of events after the incident with Victor Puckett on August 26, 2005, yet allegations had already been levied against SANDERS and Lebshier, the person who was supposed to represent SANDERS, had already determined and accepted that a 3 to 5-day suspension would be the likely outcome.

d. No one from CMS management talked to SANDERS about the September 9, 2005 incident before he was put on administrative leave and subsequently ordered to attend an IME. In fact, it was not until May of 2007 that SANDERS received any indication as to why he had been ordered to attend an IME – 13 months after SANDERS' attorney made the inquiry.

e. The OEIG determined that the allegations against SANDERS were "unfounded." This determination occurred prior to ordering SANDERS to attend the September 5, 2007 medical examination. As stated before, it was

25

not SANDERS had been given a specific directive to use "short form" prior to August 26, 2005 is unknown; again, Victor Puckett did not testify. But, if SANDERS had been given that specific directive, SANDERS would certainly be insubordinate for intentionally ignoring these instructions while performing the essential duties of his job. No matter what SANDERS thinks about a supervisor's instructions, he must accept the fact that he is required to follow them. Otherwise, he will undoubtedly find himself in front of the Civil Service Commission again for one reason or another.

## RECOMMENDED DECISION

It is the recommended finding that the written charges for discharge approved by the Director of Central Management Services, State of Illinois, have not been proven because, in light of the circumstances of this case, CMS was not reasonable in ordering Michael Sanders to attend the independent medical examination scheduled on September 5, 2007.


                                                  Andrew C. Barris
                                                  Administrative Law Judge

Entered this 8th day
August 2008

# EXHIBIT A17

# THIS EXHIBIT IS A COPY OF A PARTIAL TRANSCRIPT OF THE TESTIMONY OF DEPUTY GENERAL COUNSEL JEFF SHUCK

1

1          BEFORE THE CIVIL SERVICE COMMISSION

2                     STATE OF ILLINOIS

3

ILLINOIS DEPARTMENT OF        )
4  CENTRAL MANAGEMENT          )
SERVICES,                     )
5                              )
          Petitioner,          )
6                              )
     vs.                       )   Case No. DA-11-08
7                              )
MICHAEL SANDERS,               )
8                              )
          Respondent.          )
9

10

11

12       Hearing held on January 23, 2008 at the

13  Offices of the Illinois Civil Service Commission,

14  400 West Monroe, Suite 306, Springfield, Illinois,

15  scheduled for the hour of 10:00 a.m.

16

17

18  PRESENT:

19     MR. ANDREW BARRIS,
          Administrative Law Judge
20
     DONNA M. DODD, CSR
21

22
          GOLEMBECK REPORTING SERVICE
23        Connie S. Golembeck, Owner
               (217) 523-8244
24             (217) 632-8244

183

1   them back to management.  Then members of Internal

2   Personnel then brought that situation to my

3   attention seeking legal advice about that.

4       Q.   When you say that Mr. Sanders made

5   statements to a union steward, what were the nature

6   of those statements just generally?  What is your

7   understanding of them?

8       A.   Right.  What was related to me, it was

9   during the course of a predisciplinary meeting that

10  Mr. Sanders was agitated, and that a request was

11  made to take a break, and Mr. Sanders and his union

12  steward stepped out in the hallway.  And the union

13  steward subsequently reported that, it was during

14  that break, that Mr. Sanders was, as she described

15  it, visibly upset with clinched teeth and making

16  threats against his supervisor.  And obviously that

17  was a matter that people in Internal Personnel

18  wanted to get some advice about.

19      Q.   Okay.  Did -- Mr. Sanders was discharged

20  for failing to attend an IME, independent medical

21  examination.

22              Are you familiar with that?

23      A.   Yes.  One of the questions that was

24  brought to me was, you know, that proper handling

184

1    of that situation.   They had suspended the

2    continuation of that prediscipinary meeting in

3    order to address the situation that occurred in the

4    hallway, and it was basically a two-fold thing.

5                    One, was to refer what we perceived as

6    threats made by Mr. Sanders against his supervisor

7    to the Office of the OEIG for their investigation

8    and disposition, and the second was to address the

9    matter of his employment going forward.

10                   One of the issues that's connected to

11   that is whether it was appropriate and safe to have

12   Mr. Sanders, you know, go back to the work site

13   given the fact that he just made verbal, very

14   specific verbal threats about his supervisor, and,

15   you know, the folks in Internal Personnel come to

16   me for advice about that.

17       Q.   And as far as determining whether or not

18   it was safe or appropriate to allow Mr. Sanders

19   back into the workplace given those threats, were

20   you approached concerning what the options would

21   be?

22       A.   Yes, yes.   And I determined that it would

23   be appropriate to send Mr. Sanders for an

24   independent medical evaluation to determine whether

185

1    or not a medical professional felt that Mr. Sanders

2    was capable of performing the duties of his

3    position or not.

