E-FILED
Tuesday, 01 November, 2011  05:09:35 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| MICHAEL  A.  SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. 09-3207 |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CENTRAL MANAGEMENT SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES the Defendant, the ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES, by and through its attorney, Lisa Madigan, Attorney General for the State of Illinois, and for its Memorandum of Law in Support of its Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1, states unto the Court as follows:

## I.  INTRODUCTION

Plaintiff, Michael Sanders, was employed as an entry-level data processing technician for the Illinois Department of Central Management Services ("CMS").  During the first seven months of Plaintiff's employment with CMS, Plaintiff, on numerous occasions, engaged in conduct that was insubordinate, disrespectful, and threatening towards his supervisory staff.  A determination was made by CMS to place Plaintiff on paid administrative leave, and require Plaintiff to attend an psychiatric independent medical evaluation to determine his fitness for duty.  Plaintiff refused to attend any of the psychiatric independent medical examinations scheduled by CMS.  As a result, Plaintiff was disciplined with a 30-day suspension, and was ultimately discharged for his continued insubordination for his failure to attend the psychiatric independent medical evaluations.  Plaintiff was reinstated to his position by the Illinois Civil Service Commission. Plaintiff brings his

Complaint against CMS, alleging that CMS violated his rights under the Americans with Disabilities Act ("ADA") in requiring Plaintiff to attend a psychiatric independent medical examination. Plaintiff further alleges that CMS violated the ADA by disciplining Plaintiff for his failure to attend the psychiatric independent medical examination.

Defendant is entitled to summary judgment on Plaintiff's claims.   The psychiatric independent medical examination sought by CMS was job-related and consistent with business necessity.

## II.  UNDISPUTED MATERIAL FACTS

### Plaintiff's Employment History with the State of Illinois

1. Plaintiff began employment the State of Illinois at the Illinois Board of Education in 1993. (Exhibit A, Testimony of Michael Sanders from the January 23, 2008, hearing in *Illinois Department of Central Management Services v. Michael Sanders*, Illinois Civil Service Commission case number DA-11-08, p. 68, ln. 6-11).

2. In 2000, Plaintiff became employed with the Illinois Department of Public Aid as a data processing technician.  (Exhibit A, Testimony of Michael Sanders, p. 68, ln. 10-16; p. 69, ln. 1-4).

3. While employed at the Department of Public Aid, Plaintiff was reprimanded in 2004 for failing to follow instructions, and for sending several discourteous and disrespectful emails to his supervisor.  (Exhibit A, Testimony of Jeff Shuck from the January 23, 2008, hearing in DA-11-08, p. 201, ln. 2-11; Petitioner's Exhibit 8 from DA-11-08, p. 4).

4. In approximately February, 2005, Plaintiff became employed with the Illinois Department of Human Services as a data processing technician.  (Exhibit A, Testimony of Michael Sanders, p. 68, ln. 6-21; p. 69, ln. 1-4).

5.      When Plaintiff became employed with the Illinois Department of Human Services, Victor Puckett was Plaintiff's immediate supervisor.  (Exhibit A, Testimony of Michael Sanders, p. 69, ln. 17-23).

6.      On March 16, 2005, the Illinois Department of Central Management Service's Bureau of Communication and Computer Services assumed management of data processing for all State agencies.  (Exhibit B, Affidavit of Jeff Shuck, ¶ 5).

7.      Due to the consolidation of data processing into CMS, Plaintiff became an employee of CMS on March 16, 2005.  (Exhibit B, Affidavit of Jeff Shuck, ¶ 6).

8.      Once an employee of CMS, Defendant Sanders was employed in an entry-level position as a data processing technician, the same position he held with the Department of Public Aid and the Department of Human Services.  (Exhibit C, Testimony of Stephen Petrilli from the March 18, 2008 hearing in DA-11-08, p. 494, ln. 14-24; Exhibit A, Testimony of Michael Sanders, p. 69, ln. 1-4).

9.      Plaintiff was employed in Input/Output Control, commonly referred to as IO Control. (Exhibit C, Testimony of Stephen Petrilli, p. 492, ln. 15-22).

10.     Plaintiff worked in the Input Unit of IO Control, and worked the second shift.  (Exhibit C, Testimony of Stephen Petrilli, p. 492, ln. 11-14).

11.     For his job duties, Plaintiff monitored computer programs and corrected the programs if they failed to run correctly.  (Exhibit A, Testimony of Michael Sanders, p. 67-68, ln. 19-5).

12.     If a program does not complete properly, it is called an abend, or an abnormal end.  (Exhibit C, Testimony of Stephen Petrilli, p. 494, ln. 8-13).

13.     JCL stands for job control language of a program, and a JCL override can restart a program that has ended improperly.  (Exhibit C, Testimony of Stephen Petrilli, p. 495-496, ln.18-1; p. 512-513, ln. 21-14).

14.     According to Plaintiff's supervisory staff, Plaintiff was responsible for following the production processing schedules for several State agencies.  (See Exhibit C, Testimony of Stephen Petrilli, p. 492-493, ln. 15-1).

15.     Plaintiff's supervisory staff believes that the programs monitored by Plaintiff process a variety of information, including LINK card benefits, pharmacy information used by mental health facilities, cash benefits, and personnel payroll.  (Exhibit C, Testimony of Stephen Petrilli, p. 510-511, ln. 19-3).

