E-FILED
Tuesday, 01 November, 2011  05:09:35 PM
Clerk, U.S. District Court, ILCD

1

1        BEFORE THE CIVIL SERVICE COMMISSION

2              STATE OF ILLINOIS

3

ILLINOIS DEPARTMENT OF        )
4  CENTRAL MANAGEMENT          )
SERVICES,                     )
5                             )
          Petitioner,          )
6                             )
     vs.                       )    Case No. DA-11-08
7                             )
MICHAEL SANDERS,              )
8                             )    COPY
          Respondent.          )
9

10

11

12        Hearing held on January 23, 2008 at the

13  Offices of the Illinois Civil Service Commission,

14  400 West Monroe, Suite 306, Springfield, Illinois,

15  scheduled for the hour of 10:00 a.m.

16

17

18  PRESENT:

19      MR. ANDREW BARRIS,
            Administrative Law Judge
20
        DONNA M. DODD, CSR
21

22

            GOLEMBECK REPORTING SERVICE
23            Connie S. Golembeck, Owner
                 (217) 523-8244
24               (217) 632-8244

EXHIBIT

A

29

1          All right.  Ms. Romano.

2          MS. ROMANO:  Yes.  I'd like permission to

3    treat Mr. Sanders as an adverse witness.

4          ADMINISTRATIVE LAW JUDGE BARRIS:  All

5    right.

6                    DIRECT EXAMINATION

7    BY MS. ROMANO:

8      Q.   Good morning.

9      A.   Good morning.

10     Q.   Could you please state your name for the

11   record?

12     A.   My name is Michael Sanders.

13     Q.   And could you spell your last name for the

14   court reporter?

15     A.   S-A-N-D-E-R-S.

16     Q.   You were employed by the Department of

17   Central Management Services, correct?

18     A.   Yes, ma'am.

19     Q.   And you worked for the Bureau of

20   Communication and Computer Services?

21     A.   Yes, ma'am.

22     Q.   Is this referred to as BCCS?

23     A.   Yes.

24     Q.   Okay.  And in this position you worked as

64

1                    REDIRECT EXAMINATION

2     BY MS. ROMANO:

3          Q.   You just mentioned that it was your

4     understanding that your tirade against Victor

5     Puckett which was mentioned in that paragraph you

6     just read to us in Respondent's Exhibit Number 2

7     was based upon some sort of occurrence that

8     happened on I believe August 26, 2005?

9          A.   Yes.

10         Q.   Did you have a conversation with a Jayme

11    Lebshier on September 9, 2005?

12         A.   Yes.

13         Q.   And during your conversation with Jayme

14    Lebshier on September 9, 2005, did you discuss

15    Victor Puckett?

16         A.   Yes.   September the 9th, 2005, that was

17    the date of our predisciplinary meeting.   Jayme

18    Lebshier representing AFSCME attended the meeting

19    with me, and after the meeting Jayme and I went

20    outside of the building and had a private

21    conversation of our own and, of course, you know,

22    we were discussing Victor Puckett.

23         Q.   Were you upset during that conversation?

24         A.   I'm quite certain that I was.

67

1    take a ten minute break.  Who are you going to call

2    next?

3         MS. ROMANO:  Jayme Lebshier.  I'm not

4    certain if she's here.  We'll check.

5         ADMINISTRATIVE LAW JUDGE BARRIS:  Ten

6    minutes we'll be back.

7                   (Whereupon there was a recess

8                    taken.)

9                 EXAMINATION

10   BY ADMINISTRATIVE LAW JUDGE BARRIS:

11       Q.  Mr. Sanders, I've got some questions for

12   you.

13       A.  Yes, sir.

14       Q.  And I think every question I'm going to

15   ask has been touched upon in one way or other.

16            But when you were terminated, you

17   worked for CMS, right?

18       A.  Yes, sir.

19       Q.  And you were a data processor?

20       A.  Data Processing Technician.

21       Q.  Okay.  And what did that involve?

22       A.  My job at CMS was to monitor the computer

23   system to ensure that certain computer programs

24   have been running, that if they, what we call

68

1  adbin.  If the computer programs develop problems,

2  and quite frequently those programs would

3  breakdown, and what my job was to detect when they

4  had broken down and to correct the problems and get

5  the programs reinitiated.

