184

1  of that situation.  They had suspended the
2  continuation of that predisciplinary meeting in
3  order to address the situation that occurred in the
4  hallway, and it was basically a two-fold thing.
5           One, was to refer what we perceived as
6  threats made by Mr. Sanders against his supervisor
7  to the Office of the OEIG for their investigation
8  and disposition, and the second was to address the
9  matter of his employment going forward.
10          One of the issues that's connected to
11 that is whether it was appropriate and safe to have
12 Mr. Sanders, you know, go back to the work site
13 given the fact that he just made verbal, very
14 specific verbal threats about his supervisor, and,
15 you know, the folks in Internal Personnel come to
16 me for advice about that.
17     Q.  And as far as determining whether or not
18 it was safe or appropriate to allow Mr. Sanders
19 back into the workplace given those threats, were
20 you approached concerning what the options would
21 be?
22     A.  Yes, yes.  And I determined that it would
23 be appropriate to send Mr. Sanders for an
24 independent medical evaluation to determine whether

185

or not a medical professional felt that Mr. Sanders was capable of performing the duties of his position or not.

When this issue came up, you know, I inquired as to, well, what's the history here, because it's, you know, it's a common question we ask. You need to understand some of the background, some of the situation that may have led up to whatever, you know, situation that's presented.

And it was my understanding that there had been some friction between Mr. Sanders and the supervisor in the past. Situations of Mr. Sanders essentially getting in his supervisor's face, being very reluctant to take supervision, you know, being defiant, and those sorts of things.

Which when considered in the light of what was reported to have occurred during this predisciplinary meeting, led me to believe that we needed that medical determination to see whether it was safe to have him continue.

Q. Okay. And whose safety is at issue?

A. Everyone's. It's actually Mr. Sanders safety. It's the safety of his supervisor. It's

000282

186

1  the safety of his coworkers. It's the safety of
2  any members of the public with whom he might come
3  into contact.
4              It's a matter of overall workplace
5  safety, that when an employee is, you know,
6  seemingly out of control, as it seemed to be in
7  that situation, it's not a determination that I or
8  any others in CMS are capable of making.
9              We need a medical professional to tell
10 us whether this individual is, you know, this is
11 some kind of momentarily thing that doesn't present
12 any kind of a threat or it was something that does
13 present a problem, and it wouldn't require finding
14 a person isn't fit to perform these duties.
15     Q.  And does CMS have the authority to order
16 its employees to be subject to an IME?
17     A.  I think any --
18         MR. WILSON: I'm going to object. That
19 calls for a legal opinion. That's part of the
20 ultimate issue that you are going to be asked to
21 decide.
22         ADMINISTRATIVE LAW JUDGE BARRIS: All
23 right. Well, actually I'd like for him to answer
24 what authority CMS or any state agency has to order

1  an independent medical evaluation.  I assume that's
2  what the question is going to.
3              MR. GINDER:  Yes.
4              ADMINISTRATIVE LAW JUDGE BARRIS:  Okay.
5  So whatever objection you're making, I'm
6  overruling, go ahead and answer.
7              THE WITNESS:  Well, yes.  And it's not
8  just the state as an employer, but any employer is
9  faced with duties under the law to protect its
10 employees from their coworkers and from other
11 threats that -- that are posed to their employees
12 in the workplace, whether those are by coworkers or
13 by members of the public where those employers are
14 on notice that there's some kind of threat or
15 danger.
16             And the fact of the matter in this
17 case was, we were presented with a situation where
18 we had an employee who was reported to be making
19 what I determined were very specific threats
20 against his supervisor, that there was a history of
21 friction that wasn't a, you know, something that
22 had just come up for a first time, and that given
23 the descriptions of Mr. Sanders behavior from those
24 who were present at that pre-D meeting, I felt it