4              When this issue came up, you know, I

5    inquired as to, well, what's the history here,

6    because it's, you know, it's a common question we

7    ask.  You need to understand some of the

8    background, some of the situation that may have led

9    up to whatever, you know, situation that's

10   presented.

11             And it was my understanding that there

12   had been some friction between Mr. Sanders and the

13   supervisor in the past.  Situations of Mr. Sanders

14   essentially getting in his supervisor's face, being

15   very reluctant to take supervision, you know, being

16   defiant, and those sorts of things.

17             Which when considered in the light of

18   what was reported to have occurred during this

19   predisciplinary meeting, led me to believe that we

20   needed that medical determination to see whether it

21   was safe to have him continue.

22        Q.   Okay.  And whose safety is at issue?

23        A.   Everyone's.  It's actually Mr. Sanders

24   safety.  It's the safety of his supervisor.  It's

195

1   but what I can say is, had, you know, an IME come

2   back with an affirmative answer to the question,

3   you know, is this individual fit to perform his

4   duties, then, yes, you know, he'd be put back to

5   work.

6            And probably Mr. Sanders and his

7   supervisor would kind of be pulled aside and said,

8   look, you know, we don't have any friction.  You

9   guys work together and get along.  If you have

10  issues, run them up the chain, and give them a

11  little pep talk to try and get past whatever

12  friction they had between them.  But, yes, I mean,

13  there would have been -- that would have been the

14  end of the issue.

15       Q.   Okay.  And we've heard earlier testimony

16  about an OEIG investigation into some actions by

17  Mr. Sanders I think relating to these threats.

18            Are you familiar with that

19  investigation?

20       A.   Yes, I am.

21       Q.   Okay.  And was it your understanding that

22  that investigation came back as unfounded?

23       A.   That is my understanding, yes.

24       Q.   And given that knowledge, you still

196

1    determined that an IME was necessary?

2        A.   Yes, because we're talking about two

3    completely separate issues.  The OEIG investigation

4    was or the referal to OEIG was for the purpose of

5    their determining whether there had been any

6    violation of the rules sufficient to warrant

7    discipline with respect to his conduct at that

8    predisciplinary meeting.  Okay.  That addresses a

9    set point in time.

10                 And the issue regarding the IME is

11   with respect to going forward.  It's a completely

12   separate issue.  One is regarding is discipline

13   appropriate for what occurred here.  The other

14   question with the IME is, well, what do we do now.

15   It's completely independent.  If there was

16   discipline or if there was not, either way doesn't

17   answer the question of whether or not Mr. Sanders

18   was fit to perform his duties.

19                 Either way can be completely

20   consistent.  He could be deserving of discipline

21   and fit to perform his duties or not fit.  He could

22   be not deserving of discipline and fit or unfit to

23   perform his duties.  They don't control each other

24   in any way.

210

1          A.   I don't believe so.  If you give me a

2     moment, I'll double check that.

3               ADMINISTRATIVE LAW JUDGE BARRIS:  Now,

4     that your questions are getting into the content

5     now, can I look into the content for policy?

6               MR. WILSON:  Sure.

7               ADMINISTRATIVE LAW JUDGE BARRIS:  Okay.

8     BY MR. WILSON:

9          Q.   Do you recall the question?

10         A.   I believe I do.  You asked me if there was

11    any reference to any policy or rule in this letter.

12         Q.   A specific policy or rule?

13         A.   And I think my answer to your question is

14    that I make a couple of statements in here that I

15    believe are reflective of policy, but they don't

16    refer to any policy by any sort of number or any

17    other book where you would find such.

18         Q.   Okay.  And you don't cite any provisions

19    of the AFSCME contract in that letter, do you?

20         A.   I believe that's correct, I do not.

21         Q.   Okay.  The letter that you wrote July

22    31st, do you have a copy of that?

23         A.   Yes, I do.

24         Q.   Do you see in the second full paragraph of

211

1    that letter when you suggest that a history of

2    friction between Michael and Victor evidences an

3    inability on Michael's part to accept supervision

4    from a supervisor?

5        A.   Yes.

6        Q.   And then you go on to assert that, well,

7    essentially, if I summarize that letter, are you

8    saying that the IME is justified because Michael is

9    unable to accept supervision from Victor Puckett?

10       A.   No.

11              What I was indicating here is that the

12   decision to send Mr. Sanders for an IME was based

13   upon his conduct at the predisciplinary hearing.

14              In reviewing that conduct, I asked

15   about and also considered whatever other history

16   could be brought to my attention about that, and I

17   was informed that there was this history of

18   friction between Mr. Sanders and his supervisor.

19              To me, that was instructive in helping

20   me decide whether to interpret what occurred, was

21   reported to have occurred at the predisciplinary

22   meeting as, you know, more or likely to be a one

23   time somebody saying something he shouldn't have

24   said versus, you know, an escalating pattern type