16.     Plaintiff's supervisory staff believes that patients, clients, and state employees are affected by the processing work performed by this unit.  (Exhibit C, Testimony of Stephen Petrilli, p. 509-510, ln. 14-6).

17.     After Victor Puckett, Dennis Phipps, a Public Service Administrator, was the next supervisor in Plaintiff's chain of command. (Exhibit D, Affidavit of Victor Puckett, ¶ 5).

18.     Upon the retirement of Dennis Phipps, Jim Davis assumed Phipps' position on a temporary assignment while Plaintiff was employed by CMS.  (Exhibit D, Affidavit of Victor Puckett, ¶ 5).

19.     The next supervisor in Plaintiff's chain of command was Deb Cowan, a Senior Public Service Administrator.  (Exhibit D, Affidavit of Victor Puckett, ¶ 6).

20.     When Ms. Cowan was on medical leave during Plaintiff's employment with CMS, Steve Miller acted in Ms. Cowan's supervisory role.  (Exhibit D, Affidavit of Victor Puckett, ¶ 6).

21.      After Ms. Cowan, the next supervisor in Plaintiff's chain of command was Steven Petrilli, an Operations Manager.  (See Exhibit D, Affidavit of Victor Puckett, ¶7).

<u>Plaintiff's Conduct at CMS</u>

22.     On February 10, 2005, Victor Puckett sent an email to the I/O input unit. (Exhibit D, Affidavit of Victor Puckett, ¶ 8, Puckett Affidavit Exhibit 1).

-4-

23.  Mr. Puckett's February 10, 2005, email was sent to Plaintiff, and directed staff to inform their immediate supervisor if they needed to leave their work area.  (Exhibit D, Affidavit of Victor Puckett, ¶ 8, Puckett Affidavit Exhibit 1).

24.  On February 11, 2005, Mr. Puckett sent an email to Plaintiff directing Plaintiff to refrain from entering unauthorized areas at work, and directing Plaintiff to refrain from leaving his work area without notifying his supervisor.  (Exhibit D, Affidavit of Victor Puckett, ¶ 9, Exhibit 2).

25.  On March 9, 2005, Mr. Puckett sent an email to Plaintiff directing Plaintiff to stop attempting to fix a program malfunction with his own flow chart, and directing Plaintiff to only fix a program with flow charts that have been provided.  (Exhibit D, Affidavit of Victor Puckett, ¶ 10, Puckett Affidavit Exhibit 3).

26.  On June 8, 2005, Plaintiff received a one-day suspension for conduct including being absent from his work area without notifying his supervisor and for being in a restricted area in the workplace.  (Exhibit B, Affidavit of Jeff Shuck, ¶ 7, Shuck Affidavit Exhibit 1).

27.  On June 10, 2005, Victor Puckett sent Plaintiff an email advising Plaintiff that Plaintiff had incorrectly performed a work-related task, and advised Plaintiff that an immediate supervisor should be notified prior to Plaintiff attempting to fix a programming error.  (Exhibit D, Affidavit of Victor Puckett, ¶ 11, Puckett Affidavit Exhibit 4).

28.  Plaintiff responded to Mr. Puckett's email by email dated June 10, 2005. (Exhibit D, Affidavit of Victor Puckett, ¶ 11, Puckett Affidavit Exhibit 4).

29.  In his email response, Plaintiff advised Mr. Puckett that Mr. Puckett's email is petty, and Plaintiff complained that Puckett's "complaints" about Plaintiff were "trivial and mundane." (Exhibit D, Affidavit of Victor Puckett, ¶ 11, Puckett Affidavit Exhibit 4).

30.     In addition, Plaintiff advised Mr. Puckett that Plaintiff "would appreciate it if you would take more time to consider the relevance of your E-Mails before you send them to me."  (Exhibit D, Affidavit of Victor Puckett, ¶ 11, Puckett Affidavit Exhibit 4).

31.     On June 24, 2005, Mr. Puckett sent an email to Plaintiff, advising Plaintiff not to leave his work area if no one else is present in the work area.  (Exhibit D, Affidavit of Victor Puckett, ¶ 12, Puckett Affidavit Exhibit 5).

32.     Plaintiff responded to Mr. Puckett's email by email dated June 24, 2005, wherein he accused Mr. Puckett of being a racist.  (Exhibit D, Affidavit of Victor Puckett, ¶ 12, Puckett Affidavit Exhibit 5).

33.     On June 30, 2005, Mr. Puckett sent Plaintiff an email advising Plaintiff to consult with a supervisor before fixing a program when it abends. (Exhibit D, Affidavit of Victor Puckett, ¶ 13, Puckett Affidavit Exhibit 6).

34.     On July 2, 2005, Plaintiff responded to Mr. Puckett's email with an email that included the following statements: "I believe that your failure to properly acknowledge my work is due to little more than your acute racism and bigotry.  In my opinion You have developed some type of fetish with this African American employee that you need to address with higher management.  The directions that you provide are little more that [sic] subterfuge to disguise your racial fetish and increase the amount of work that I would have to perform."  (Exhibit D, Affidavit of Victor Puckett, ¶ 13, Puckett Affidavit Exhibit 6).