6      Q.   All right.  So I guess backtracking to the

7  beginning of your career with the state, you

8  started in 1993?

9      A.   Yes, sir.

10      Q.   Where did you start in 1993?

11      A.   The Illinois Board of Education.

12      Q.   How long were you there?

13      A.   Seven years.

14      Q.   Okay.  And then from the Board of

15  Education you went to where?

16      A.   The Department of Public Aid.

17      Q.   Okay.  And how long were you there?

18      A.   Five years.

19      Q.   Okay.  And then after you were at the

20  Department of Public Aid, where did you go?

21      A.   Department of Human Services.

22      Q.   Okay.  And at the Department of Human

23  Services, how long were you there?

24      A.   About three months.

69

1    Q.   Okay.  At Department of Human Services

2  were you a data processing?

3    A.   Yes.  My job title at Public Aid, DHS, and

4  CMS, it's all been the same.

5    Q.   Okay.  And as a result of consolidation of

6  some sorts you then started working at CMS?

7    A.   Yes.  I was at DHS.  Statewide reorg took

8  place, and because of the reorg, I didn't change

9  locations or anything.  I just was taken off DHS

10  payroll and put on CMS payroll.

11    Q.   When you were at DHS who was your

12  supervisor?

13    A.   Victor Puckett.

14    Q.   Okay.  When you were at Public Aid who was

15  your supervisor?

16    A.   His name was Bob Holly.

17    Q.   Okay.  So when did Victor Puckett become

18  your supervisor?

19    A.   The time that I transferred from Public

20  Aid to DHS.

21    Q.   And when was that?

22    A.   I can only approximate, probably like

23  about February of '05.

24    Q.   Okay.  Could you spell, his name is

72

1   very, very close, but our faces were close because

2   he was leaning over me.  And the statements that

3   he's written, you know, he makes mention of the

4   fact that I was sitting in my chair.  You know, he

5   threatened to throw me out of the building, which I

6   felt was completely inappropriate.

7                I felt, you know, threatened by that,

8   you know, because the way I took it at the time is,

9   I took it to mean that he's going to grab me by my

10  arm and escort me out of the building, which is

11  something that, I'm not a lawyer, but I don't think

12  he has the power to do that.

13               But, you know, he got so upset that he

14  got on the phone.  He called the Bureau Chief and

15  then that's how the confrontation ended.

16       Q.   So he called the Bureau Chief in your

17  presence?

18       A.   Yes.  He was on his cell phone and he

19  called the Bureau Chief saying that I wasn't

20  cooperating with him, and then the Bureau Chief

21  told him to go out in the hall and calm down.

22       Q.   All right.  There was testimony earlier

23  about someone calling the State Police.

24               Did you call the State Police?

73

1      A.   Yes, I did.

2      Q.   And when did you call the State Police?

3      A.   The next day.

4      Q.   So the argument was over and you called

5   the State Police?

6      A.   Yes, sir.

7      Q.   Okay.  If the argument was over, why did

8   you call the State Police?

9      A.   Because I went home.  I work four to

10  midnight.  This happened at nine or 10:00 at night.

11  I went home that night and I was deeply disturbed

12  by what happened, and I didn't feel that, you know,

13  especially given the hours that I work, you know, I

14  don't normally have access to be able to walk up to

15  Personnel, you know, or, you know, I have these

16  alternate hours if you understand what I'm saying.

17              I went home that night and I was

18  bothered by it and I came back.  Actually what I

19  feel, I feel what he did was criminal.  He stood

20  over me for half an hour, you know.  I don't --

21  regardless of whether he's a supervisor or not,

22  when I feel like if I tell him that I'm through

23  talking, that I don't want to discuss it anymore,

24  and that when I tell him to leave me, to leave me

76

1    Q.    Okay.  Who had knowledge that the State

2    Police showed up?

3    A.    The guards in the building.  Victor

4    Puckett, he knew.  The guards informed Victor

5    Puckett that I was outside talking to the State

6    Police.  They knew that I called the State Police.

7    I did not inform them.

8    Q.    So that would be on August 27, 2005?

9    A.    Yes, sir.

10   Q.    So did anything happen as relates to your

11   employment -- strike that.