000284

1   was really incumbent upon us as the employer to get
2   that medical determination, so as to determine that
3   Mr. Sanders isn't a threat to himself or anyone
4   else, to protect Mr. Sanders, his supervisor, and
5   anyone else in the workplace, whether they be
6   employees or people from the public who might be in
7   there.
8   BY MR. GINDER:
9       Q.   Okay.  And if CMS was prohibited from
10  ordering these IMEs, do you feel that would
11  negatively impact CMS and its employees?
12          MR. WILSON:  I'm going to object,
13  speculative.
14          ADMINISTRATIVE LAW JUDGE BARRIS:  All
15  right.  Well, actually the initial question was the
16  authority.  We didn't get an authority there.
17          Was there a rule or is there a case,
18  just common sense?
19          THE WITNESS:  Well, it's some of both.
20  Okay.  I apologize.  I really didn't get to really
21  the point of your question.
22          Yes.  There is a rule that addresses
23  that in the context of disability leave that's
24  303.145.  That rule had been interpreted for many

201

```
 1  BY MR. GINDER:
 2      Q.   Have you had a chance to review
 3  Petitioner's Number 8, Mr. Shuck?
 4      A.   I recognize this as a letter I wrote to
 5  Mr. Wilson.
 6      Q.   Is that your signature that appears on the
 7  last page?
 8      A.   It is.
 9      Q.   Okay.  And what's the date that you sent
10  this letter out?
11      A.   It's dated May 14, 2007.
12           MR. GINDER:  Okay.  I don't have anything
13  further at this time.
14           ADMINISTRATIVE LAW JUDGE BARRIS:  All
15  right.  Mr. Wilson?
16           MR. WILSON:  Yes.  Let's talk about Rule
17  303.145.
18           MR. GINDER:  I object to that.  I think
19  we've already established that that rule is not at
20  issue.
21           MR. WILSON:  As long as they're willing to
22  stipulate that that was not a cite -- a basis
23  relied upon, that's fine.  He testified that --
24           ADMINISTRATIVE LAW JUDGE BARRIS:  I'm
```

219

1   You know, hopefully in, you know, to
2 move forward in an appropriate and productive
3 fashion so that there aren't future problems.
4   Q.   Okay.  And if the employee's undergoing an
5 IME and it comes back as not fit to perform a duty,
6 what would be the pass in that scenario?
7   A.   Well, it would depend to a certain extent
8 on the situation that we're presented with.  In a
9 case such as Mr. Sanders, you know, had he attended
10 the IME and we get back a negative answer to the
11 question, is he fit to perform his duties, then
12 we'd have to have a conversation with Mr. Sanders
13 and explain, you know, what our position is and ask
14 input from him as to, if he believes there is, you
15 know, something going on that maybe he should take
16 a disability leave or whether he's going to request
17 some sort of accommodation from us or whether he
18 wants to go for yet another medical opinion that
19 might differ from our independent.  You know, there
20 is a number of different possibilities and we'd
21 discuss those options with him to see where he
22 wanted to go and then we can make a decision as to
23 where we were based on that discussion.
24   Q.   So would it be your understanding that an

220

1  IME could actually be a benefit to the employee if
2  they have special needs or they need an
3  accommodation?
4      A.   It's possible, yes.
5      Q.   Okay.
6      A.   I mean, the intent is to make sure that
7  the workplace is safe and to make sure the person
8  is fit to perform their duties.  But one result of
9  that might be to, you know, have an employee who is
10 better accommodated than they were in the past.
11     Q.   Okay.  And in Mr. Sanders particular
12 situation, what type of information were you
13 seeking from the doctor?
14          I mean, were you looking for his
15 entire medical history or for a comprehensive
16 analysis of his mental state or were you simply
17 looking for an answer as to whether he's fit or
18 not?
19     A.   No.  I mean, we're simply looking for an
20 answer, yes or no to the question, is this
21 individual fit to perform his duties, you know,
22 according to the position description that we'd
23 send along.
24          You know, if there were an issue with