35.     Plaintiff's email response also included the following statements: "Perhaps, the distinction between slaves and subordinate employees is not clear to you.  I suggest that you seek mental health counseling on obtaining a better understanding of the differences between the two and on how to properly work with your employees.  You are to interpret this as saying that I

believe that you are in need of mental health treatment." (Exhibit D, Affidavit of Victor Puckett, ¶ 13, Puckett Affidavit Exhibit 6).

36.     On August 10, 2005, Plaintiff received a three-day suspension for his July 2, 2005 email to Mr. Puckett; for leaving work early without obtaining approval to take benefit time on June 25, 2005; and for an incident on June 30, 2005 where Plaintiff, while on the telephone with a programmer, became irate to his supervisor when his supervisor asked to speak to the programmer. (Exhibit B, Affidavit of Jeff Shuck, ¶ 8, Shuck Affidavit Exhibit 2).

37.     On August 9, 2005, Mr. Puckett sent an email to Plaintiff, directing Plaintiff to come to his supervisors for assistance on work-related tasks, instead of others in the agency. (Exhibit D, Affidavit of Victor Puckett, ¶ 14, Puckett Affidavit Exhibit 7).

38.     On August 13, 2005, Plaintiff responded to Mr. Puckett's email with an email that contained the following statement: "I DO NOT NEED YOU TO INTERFERE IN THE [sic] MY COMMUNICATION WITH OTHER UNITS OF THIS AGENCY WHEN LEGITIMATE WORK RELATED REASONS EXIST FOR THAT COMMUNICATION." (Emphasis in original). (Exhibit D, Affidavit of Victor Puckett, ¶ 14, Puckett Affidavit Exhibit 7).

39.     On August 26, 2005, a software program Plaintiff was monitoring shut down. (Exhibit A, Testimony of Michael Sanders, p. 85, ln. 4-7).

40.     Plaintiff's supervisory staff believes that if a software program shuts down, there are specific instructions on how to restart a program. (Exhibit C, Testimony of Stephen Petrilli, p. 512, ln. 3-20; p. 509-510, ln. 14-18).

41.     Plaintiff's supervisory staff believes that given the interrelation between the various software programs monitored by Plaintiff, it was important that Plaintiff follow the instruction

schedule when restarting a program.  (Exhibit C, Testimony of Stephen Petrilli, p. 512-514, ln. 21-19).

42.    Plaintiff did not believe it was necessary for him to follow the protocols for fixing software established by his supervisory staff.  (Exhibit A, Testimony of Michael Sanders, p. 79-80, ln. 4-15).

43.    Plaintiff's supervisory staff believes that if an employee uses a different methodology or different job control language to fix a program, problems may result weeks later or the unauthorized method could effect other software programs.  (See Exhibit C, Testimony of Stephen Petrilli, p. 516-517, ln. 22-12).

44.    Plaintiff's supervisory staff believes that if an employee does not follow the Department's instructions when fixing a program, it would be the responsibility of the employee's supervisor to bring the error to the employee's attention.  (Exhibit C, Testimony of Stephen Petrilli, p. 514-515, ln. 20-4).

45.    When the program monitored by Plaintiff shut down on August 26, 2005, Plaintiff did not follow the Department's instructions for restarting the program.  (Exhibit A, Testimony of Michael Sanders, p. 79-80, ln. 4-15).

46.    Mr. Puckett attempted to discuss with Plaintiff the manner in which Plaintiff went about restarting the program. (Exhibit A, Testimony of Michael Sanders, p. 84-85, ln. 23-16).

47.    Plaintiff believes that Mr. Puckett's discussion with him about Plaintiff's incorrect method to fix the program was ignorant, unimportant, irrelevant, and unnecessary.  (Exhibit E, Testimony of Michael Sanders, p. 300, ln. 4-19; p. 312-313, ln. 11-23).

48.    Plaintiff's supervisory staff received a report from Victor Puckett regarding Plaintiff's behavior on August 26, 2005.   (Exhibit D, Affidavit of Victor Puckett, ¶ 15, Puckett Affidavit Exhibit 8).

49.     In the report, Mr. Puckett states that while he was trying to inform Plaintiff that Plaintiff needed to follow the written instructions to fix a program, Plaintiff told Mr. Puckett twice that he was through listening to Mr. Puckett.  (Exhibit D, Affidavit of Victor Puckett, ¶ 15, Puckett Affidavit Exhibit 8).

50.     The report also states that Plaintiff leaned in very closely to Mr. Puckett's face, and Mr. Puckett had to ask Plaintiff to move away three times.  (Exhibit D, Affidavit of Victor Puckett, ¶ 15, Puckett Affidavit Exhibit 8).

51.     In the report, Mr. Puckett states that Plaintiff's behavior intimidated Mr. Puckett, and made Mr. Puckett feel threatened.  (Exhibit D, Affidavit of Victor Puckett, ¶ 15, Puckett Affidavit Exhibit 8).

52.     The following day, on August 27, 2005, while at work during the second shift, Plaintiff dialed 911 to report his discussion with Mr. Puckett from the previous evening. (See Exhibit A, Testimony of Michael Sanders, p. 72-73, ln. 22-3).