12         After August 27, 2005, did anything

13   happen in between or between you and Mr. Puckett

14   regarding your job or any altercation that occurred

15   the previous day?

16   A.    I'm sorry, can you repeat that?

17   Q.    Yeah.  That was horrible.

18         Did anything happen between August 27,

19   2005 and October 5, 2005 regarding your employment

20   or your interaction with Mr. Puckett?

21   A.    There was nothing else that happened

22   between us.  They scheduled a pre-D as a result of

23   what happened.

24   Q.    When you say they, who do you mean?

77

1    A.    My unit management.

2    Q.    Unit management?

3    A.    Yeah.   Yeah.   It was Steve Petrilli.   He's

4    the Bureau Chief and Jayme Carter Lebshier and a

5    Personnel liaison down there.   That was on

6    September the 9th and that was the day I was put on

7    admin leave.

8    Q.    So you had a predisciplinary hearing.   You

9    were placed on administrative leave?

10   A.    The same day.

11   Q.    And that was September 9, 2005?

12   A.    Yes, sir.

13   Q.    And what happened after September 9, 2005?

14   A.    I was terminated or well, CMS scheduled

15   two IMEs for me.   I refused to attend either IME.

16   Q.    Okay.   Stop right there.   So they

17   scheduled two IMEs for you.

18         Would those be the IMEs October 5th

19   and October 12th, 2005, if you know?

20         I don't want you guessing.   But if I

21   give you Petitioner's Exhibit 4 will that help you?

22   A.    Yes, yes.

23   Q.    Okay.

24   A.    Yes.

79

1              REDIRECT EXAMINATION

2    BY MS. ROMANO:

3         Q.   Yes, just some clarification.

4              You were discussing the incident that

5    occurred August 26, 2005.  You were stating that

6    something occurred between you and your supervisor,

7    Victor Puckett?

8         A.   Uh-huh.

9         Q.   That's what I want to talk with you about,

10   and I took some notes here about what you

11   previously said.

12             That it appears it initiated because

13   he complained about the way you fixed a certain

14   program?

15        A.   Yes.

16        Q.   Was he trying -- was he trying to tell you

17   to do it a different way?

18        A.   Ms. Romano, when you work with software,

19   you are working in a pass/fail environment.  This

20   is not the type of thing to where, for example, if

21   you're a secretary and you have a boss that wants a

22   one inch margin as opposed to someone who wants a

23   one and a half inch margin.

24             What I do at my job, it is a pass/fail

80

1  environment.  It doesn't matter about whether his,

2  you know, what he may call his procedure or what I

3  may call my procedure.  The important thing is that

4  there is a pass/fail environment.  Whatever I do is

5  either going to work or it's not going to work.

6              You know, I was to run the task for

7  fixing the job.  What I did was completely

8  legitimate.  And if what I did had not worked then,

9  I mean, if it wasn't legitimate then it would not

10  have worked.  I want you to keep that in mind.

11  This is a pass/fail environment.

12              He comes over complaining about that

13  I've done something wrong when I know that I

14  haven't and, again, that's not the first time that

15  he's done that.

16      Q.   Now, isn't it true that the software you

17  deal with affects the benefits that certain

18  individuals might receive, benefit checks, is that

19  a fair statement?

20      A.   I don't think it deals with checks.  I

21  think it's just basically just data processing in

22  general.  It could be anything.  It could be -- it

23  could be something that, you know, is recording

24  births in the State of Illinois or something that's

84

1   that.

2       A.   I don't think this is the method.  I don't

3   think it gets that far.  What we have is, when

4   these things breakdown, we have a set of

5   instructions that we have to follow.  The

6   instructions, you know, they tell you what to do,

7   basically what to do.

8           I followed the instructions.

9   Everything I did was legitimate and he knows it was

10  legitimate.  He comes over.  This is more or less

11  like the closest example I can give you.  It's

12  like, for example, if you want to fire a secretary

13  because she writes the word doctor, she writes

14  D-O-C-T-O-R, and maybe you're not happy about that,

15  what you want is Dr.