238

```
 1                    EXAMINATION
 2   BY ADMINISTRATIVE LAW JUDGE BARRIS:
 3       Q.  All right.  Looking at Petitioner's
 4   Exhibit 6, you did look at this document in
 5   reaching your decision to order the IME?
 6       A.  The -- yes.  Yes.
 7               To further expound on that time line a
 8   little bit, just so that it's clear, what had
 9   happened was, the situation was presented, as I
10   recall, late on a Friday afternoon, and these
11   things that were related to me were that threats
12   were with respect to Saturday night.  The concern
13   was that, you know, there wouldn't be any
14   management around, you know, outside of BCCS.
15   There might be somebody at BCCS, but there wouldn't
16   be anybody in Personnel to deal with anything if it
17   came up.
18               The decision was to go ahead and place
19   Mr. Sanders on an admin leave, so that he wouldn't
20   be at work on Saturday, and that we would have an
21   opportunity to take a look at everything fresh the
22   next week, and I would have been presented with
23   this statement by Ms. Lebshier sometime early the
24   next week.
```

270

1  STATE OF ILLINOIS    )
2                       )
3  COUNTY OF SANGAMON   )

4              C E R T I F I C A T E

5        I, DONNA M. DODD, a Certified Shorthand
6  Reporter and Notary Public, in and for said County
7  and State, do hereby certify that I reported in
8  shorthand the proceedings had on the hearing of the
9  above-entitled cause on January 23, 2008, and that
10 the foregoing is a true and correct transcript of
11 my shorthand notes so taken.
12        Given under my hand and seal this 21st
13 day of February, A.D., 2008.

14
15
16
17                    s/ Donna M. Dodd
                    _____
18                  Certified Shorthand Reporter
19                  and Notary Public
20                  CSR # 084-003912

"OFFICIAL SEAL"
Donna M. Dodd
Notary Public, State of Illinois
My Commission Exp. 05/19/2010

23 My commission expires
24 May 19, 2010.

000367

## REPORT OF INCIDENT WITH MICHAEL SANDERS

On Friday, 9 September, after attending a pre-disciplinary hearing for Michael Sanders (in my position as union steward), I approached him outside Deb Cowan's office in I/O to firm up plans for his rebuttal and to make sure he was alright. Michael seemed very upset and hyper. When I inquired as to whether he would be OK to serve his shift, he informed me that he had "90 days", "90 days". I asked him what he meant and instead of answering that question, he told me that he was tired of these people picking on him and that he had had it. He then went on to explain to me that the State Police had informed him when he had called them on Saturday, 3 September that if Victor Puckett "tried anything, just to call them and they would place him in handcuffs and remove him (Victor) from the building." I told Michael to please be careful and not place himself in a position that could be more harmful to his career. Michael then told me "I am going to get him, he is not going to do this to me. All I have to do is call the State Police and they will take care of it." I told Michael that we would handle it and to please not do anything that would get him into more trouble. I advised him to just keep his head down, do his job, follow his supervisor's instructions and if there was any problems to call me on my cell phone. Michael was becoming even more visibly upset and was shaking noticeably. Michael became more threatening in both attitude and speech and informed me that "I am going to get Puckett. Saturday night I am going to set him up. It will be just me and Puckett and I am going to get him." At this point, I became very concerned and frankly, scared of what might happen in I/O on Saturday night as it would only be Victor and Michael working. I told Michael we needed to go outside for a few minutes to discuss this and cool down. He agreed and I told him I had to let Victor know we were going outside. I went to Victor and whispered to him that Michael had just threatened him to me and to be very careful and to go into Deb Cowan's office after I took Michael out and let Steve Petrilli, Deb Cowan, and Deb Stout know what Michael had said as I took it to be a credible threat.

PETITIONER'S EXHIBIT

SEP-12-2005 09:46        MGT INFORMATION SVCS            217 524 0289    P.03/03

At this point, Michael and I headed out of I/O to go outdoors. He left me in the hall and at this point I saw Gerry Mitchell coming down the hall. I motioned to him, and he approached me. At this time, I informed him that Michael had made serious threats to set Victor Puckett up on Saturday night when they would be working alone together and Michael's plan to call the State Police. Gerry was very concerned and asked what he could do. I told him who was still in Deb's office and to please get the word to them regarding these threats and that I was taking Michael outside to talk to him.