53.     The police responded to the call, but did not interview or arrest Mr. Puckett.  (Exhibit A, Testimony of Michael Sanders, p. 88, ln. 12-16).

54.     As a result of his conduct during the August 26, 2005, incident involving Mr. Puckett, Plaintiff faced discipline.  (Exhibit A, Testimony of Michael Sanders, p. 76-77, ln. 18-1).

55.     A pre-disciplinary hearing was held on September 9, 2005.  (Exhibit A, Testimony of Michael Sanders, p. 64, ln. 3-22).

56.     Plaintiff was represented at the hearing by Jayme Lebshier, his union representative. (Exhibit A, Testimony of Michael Sanders, p. 64, ln. 3-22).

57.   Before the hearing was over, Plaintiff announced that he had enough, and left the hearing. (Exhibit A, Testimony of Jayme Lebshier from January 23, 2008, hearing in DA-11-08, p. 107, ln. 1-21).

58.   Ms. Lebshier left the meeting to join Plaintiff.  (Exhibit A, Testimony of Jayme Lebshier, p. 107, ln. 20-24).

59.   Plaintiff and Ms. Lebshier went outside of the building, and had a conversation about Victor Puckett. (Exhibit A, Testimony of Michael Sanders, p. 64, ln. 13-22).

60.   Plaintiff was upset during his conversation with Ms. Lebshier about Mr. Puckett.  (Exhibit A, Testimony of Michael Sanders, p. 64, ln. 13-24).

61.   Ms. Lebshier notified Plaintiff's supervisory staff that during her conversation with Plaintiff, Plaintiff threatened to harm Mr. Puckett.  (Exhibit A, Testimony of Jayme Lebshier, p. 112, ln. 11-15).

62.   Plaintiff's supervisory staff received a written report from Ms. Lebshier regarding her conversation with Plaintiff that occurred on September 9, 2005, after Plaintiff left his pre-disciplinary hearing. (Exhibit A, Testimony of Jayme Lebshier, p. 115-118, ln. 18-24; Petitioner's Exhibit 5; Petitioner's Exhibit 6).

63.   In her written report, Ms. Lebshier informed Plaintiff's supervisory staff that during her conversation with Plaintiff about Mr. Puckett, Plaintiff became visibly upset, was shaking, and said repeatedly that he was going to "get" Mr. Puckett.  (Exhibit A, Petitioner's Exhibit 6).

64.   In her written report, Ms. Lebshier informed Plaintiff's supervisory staff that Plaintiff stated he was going to "set up" Mr. Puckett the following evening shift, a Saturday, when they

would be working alone together and there would be no witnesses. (Exhibit A, Petitioner's Exhibit 6).

65.     In her written report, Ms. Lebshier informed Plaintiff's supervisory staff that she tried to calm Plaintiff down during the conversation, but Plaintiff was "in [her] face" and she was frightened by Mr. Sanders' conduct during the conversation. (Exhibit A, Petitioner's Exhibit 6).

### Defendant's Determination to Send Plaintiff to an Fitness for Duty Examination

66.     Jeff Shuck is Deputy General Counsel for the Department's Legal Department, overseeing personnel matters. (Exhibit B, Affidavit of Jeff Shuck, ¶ 1).

67.     On September 9, 2005, Mr. Shuck received a report that Plaintiff made threats against his supervisor. (Exhibit A, Testimony of Jeff Shuck from January 23, 2008, hearing in DA-11-08, p. 182-183, ln. 15-3).

68.     Mr. Shuck initially learned of the situation late on a Friday afternoon, and since Plaintiff's threats focused on the following day, a Saturday, a decision was made to immediately place him on administrative leave. (Exhibit A, Testimony of Jeff Shuck, p. 238, ln. 3-24).

69.     Plaintiff was placed on paid administrative leave effective September 9, 2005. (Exhibit B, Affidavit of Jeff Shuck, ¶ 9).

70.     After Plaintiff was placed on paid administrative leave, Mr. Shuck determined that it would be appropriate to send Plaintiff for an independent medical evaluation to determine whether or not a medical professional felt that Plaintiff was capable of performing the duties of his position, and whether it was safe for Plaintiff to continue performing the duties of his position. (Exhibit A, Testimony of Jeff Shuck, p. 184-185, ln. 17-21).

71.     In determining whether Plaintiff should attend a fitness for duty examination, Mr. Shuck read the written report submitted by Ms. Lebshier; took into consideration the history between Plaintiff and Mr. Puckett; considered Plaintiff's insubordinate conduct towards supervisory staff; considered Plaintiff's recent disciplinary history; and considered the safety of Plaintiff, Mr. Puckett, their co-workers, and any members of the public that might be in the building where Plaintiff works.  (Exhibit A, Testimony of Jeff Shuck, p. 238, ln. 3-6; p. 184-188, ln. 17-7; p. 201, ln. 2-11; Petitioner's Exhibit 8).

72.     Had the independent medical examination resulted in a finding that Plaintiff was unfit for duty, Mr. Shuck believes that Defendant would have offered Plaintiff an accommodation, a disability leave, or the opportunity to obtain a second opinion. (Exhibit A, Testimony of Jeff Shuck, p. 219-220 , ln. 4-10).