16          Now, that's the best example I can

17  give you, you know.

18      Q.   But you just told me though that even

19  getting a comma out of place could really mess up

20  this system, right?

21      A.   That's correct.  But if the software

22  allows it, then it's permissible.

23      Q.   Did -- so there were certain instructions

24  as to how to manage the software, and that might

85

1  not be the right term to use.  How to --

2      A.   How to restart a program once it has

3  shutdown.

4      Q.   And was that what exactly was occurring at

5  the time whenever Victor Puckett approached you on

6  August 26th, had a program shutdown?

7      A.   Yes.

8      Q.   Okay.

9      A.   And I had fixed it and he was not happy

10  with the way that I fixed it.  And, again, I want

11  to emphasis to you, the best way I can explain it,

12  this is a pass/fail environment.  Whatever I do, it

13  either works or else it does not work.

14      Q.   And he believed that you did not do it

15  correctly?

16      A.   That's what he was saying.

17      Q.   Did --

18      A.   That's what he was saying and that's what

19  caused the argument and that's why I told him, I

20  said, I am through talking about this.

21      Q.   Did he provide you with any --

22          MR. WILSON:   I'm going to object at this

23  point.  CMS has stated that the reason for the

24  discharge was failure to attend an IME, not as a

88

1   to attack him.  He would not leave.  He stood over

2   me for a half hour yelling and screaming at me,

3   cussing me out, telling me how I fucked up

4   everything when he knows that he's not talking

5   about anything and I know it too.

6            So after I explained this to the State

7   Police, the guy told me, well, if this happens

8   again, call us back.  He says, if you feel that he

9   is trying to get you to do something to him, if you

10  feel that he's trying to make you hit him, if it

11  happens again, call us back and we will arrest him.

12       Q.   Did they arrest Victor Puckett that night?

13       A.   No, they did not.

14       Q.   Did they talk to Victor Puckett that night

15  when they came out?

16       A.   No.  He said, he said, you should have

17  called us yesterday.  He asked me the same question

18  you did.  He said, why did you wait 24 hours.  So

19  he just kind of wrote it off, but he says, if it

20  happens again, call us back.

21       Q.   Did Victor Puckett attempt to hurt you or

22  harm you in any way the night of August 26, 2007?

23       A.    He did not physically touch me, but I

24  think when you start talking about you're going to

96

1      ADMINISTRATIVE LAW JUDGE BARRIS:   Sure.

2  Or say uh-huh or huh-uh, you can't do that either,

3  because that sometimes becomes unclear too.

4      THE WITNESS:   Okay.

5      ADMINISTRATIVE LAW JUDGE BARRIS:   And if

6  there is an objection, stop testifying, let me

7  address the objection, then we'll go from there.

8      THE WITNESS:   Yes, sir.

9      ADMINISTRATIVE LAW JUDGE BARRIS:   All

10  right.  Ms. Romano.

11                    DIRECT EXAMINATION

12  BY MS. ROMANO:

13      Q.   Could you please state your name for the

14  record?

15      A.   My name is Jayme Lebshier.

16      Q.   And did I spell it correctly whenever I

17  spelled it previously?

18      A.   Yes, Ms. Romano, you did.

19      Q.   Okay.  Are you employed?

20      A.   Yes, ma'am.

21      Q.   Where do you work?

22      A.   I work for the Department of Human

23  Services at the Harris facility in Springfield.

24      Q.   How long have you worked there?

000193

107

1    Q.   So did Mr. Sanders stay through the

2  conclusion of predisciplinary meeting?

3    A.   He did not.

4    Q.   What happened?

5    A.   He took exception to the charges.  He took

6  exception to the fact that he was being pre-D'd.

7  He basically leapt, well, from flat footed to the

8  ground and exited the room rather quickly, went to

9  the doorway.  They tried to call him back.

10            I asked that he remain.  He said he

11  had enough.  I can't verbatim tell you.  Bottom

12  line is, he had enough.  He was leaving.

13    Q.   Okay.  And you said they called him.  Who?

14    A.   Those present that asked him to return to

15  the room were Steve Petrilli, Deb Cowan, Deb Stout,

16  myself.