Michael and I went outside and again in the course of our conversation he made the same threats to set up Victor when there would be "no witnesses" and that he "had had it". I told Michael to please not talk like that and to please not act on this threat, but he continued to insist that he was "going to get Puckett" and that no one was going to treat him like this. I told Michael again, to stop talking about this in front of me and that if management asked me, I would have to write a statement regarding the threats he had made against Victor. It did not stop him and I told Michael that he had to stop making threats and that we would handle the rebuttal and discipline issues next week, but for now he needed to calm down and focus on getting through his shift without incident. Michael did not respond to this and let me know that Saturday night was going to be his night and that he was really looking forward to seeing the State Police escort Victor Puckett out of the building in handcuffs. By this time Michael was very nervous, shaking visibly and in my face. The violent tone of his voice and his very close proximity to me frightened me and convinced me that the only thing I could do was escort him back into I/O with the same admonishment to please think about his actions and to just do his job and get through the night. I then returned Michael to I/O.

*[signature: Jayme Carter Lebshier]*

JAYME CARTER LEBSHIER                               10 SEPTEMBER 2005

SEP-12-2005  12:12        MGT INFORMATION SVCS              217 524 0289    P.02/03

## REPORT OF INCIDENT WITH MICHAEL SANDERS

On Friday, 9 September, after attending a pre-disciplinary hearing for Michael Sanders (in my position as Union Steward), I approached him outside Deb Cowan's office in I/O to firm up plans for his rebuttal and to make sure he was alright. Michael seemed very upset and hyper. When I inquired as to whether he would be OK to serve his shift, he informed me that he had "90 Days", "90 Days". I asked him what he meant and instead of answering that question, he told me that he was tired of these people picking on him and that he had had it. He then went on to explain to me that the State Police had informed him when he had called them on Saturday, 27 August that if Victor Puckett "tried anything, just to call them and they would place him in handcuffs and remove him (Victor) from the building." I told Michael to please be careful and not place himself in a position that could be more harmful to his career. Michael then told me "I am going to get him, he is not going to do this to me. All I have to do is call the State Police and they will take care of it." I told Michael that we would handle it and to please not do anything that would get him into more trouble. I advised him to just keep his head down, do his job, follow his supervisor's instructions and if there was any problems to call me on my cell phone. Michael was becoming even more visibly upset and was shaking noticeably. Michael became more threatening in both attitude and speech and informed me that "I am going to get Puckett. Saturday night I am going to set him up. It will be just me and Puckett and I am going to get him." At this point, I became very concerned and frankly, scared of what might happen in I/O on Saturday night as it would only be Victor and Michael working. I told Michael we needed to go outside for a few minutes to discuss this and cool down, he agreed and I told him I had to let Victor know we were going outside. I went to Victor and whispered to him that Michael had just threatened him to me and to be very careful and to go into Deb Cowan's office after I took Michael out and let Steve Petrilli, Deb Cowan, and Deb Stout know what Michael had said as I took it to be a credible threat.

PETITIONER'S EXHIBIT

00662

At this point, Michael and I headed out of I/O to go outdoors. He left me in the hall and at this point I saw Gerry Mitchell coming down the hall. I motioned to him, and he approached me. At this time, I informed him that Michael had made serious threats to set Victor Puckett up on Saturday night when they would be working alone together and Michael's plan to call the State Police. Gerry was very concerned and asked what he could do. I told him who was still in Deb's office and to please get the word to them regarding these threats and that I was taking Michael outside to talk to him.