73.     Defendant scheduled an independent medical examination for Plaintiff to be conducted by Dr. Terry Killian on October 5, 2005.  (Exhibit C, Testimony of Melissa Riggins from March 18, 2008 hearing in DA-11-08, p. 408, ln. 8-20; Petitioner's Exhibit 9, p. 1).

74.     Dr. Killian is a psychiatrist.  (Complaint, ¶ 16).

75.     Plaintiff did not attend the October 5, 2005, independent medical examination.  (Complaint, ¶ 20).

76.     Defendant scheduled a second independent medical examination for Plaintiff to be conducted by Dr. Terry Killian on October 12, 2005.  (Exhibit C, Petitioner's Exhibit 9, p. 2).

77.     Plaintiff did not attend the October 12, 2005, independent medical examination. (Complaint, ¶ 20).

78.   On November 23, 2005, Plaintiff was discharged by Defendant for insubordinate conduct for failing to attend the October 5, 2005, and October 12, 2005, independent medical examinations.  (Exhibit B, Affidavit of Jeff Shuck, ¶ 11).

79.   Plaintiff remained on paid administrative leave from September 9, 2005, to November 23, 2005.  (Exhibit B, Affidavit of Jeff Shuck, ¶ 10).

80.   Defendant voluntarily rescinded Plaintiff's discharge effective February 1, 2006.  (See Exhibit F, certified copy of Findings and Decision of the Commission in *Illinois Department of Central Management Services v. Michael Sanders,* Illinois Civil Service Commission case number DA-25-06).

81.   Plaintiff was reimbursed for back wages which accrued between November 23, 2005 though February 1, 2006.  (Exhibit B, Affidavit of Jeff Shuck, ¶ 13).

82.   Upon Plaintiff's reinstatement, Plaintiff was immediately placed upon paid administrative leave.  (Exhibit B, Affidavit of Jeff Shuck, ¶ 13).

83.   Defendant scheduled a third independent medical examination for Plaintiff to be conducted by Dr. Terry Killian on April 19, 2006. (Exhibit C, Petitioner's Exhibit 9, p. 2).

84.   Melissa Riggins was the Acting Human Resources Director for CMS from September, 2006, through September, 2007.  (Exhibit C, Testimony of Melissa Riggins from March 18, 2008 hearing in DA-11-08, p. 395-396, ln. 22-20).

85.   In September, 2007, Ms. Riggins received a report from Dr. Killian summarizing Defendant's attempts to schedule an independent medical examination for Plaintiff. (Exhibit C, Testimony of Melissa Riggins, p. 408, ln. 8-20; Petitioner's Exhibit 9).

86.   In the report, Dr. Killian states that Plaintiff, in response to the independent medical examination scheduled for April 19, 2006, threatened legal action against Dr. Killian. (Exhibit C, Petitioner's Exhibit 9, p. 2).

87.   Plaintiff did not attend the April 19, 2006, independent medical examination. (Complaint, ¶ 20).

88.   Defendant scheduled a fourth independent medical examination for Plaintiff to be conducted by Dr. Terry Killian on January 30, 2007. (Exhibit C, Petitioner's Exhibit 9, p. 2).

89.   Plaintiff did not attend the January 30, 2007, independent medical examination. (Complaint, ¶ 20).

90.   Defendant scheduled a fifth independent medical examination for Plaintiff to be conducted by Dr. Terry Killian on June 13, 2007. (Exhibit C, Petitioner's Exhibit 9, p. 2).

91.   Plaintiff did not attend the June 13, 2007, independent medical examination. (Complaint, ¶ 20).

92.   Plaintiff was on paid administrative leave from February 1, 2006 to August 1, 2007. (Exhibit B, Affidavit of Jeff Shuck, ¶ 14).

93.   From August 1, 2007, to August 30, 2007, Plaintiff served a 30-day suspension for insubordination for failing to attend the June 13, 2007, independent medical examination. (Exhibit B, Affidavit of Jeff Shuck, ¶ 15).

94.   After the completion of the 30-day suspension, Plaintiff was immediately placed on paid administrative leave.  (Exhibit B, Affidavit of Jeff Shuck, ¶ 16).

95.   Defendant scheduled a sixth independent medical examination for Plaintiff to be conducted by Dr. Terry Killian on September 5, 2007. (Exhibit C, Petitioner's Exhibit 9, p. 1, 2).

96.   In Dr. Killian's September 5, 2007, report, Dr. Killian advised Ms. Riggins that prior to the September 5, 2007, independent medical examination, Plaintiff delivered two memos to Dr. Killian.  (Exhibit C, Petitioner's Exhibit 9, p. 2, 4-7).

97.   Dr. Killian reported that in the memos, Plaintiff threatened legal action against Dr. Killian, threatened disciplinary action against Dr. Killian, and threatened to contact the media if Dr.

Killian refused to cancel the independent medical examination.  (Exhibit C, Petitioner's Exhibit 9, p. 2, 4-7).

98. Plaintiff did not attend the September 5, 2007, independent medical examination. (Complaint, ¶ 20).

99. On October 5, 2007, Plaintiff was placed on suspension pending discharge for insubordination for failing to attend the September 5, 2007, independent medical examination. (Exhibit B, Affidavit of Jeff Shuck, ¶ 16).

100. Plaintiff was on paid administrative leave from August 31, 2007, to October 5, 2007. (Exhibit B, Affidavit of Jeff Shuck, ¶ 18).