17    Q.   So were they successful in getting him to

18  stay at the meeting?

19    A.   No.

20    Q.   So he left the meeting?

21    A.   Correct.

22    Q.   And then what happened?

23    A.   I excused myself and joined Mr. Sanders

24  outside the room.

112

1   went back to the building had he calmed down and

2   had things gotten more peaceful I guess between him

3   and his statements against Mr. Puckett?

4       A.   At the point that we finished smoking he

5   seemed okay.  As we returned to the building it

6   started again, and the closer we get to the

7   building, the more agitated Mr. Sanders had been,

8   had become and that, again, caused an increase of

9   concern for me.  So we were okay and then we

10  weren't okay.

11      Q.   So the threatening statements started

12  again as you're approaching the building?

13      A.   As soon as we turned and started to go

14  back to the building he became more agitated and

15  pushed this, I'm going to get him thing again

16  agenda.  Whereupon I told him that it either ceased

17  or I will write a statement.  He did not cease and

18  hence my statement.

19      Q.   Oh, okay.  All right.  So when you came

20  back into the building then, what happened?

21      A.   Before I had left to take Michael outside,

22  I had whispered to Mr. Puckett that there was an

23  issue I was concerned about, and would he please

24  ask Ms. Cowan, Ms. Stout, and Mr. Petrilli, make

115

1  the workplace and just, well, I just felt that was

2  the best way to mitigate the situation.

3      Q.  Did Mr. Sanders give you any indication he

4  was planning to do something on the Saturday night?

5      A.  He continued to insist that he and Mr.

6  Puckett were working alone the next night, and that

7  he would set him up, that he would get him, because

8  it was only them working.

9      Q.  So you're in Mr. Petrilli's office.  You

10 informed them of what happened, and did anything

11 else happen regarding this incident?

12     A.  Well, they asked, you know, I told them

13 that I feared, and as a mandated self-reporter, I

14 had to make it known, and that I was going to have

15 to write a statement.

16     Q.  Okay.

17     A.  To what had occurred.

18     Q.  Okay.  And did you then ultimately reduce

19 your observations into writing?

20     A.  I did.

21     Q.  Okay.  I'm going to hand you a document

22 for you to look at.  I'm marking this as

23 Petitioner's Exhibit 5, and if you would take a

24 moment and just look over that particular document.

116

1          Do you recognize the document?

2      A.   I do.

3      Q.   What is it?

4      A.   It is the statement that I wrote regarding

5  the incident with Mr. Sanders on September 9, 2005.

6      Q.   Okay.  And when was this particular

7  document written?

8      A.   To the best of my recollection, I gave a

9  handwritten account during that meeting with Mr.

10  Petrilli on Friday, September 9th.

11      Q.   So is this based upon your handwritten

12  account, because this looks like it's drafted on a

13  computer?

14      A.   It is drafted on a computer.  I was asked

15  to, by CMS, to put it into an automated form.  The

16  handwritten was difficult, and I was in a hurry,

17  and they asked if I could transcribe it and I said

18  yes.

19      Q.   Was there anyone in particular at CMS that

20  asked you to?

21      A.   Deb Stout, as her capacity as Labor

22  Relations, asked that it be put into a document.

23      Q.   And then did you submit this document to

24  anyone?

117

1    A.   I did submit it to CMS Labor Relations as

2  requested by Ms. Stout, and Mr. Petrilli, Ms.

3  Cowan.

4    Q.   Okay.  At anytime then did you have the

5  opportunity -- did you then provide another written

6  report of what happened on that particular evening?

7    A.   I did.  It was brought to my attention by

8  Steve Petrilli that, I had originally indicated

9  that the police had been called on the Saturday

10  previous to 9 September, when in actuality, the

11  police been called in on 27 August, 2005.

12                I then made the corrections,

13  resubmitted the document with an e-mail stating to

14  the affect that I had, sorry for the inconvenience,

15  had made the mistake, and would you please, you

16  know, accept this document.

17    Q.   Okay.  I'm handing you what I've marked as

18  Petitioner's Exhibit 6 for you to look it over, and

19  if you could please tell me if you recognize this

20  document?