Michael and I went outside and again in the course of our conversation he made the same threats to set up Victor when there would be "no witnesses" and that he "had had it". I told Michael to please not talk like that and to please not act on this threat, but he continued to insist that he was "going to get Puckett" and that no one was going to treat him like this. I told Michael again, to stop talking about this in front of me and that if management asked me, I would have to write a statement regarding the threats he had made against Victor. It did not stop him and I told Michael that he had to stop making threats and that we would handle the rebuttal and discipline issues next week, but for now he needed to calm down and focus on getting through his shift without incident. Michael did not respond to this and let me know that Saturday night was going to be his night and that he was really looking forward to seeing the State Police escort Victor Puckett out of the building in handcuffs. By this time Michael was very nervous, shaking visibly and in my face. The violent tone of his voice and his very close proximity to me frightened me and convinced me that the only thing I could do was escort him back into I/O with the same admonishment to please think about his actions and to just do his job and get through the night. I then returned Michael to I/O.


Jayme Carter Lebshier                    10 September 2005

TOTAL P.03
: 00663



**ILLINOIS**  Rod R. Blagojevich, Governor
**DEPARTMENT OF CENTRAL MANAGEMENT SERVICES**
Maureen T. O'Donnell, Acting Director

May 14, 2007

Mr. Bradley B. Wilson
Gates, Wise & Schlosser, P.C.
1231 South Eighth Street
Springfield, Illinois 62703

RECEIVED

MAY 15 2007

Re: Michael Sanders

Dear Mr. Wilson:

This letter is in response to your correspondence of April 7, 2006, regarding Michael Sanders, an employee of the Department of Central Management Services (CMS). You indicate, on behalf of your client, that CMS has no legal authority to compel an employee to attend an independent medical examination. CMS has scheduled three separate appointments for Mr. Sanders to be examined by Dr. Terry Killian for the purpose of determining whether Mr. Sanders is fit for duty in his position as data processing technician. You asked that our office provide a source of authority for CMS' order for an examination, which we provide below.

### CMS HAS A COMMON LAW DUTY TO PROTECT ITS EMPLOYEES

CMS is an employer that can be held liable for failing to protect its employees in certain circumstances. The Appellate Court of Illinois, Second District, has recognized Negligent Retention of an employee as a valid cause of action in Illinois. *Geise v. Phoenix Co.*, 246 Ill. App. 3d 441, 448, 615 N.E.2d 1179, 1183-84, 186 Ill. Dec. 122, 126-127 (1993). The Court stated, "Negligent retention occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigation, discharge, or reassignment." *Id.* Although the Illinois Supreme Court ultimately reversed the Appellate Court decision, it did so on subject matter jurisdiction grounds, and did not overrule the Appellate Court's finding that Illinois' recognizes liability for an employer who negligently retains "in its employment an employee that the employer knew or should have known was unfit for the job so as to create a danger to third parties." *Geise v. Phoenix*, 159 Ill. 2d 507, 512 and 518, 639 N.E.2d 1273, 1275 and 1278, 203 Ill. Dec. 454, 456 and 459 (1994). The plaintiff in *Geise* sought to hold her employer liable for negligent retention because her employer knew that her supervisor was sexually harassing her, and failed to take action to protect her from this danger. *Geise* at 442, 615 N.E.2d at 1180, 186 Ill. Dec. at 123. The employer was aware of the harassment, and continued to allow the harasser to remain in a supervisory role over the plaintiff. *Id.* The plaintiff claimed that the employer's failure to protect her from the actions of another employee, and the fact that


PETITIONER'S EXHIBIT

the employer allowed the harasser to remain in a supervisory role for which he was unfit because of the known harassment, amounted to a breach of the employer's duty of care. *Id.* Where an employer fails to make a "reasonably adequate investigation" that would have shown an employee to be unfit for the duties of the job, and that unfitness then leads to the injury of a third-party, the employer's failure to investigate can be considered the proximate cause of the injury. *Easley v. Appollo Detective Agency, Inc.* 69 Ill. App. 3d 920, 387 N.E.2d 1241, 26 Ill. Dec. 313 (1st D 1979).