101. On October 17, 2007, Plaintiff was discharged by Defendant for insubordination for failing to attend the September 5, 2007, independent medical examination. (Exhibit B, Affidavit of Jeff Shuck, ¶ 19).

102. Plaintiff appealed his discharge to the Illinois Civil Service Commission.  (Exhibit B, Affidavit of Jeff Shuck, ¶ 20).

103. On August 21, 2008, the Illinois Civil Service Commission reversed Defendant's discharge of Plaintiff. (Exhibit B, Affidavit of Jeff Shuck, ¶ 21).

104. On September 23, 2008, Defendant filed a complaint in circuit court seeking administrative review of the Illinois Civil Service Commission's decision and a motion seeking to stay enforcement of the Commission's decision. (Exhibit B, Affidavit of Jeff Shuck, ¶ 22).

105. On October 30, 2008, the circuit court entered an order on Plaintiff's motion to stay. (Exhibit G, certified copy of Order entered in *Illinois Department of Central Management Services v. Illinois Civil Service Commission*, Sangamon County case number 2008-MR-551).

106.    In the order, the circuit court ordered Defendant to reinstate Plaintiff on paid administrative leave effective October 28, 2008.  (Exhibit G).

107.    On February 24, 2008, the circuit court denied Defendant's complaint seeking administrative review.  (Exhibit H, certified copy of Order entered in Sangamon County case number 2008-MR-551).

108.    Plaintiff was reinstated to employment with CMS and reimbursed for back wages which accrued from October 5, 2007 through October 28, 2008. (Exhibit B, Affidavit of Jeff Shuck, ¶ 23).

### III.  ARGUMENT

#### A.    Standard for Summary Judgment

Summary judgment is proper if the pleadings, answers to interrogatories, depositions, and admissions, along with affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c).  Only disputes over facts that might affect the outcome of the suit, under the governing law, will properly preclude the entry of summary judgment.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  In making this determination, the court is to draw inferences from the record in the light most favorable to the non-moving party.  The court is not required, however, to draw every conceivable inference; rather, it may draw only those that are reasonable.  *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1986).

The Seventh Circuit clarified the standard further in *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473 (7th Cir. 1988), *cert. denied*, 488 U.S. 852 (1988):

> The existence of a triable issue is no longer sufficient to survive a motion for summary judgment . . . the test for summary judgment is whether sufficient evidence exists in the pre-trial record to allow the non-moving party to survive a motion for directed verdict.

*Id.* at 476.

The United States Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986), established that a party moving for summary judgment can prevail simply by showing that the other party has no evidence on an issue which the party has the burden of proof. *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine" issue for trial. *Mechnig v. Sears Roebuck & Co.*, 864 F.2d 1359, 1363 (7th Cir. 1988). The plaintiff must come forward with evidence that would reasonably permit the finder of fact to find in plaintiff's favor on a material question; otherwise, the court must enter summary judgment against the plaintiff. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920-921 (7th Cir. 1994); *International Union of Operating Engineers v. Associated General Contractors*, 845 F.2d 704, 708 (7th Cir. 1988).

**B.    The psychiatric independent medical examination ordered by Defendant was consistent with the ADA, thus entitling Defendant to summary judgment on Plaintiff's claim.**

Plaintiff's allegations against Defendant are limited. Plaintiff alleges Defendant violated his rights under Section 12112(d)(4)(A) of the ADA by requiring him to attend a psychiatric independent medical examination and then subjecting Plaintiff to discipline for his failure to attend. (Complaint, ¶ 25). Section 12112(d)(4)(A) provides that an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The following section in the ADA permits employers to "make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B).

The Seventh Circuit recognizes that the EEOC enforcement guidelines provide that an employer-requested medical examination is considered job-related and consistent with a business necessity "when an employer has a reasonable belief based on objective evidence that a medical

condition will impair an employee's ability to perform essential job function or that the employee

will pose a threat due to a medical condition." *Coffman v. Indianapolis Fire Department*, 578 F.3d

559, 565 (7th Cir. 2009), *see* 29 CFR § 1630 app. *See also Karraker v. Rent-A-Center, Inc.*, 411 F.3d

831 (2005) ("We frequently look to EEOC guidelines for guidance in discrimination cases, which,

"while not controlling upon courts by reason of their authority, do constitute a body of experience

and informed judgment to which courts and litigants may properly resort for guidance." *Id.* at 835,

*citing Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986)).  Courts have applied an objective or

reasonable person standard in cases involving employee fitness for duty examinations under the

ADA.  *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001); *Sullivan v. River Valley

School Dist.*, 197 F.3d 804, 813 (6th Cir. 1999); *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146

(9th Cir. 2010);  *Conroy v. N.Y. State Dep't of Corr. Servs.,* 333 F.3d 88, 98 (2d Cir. 2003).

　　　The Seventh Circuit has further acknowledged that psychiatric fitness for duty evaluations

"may be permissible when they reflect concern for the safety of employees and the 'public at large.'"

*Coffman,* 578 F.3d at 565 *citing Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2000) *and

Conroy,* 333 F.3d at 99.  Whether a fitness for duty examination meets the criteria under the ADA

varies by workplace.  *Coffman*, 578 F.3d at 565, *citing Conroy*, 333 F.3d at 99.