21    A.   Yes.  This is the corrected version

22  indicating 27 August, 2005 instead of 3 September.

23    Q.   And just to be clear, let's see, I want to

24  make sure, because this is kind of hard to find in

118

1    here.

2         A.   Yes, ma'am.

3         Q.   Let's see, the revision that you're

4    talking about in Petitioner's Exhibit 6, is that

5    on, let's see, line, in the twelfth line?

6         A.   That is correct.

7         Q.   There is a date.  Now, on Petitioner's

8    Exhibit 6 there is date of Saturday, 29 August?

9         A.   27 August.

10        Q.   27 August?

11        A.   Yes, ma'am.

12        Q.   And on Petitioner's Exhibit 5 it says

13   Saturday, 3 September?

14        A.   That's correct.

15        Q.   So you're telling us that --

16        A.   Mr. Petrilli corrected me.

17        Q.   Okay.

18        A.   Mr. Petrilli caught it, because he had

19   been involved in the issue with the State Police

20   reporting to the Harris facility and clarified to

21   me that it was the 27th of August, and would I make

22   appropriate changes to my document.

23        Q.   So Petitioner's Exhibit 6 is the correct?

24        A.   That is the corrected version.

182

1                     DIRECT EXAMINATION

2    BY MR. GINDER:

3        Q.   I'll have you state your name and spell it

4    as well.

5        A.   My name is Jeff Shuck, J-E-F-F S-H-U-C-K.

6        Q.   Thank you.  Mr. Shuck, and are you

7    currently employed?

8        A.   Yes, I am. Department of Central

9    Management Services, in the role of Deputy General

10   Counsel.

11       Q.   Would it be okay if I -- Deputy General

12   Counsel in the Legal Department?

13       A.   Yes, in the Legal Department, specifically

14   in charge of Personnel.

15       Q.   Okay.  And we're here today on the

16   discharge of Michael Sanders.

17                   What's your involvement in this

18   matter?

19       A.   It was brought to my attention that there

20   was an incident during a predisciplinary matter

21   involving Mr. Sanders, wherein, during the course

22   of a pre-D, Mr. Sanders had made some statements to

23   his union steward, and the union steward was

24   affected enough by those statements to then report

182

DIRECT EXAMINATION

BY MR. GINDER:

1  Q. I'll have you state your name and spell it

4  as well.

5  A. My name is Jeff Shuck, J-E-F-F S-H-U-C-K.

6  Q. Thank you. Mr. Shuck, and are you

7  currently employed?

8  A. Yes, I am. Department of Central

9  Management Services, in the role of Deputy General

10  Counsel.

11  Q. Would it be okay if I -- Deputy General

12  Counsel in the Legal Department?

13  A. Yes, in the Legal Department, specifically

14  in charge of Personnel.

15  Q. Okay. And we're here today on the

16  discharge of Michael Sanders.

17  What's your involvement in this

18  matter?

19  A. It was brought to my attention that there

20  was an incident during a predisciplinary matter

21  involving Mr. Sanders, wherein, during the course

22  of a pre-D, Mr. Sanders had made some statements to

23  his union steward, and the union steward was

24  affected enough by those statements to then report

000279

183

1  them back to management.  Then members of Internal

2  Personnel then brought that situation to my

3  attention seeking legal advice about that.

4      Q.  When you say that Mr. Sanders made

5  statements to a union steward, what were the nature

6  of those statements just generally?  What is your

7  understanding of them?

8      A.  Right.  What was related to me, it was

9  during the course of a predisciplinary meeting that

10  Mr. Sanders was agitated, and that a request was

11  made to take a break, and Mr. Sanders and his union

12  steward stepped out in the hallway.  And the union

13  steward subsequently reported that, it was during

14  that break, that Mr. Sanders was, as she described

15  it, visibly upset with clinched teeth and making

16  threats against his supervisor.  And obviously that

17  was a matter that people in Internal Personnel

18  wanted to get some advice about.

19      Q.  Okay.  Did -- Mr. Sanders was discharged

20  for failing to attend an IME, independent medical

21  examination.

22              Are you familiar with that?

23      A.  Yes.  One of the questions that was

24  brought to me was, you know, that proper handling