In finding that employers may be liable for negligent retention, Illinois has, in effect, imposed a common law duty on employers to protect their employees from the actions of fellow employees when the employer is aware of potential danger. There has been more than one occasion where Mr. Sanders has sought to intimidate and threaten his supervisor, Mr. Puckett. On Friday, August 26th, Mr. Sanders argued with Mr. Puckett and got in Mr. Puckett's face in a threatening manner. Mr. Sanders acted aggressive and confrontational, and had to be asked to back off several times before doing so. On Friday, September 9th, Mr. Sanders made more threats against Mr. Puckett. These threats were communicated to his own union representative, Jayme Carter Lebshier, who apparently felt they were credible and serious enough to warrant reporting them to CMS. According to her statement, Mr. Sanders stated that "he was tired of these people picking on him and that he had had it. He then went on to explain to [Ms. Carter Lebshier] that the State Police had informed him when he had called them on Saturday, August 27th, that if Victor Puckett 'tried anything, just to call them and they would place him in handcuffs and remove him (Victor) from the building.'" Mr. Sanders went on to say "I am going to get him, he is not going to do this to me. All I have to do is call the State Police and they will take care of it," referring again to his supervisor, Mr. Puckett. His threats continued, "I am going to get Puckett. Saturday night I am going to set him up. It will just be me and Puckett and I am going to get him." Ms. Carter Lebshier stated that Mr. Sanders' threats made her concerned and scared about what might happen to Mr. Puckett if they worked alone together. Mr. Sanders' own union representative reported this incident because she felt it was, in her words, "a credible threat."

If CMS does not make a "reasonably adequate investigation" into whether or not Mr. Sanders is fit for his job, when it is apparent that a lack of psychological fitness could put Mr. Puckett or any other co-worker in danger, CMS would be breaching its duty to protect its employees. The Independent Medical Examination is necessary to make a reasonably adequate investigation about whether Mr. Sanders is fit for duty in his position as data processing technician since that position is subject to the supervision of Mr. Victor Puckett. If Mr. Sanders is not fit to work safely under his supervisor, then CMS would be negligent if it continued to employ him in his current position.

Also, as recently as June 13, 2006, Mr. Sanders called Ms. Carter Lebshier to inquire about Mr. Puckett. Mr. Sanders wanted to know whether Mr. Puckett was still working at CMS and whether Mr. Puckett had been disciplined. Again, Mr. Sanders indicated that he was not going to "let Victor [Puckett] get away with what he did to him." Ms. Carter Lebshier submitted another statement, this time stating, "[Mr. Sander's] fixation

on Victor [Puckett] each time I have spoken with him has gotten more intense making me increasingly concerned about what could happen."

### THE ADA GIVES EMPLOYERS THE AUTHORITY TO REQUIRE MEDICAL EXAMINATIONS IF THEY ARE "JOB-RELATED AND CONSISTENT WITH BUSINESS NECESSITY"

The Americans with Disabilities Act (ADA) states that an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. Sec. 12112(d)(4)(A). According to guidelines put out by the U.S. Equal Employment Opportunity Commission (EEOC), an employer may request a medical examination when an employer has a reasonable belief that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition." *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)*, The U.S. Equal Employment Opportunity Commission, ADA Division, Office of Legal Counsel, http://www.eeoc.gov/policy/docs/guidance-inquiries.html. In order for an employer to order an employee to undergo a medical examination, there must be evidence that would cause a reasonable person to doubt whether the employee is capable of performing his job, and the examination must be limited to that determination only. *Sullivan v. River Valley School District*, 197 F. 3d 804 (6th Cir. 1999), cert. denied 530 U.S. 1262. In *Sullivan,* the plaintiff (a teacher who was dismissed from his job after making threats and refusing to submit to mental and physical fitness for duty examinations) argued that allowing employers to order mental and physical examinations in cases like his would give employers too much power to arbitrarily order examinations whenever they wanted. *Id.* At 811. "In particular, Sullivan worries that a decision adverse to him on the 'shaky facts' of his case would 'suggest' that an 'outside psychologist'... can lead to an employer's arbitrary investigation of anyone's psychological history." *Id.* The court rejected this argument by pointing out the limits imposed on employers by the ADA. *Id.* Employers may only order medical examinations when they are "job-related and consistent with business necessity." *Id.* The court went on to cite the EEOC guidelines in finding that fitness-for-duty examinations may be ordered when there is evidence that a health problem or aberrant behavior may "significantly affect an employee's performance of essential job functions." *Id.* At 812. The court held that the school district was justified in ordering the examination because of the plaintiff's threats to members of the school board, disruptive and abusive outbursts, and his repeated failure to follow orders. *Id.* at 808-9, 812.