　　　In 1997, the Central District of Illinois considered the propriety of psychiatric medical

examinations in *Miller v. Champaign Community Unit School District*, 983 F.Supp. 1201 (1997).

In that case, plaintiff, Earl Miller, a custodian at an elementary school, began displaying erratic

behavior eight years after he was first employed by the defendant school district.  *Id.* at 1204.  The

behavior started after a new principal was assigned to supervise Miller, and the new principal sent

Miller several memos regarding his job performance.  *Id.*  Among other behaviors, Miller informed

staff that he believed some unknown person was intentionally interfering with his job to try and get

him fired.  *Id.*  In addition, Miller accused a teacher of urinating on the bathroom floor, and, when

offered some candy by a co-worker, turned and stated that "it's going to get taken care of; it's going to get taken care of." *Id.* Miller's supervisor received a report plaintiff was going to booby-trap his office. *Id.* Miller's supervisor then contacted the director of personnel, indicating that based upon Miller's behaviors, she was concerned for her personal safety. *Id.* at 1205. After acting agitated and suspicious at a meeting with his supervisory staff to discuss his behavior, Miller was placed on a paid leave of absence and required to attend a psychiatric fitness for duty examination. *Id.* Miller attended the examination, and was diagnosed with schizophreniform disorder, with paranoid psychotic symptoms. *Id.* Based upon the psychiatrist's suggestion, Miller was returned to work. *Id.* Miller filed a complaint against his employer alleging, among other things, that the psychiatric fitness for duty examination was in violation of the ADA. *Id.* at 1203.

In granting summary judgment in favor of defendant, the Court noted that "[i]t is difficult for the court to grasp exactly what Mr. Miller is complaining about. He was never fired. His leave of absence was a paid leave of absence." *Id.* at 1206. Concluding that negligent hiring and supervision claims filed against schools are treated harshly by the courts, the Court found that "[t]he narrow ruling of this case is that a psychiatric examination is 'job-related and consistent with business necessity' in any case where an elementary school employee exhibits paranoid or agitated behavior that causes the school administration to be concerned about the personal safety of those in contact with the employee." *Id.* at 1206-1207, 1208.

In *Coffman,* plaintiff, Tonya Coffman, was employed as a firefighter. *Coffman*, 578 F.3d at 561. After Coffman had been employed as a firefighter for at least three years, her supervisory staff received reports that she was acting withdrawn and defensive for no legitimate reason. *Id.* at 562. Coffman was "mad or upset" after going over an evaluation with a supervisor, and defensive when another supervisor wanted to discuss weaknesses in some of her job skills. *Id.* Her supervisor required Coffman to attend a psychological fitness for duty examination. *Id.* Coffman attended

several examinations, and at one point was deemed unfit due to being "extremely resistant." *Id.*
Coffman was ultimately returned for duty, and sued her employer for variety of claims, including a
claim that the examinations were not job-related or consistent with business necessity. *Id.* at 563.
In affirming summary judgment in favor of Coffman's employer, the Court considered that although
Coffman's conduct of acting withdrawn and defensive may not justify mental fitness for duty
examination in different jobs, the nature of her duties as a firefighter rendered her examinations job-
related and consistent with business necessity. *Id.* at 566.

In this case, Defendant's decision to require Plaintiff to attend a psychiatric fitness for duty
examination was job-related and consistent with business necessity. Plaintiff began displaying
insubordinate conduct in 1994, while employed by the Illinois Department of Public Aid.
(Defendant's Undisputed Material Facts, ¶ 3). From that point, Plaintiff's conduct became
increasingly hostile in the workplace. Plaintiff repeatedly failed to follow supervisory direction.
(Defendant's Undisputed Material Facts, ¶ 23-26, 36, 42, 47). Next, Plaintiff sent inflammatory
emails to his immediate supervisor, Victor Puckett, accusing Mr. Puckett's assistance as being trivial
and mundane; accusing Mr. Puckett of being a racist, a bigot, and having a "fetish" toward him; and
telling Mr. Puckett that he was in need of mental health treatment. (Defendant's Undisputed
Material Facts, ¶ 29, 30, 32, 34, 35). Plaintiff's conduct culminated in demonstrative acts of
aggression towards his supervisor. Plaintiff was disciplined for becoming irate at his supervisor, and
was subject to discipline for "getting in Mr. Puckett's face" in a threatening manner. (Defendant's
Undisputed Material Facts, ¶ 36, 50, 54). Mr. Puckett reported to his supervisory staff that the
incident left him feeling threatened and intimidated by Plaintiff. (Defendant's Undisputed Material
Facts, ¶ 51). Plaintiff's response to the incident was to call 911 the following day, which resulted
in no arrest of Mr. Puckett. (Defendant's Undisputed Material Facts, ¶ 52-53).