The plaintiff in *Sullivan* also asked the court to hold that employers should only have the authority to order a medical examination where the "employee has requested accommodation or if an employer has objective evidence that the employee poses a direct threat to himself or others." *Id.* at 812. The court expressly rejected this

argument. *Id.* The rights of the employee in such cases are protected by the limits placed on employers in requiring such medical examinations. Id at 813. These limits require that the evidence must be sufficient to show that a reasonable person would doubt the employee's ability to perform the job, and that fitness-for-duty examinations be limited to only determining whether the employee is able to perform essential job functions. *Id.*

Moreover, the Illinois Department of Human Rights has held "where inquiries into the psychiatric health of an employee are job related and reflect a concern with the safety of . . . employees . . . the employer may require the employee to undergo an examination to determine his ability to work." *Saquib v. Cook County Hospital*, Charge No. 2001CE2783, EEOC No. 210A12879 (2003), citing *Krocka v. City of Chicago*, 203 F.3d 507 (7th Cir. 2000).

There is evidence that would lead a reasonable person to doubt that Mr. Sanders is capable of performing his job at CMS. His position description with the CMS Bureau of Communication and Computer Services specifically states that Mr. Sanders works under the supervision of the Data Processing Supervisor. Mr. Sanders' threats against Mr. Puckett, his disobedience towards a supervisor, misuse of state working time, and various other disciplinary problems show that he may not be capable of performing the duties required by his job. In addition to the aforementioned threats against Mr. Puckett, Mr. Sanders has been reprimanded and or suspended for numerous infractions: leaving work early without prior approval (June 25, 2005); failing to follow instructions on numerous occasions (August 25, 2005; June 30, 2005; April 29, 2005; March 31, 2005; October 10, 2004); sending discourteous and disrespectful email to his supervisor (July 2, 2005; October 19, 2004; October 18, 2004; September 23, 2004). Quite obviously, this behavior does not comport with Mr. Sander's position as a Data Processing Technician working under the supervision of the Data Processing Supervisor, Mr. Puckett. It also quite obviously indicates either an unwillingness or an inability to conform his behavior at work to the norms required by his position.

The medical examination ordered by CMS in this case is job-related and consistent with business necessity because, as with *Sullivan*, disruptive behavior and the failure to follow orders are obviously related to his employment. CMS did not arbitrarily order a medical examination, but relied on evidence that Mr. Sanders was not fit for duty. The fact that Mr. Sanders did not request disability leave does not mean that he is fit for duty. The authority of an employer to order a medical examination is not dependant upon whether the employee himself declares that he is disabled and requests leave. CMS has sufficient evidence to question whether that Mr. Sanders is able to perform his job, and CMS is only directing that a medical examination take place to determine whether Mr. Sanders is fit for duty.

Mr. Sanders should be receiving correspondence from CMS Internal Personnel indicating the date, time and place for an independent medical examination. Should Mr. Sanders fail to appear at this examination, he will be subject to discipline up to and

: 01296

including discharge. If you wish to discuss the matter with me further, please do so prior to the scheduled appointment date.

Sincerely,

s/Jeff Shuck

Jeff Shuck
Deputy General Counsel – Personnel
Department of Central Management Services

cc: Missy Riggins