As the final step in Plaintiff's course of conduct, Plaintiff left in the middle of a pre-disciplinary meeting after stating that he had "had enough", and, immediately thereafter, was upset during a conversation with his union steward as they discussed Mr. Puckett. (Defendant's Undisputed Material Facts, ¶ 57, 60). Plaintiff's supervisory staff received a report from Plaintiff's union steward, Jayme Lebshier, that Plaintiff was shaking and "in Ms. Lebshier's face" during her conversation with Plaintiff about Mr. Puckett, Plaintiff said repeatedly that he was going to "get" Mr. Puckett, and that Plaintiff was going to "set up" Mr. Puckett during the following shift during a time there would be no witnesses. (Defendant's Undisputed Material Facts, ¶ 62-4). Ms. Lebshier reported to Plaintiff's supervisory staff that she was frightened by Plaintiff during the conversation. (Defendant's Undisputed Material Facts, ¶ 65).

In determining that Plaintiff should attend a psychiatric fitness for duty evaluation, CMS Deputy General Counsel Jeff Shuck considered the history between Plaintiff and Mr. Puckett, Plaintiff's insubordinate behaviors, and the discipline Plaintiff had received while employed by CMS and at his previous employment at the Department of Public Aid. (Defendant's Undisputed Material Facts, ¶ 71). Mr. Shuck also had concerns about the safety of Plaintiff, Mr. Puckett, and any members of the public that may be in Plaintiff's workplace. (Defendant's Undisputed Material Facts, ¶ 71).

Defendant was presented with a report that Plaintiff threatened harm against his immediate supervisor. With this information, Defendant was placed in a difficult position. Defendant could have proceeded with discipline against Plaintiff for his conduct. However, Defendant had no guarantee that Plaintiff would be discharged from employment. Further, if Plaintiff challenged the discipline, a licensed psychiatrist would not be making the determination whether Plaintiff should return to the workplace. The decision would be made by someone who may not recognize the severity of the threat. By pursuing discipline for the threat of harm Plaintiff made against his

supervisor, Defendant would not have the benefit of knowing whether Plaintiff was fit to perform his duties. Instead of pursuing discipline, Defendant opted to send Plaintiff to an independent medical examination, and work to accommodate Plaintiff should he be found unfit for duty.

While *Miller* and *Coffman* affirm the propriety of psychiatric fitness for duty examinations in the context of a school employee and a firefighter, the dangers of workplace violence can occur at any location. Employers have to be diligent in their attempts to prevent violence in the workplace, and cannot wait until a incident manifests to address an employee presenting questionable behavior. Indeed, "[e]mployers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims..." *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir. 1998). Undoubtedly, reducing the potential for workplace violence is job-related and consistent with business necessity. Given the circumstances, Defendant's request was reasonable.

Plaintiff alleges that Defendant violated the ADA by disciplining him for his failure to attend the psychiatric fitness for duty examinations scheduled by Defendant. (Complaint, ¶ 25). As in the *Miller* case, it is difficult to determine what Plaintiff is complaining about. Plaintiff remained on a paid leave of absence for the majority of the time at issue. (Defendant's Undisputed Material Facts, ¶ 70. 79, 82, 92, 94, 100). Although Plaintiff was discharged for insubordinate conduct for his failure to attend the fitness for duty examinations, Plaintiff was reinstated to work, and compensated for his back wages. (Defendant's Undisputed Material Facts, ¶ 81, 108).

Defendant received a report Plaintiff intended to harm his immediate supervisor. This report came after Plaintiff had worked with his immediate supervisor for seven months, a period of time which was marked with increasingly insubordinate and hostile conduct towards his immediate supervisor. Plaintiff's angry emails, aggressive conduct, and threatening behaviors represent a level of aggression above the behaviors of the *Miller* and *Coffman* plaintiffs. Considering the workplace

dynamic, Defendant's request that Plaintiff attend a psychiatric fitness for duty examination was consistent with the ADA, and reasonable in this situation.

## IV.  CONCLUSION

Defendant is entitled to summary judgment on Plaintiff's claims.  Plaintiff cannot establish a violation of Section 12112(d)(4)(A) of the Americans with Disabilities Act.  Defendant's decision to require Plaintiff to attend an psychiatric fitness for duty examination was job-related and consistent with business necessity.

WHEREFORE, for the foregoing reasons, Defendant ILLINOIS CENTRAL MANAGEMENT SERVICES respectfully requests this honorable Court grant its Motion for Summary Judgment.

Respectfully submitted,

ILLINOIS DEPARTMENT OF
CENTRAL MANAGEMENT SERVICES,

Defendant,

LISA MADIGAN, Attorney General,
State of Illinois,

Amy Petry Romano, #6270427              Attorney for Defendant,
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706            By:   s/ Amy Petry Romano
(217)782-9056                                AMY PETRY ROMANO
        Of Counsel.                          Assistant Attorney General

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| MICHAEL A. SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. 09-3207 |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CENTRAL MANAGEMENT SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2011, I electronically filed a copy of the foregoing Memorandum of Law in Support Defendant's Motion for Summary Judgment, with the Clerk of the Court using the CM/ECF system, and I hereby certify that on the same date, I mailed by United States Postal Service, in an envelope properly addressed and with postage fully prepaid, the above-described document to the following participant:

Michael Sanders
400 East Jefferson, Apt. # 205
Springfield, IL 62701

Respectfully submitted,


   s/ Amy Petry Romano
Amy Petry Romano,  #6270427
Assistant Attorney General
500 South Second Street
Springfield, IL  62706
Phone: (217) 782-9056
Fax: (217) 782-8767
E-Mail: aromano@atg.state.il.us