E-FILED
Tuesday, 01 November, 2011  05:09:35 PM
Clerk, U.S. District Court, ILCD

391

1          BEFORE THE CIVIL SERVICE COMMISSION

2                    STATE OF ILLINOIS

3

4   IN RE:                        )
    ILLINOIS DEPARTMENT OF        )
    CENTRAL MANAGEMENT            )
5   SERVICES,                     )
                                  )        COPY
6            Petitioner,          )
                                  )
7        vs.                      )    Case No. DA-11-08
                                  )
8   MICHAEL SANDERS,              )
                                  )
9            Respondent.          )

10      Continued Hearing held on March 18, 2008, at

11   the Offices of the Illinois Civil Service

12   Commission, 400 West Monroe, Suite 306,

13   Springfield, Illinois, scheduled for the hour of

14   10:00 a.m.

15

16

17   PRESENT:

18       MR. ANDREW BARRIS,
             Administrative Law Judge
19
         DONNA M. DODD, CSR
20

21
              GOLEMBECK REPORTING SERVICE
22            Connie S. Golembeck, Owner
                   (217) 523-8244
23                 (217) 632-8244

24

EXHIBIT
**C**

394

1          ADMINISTRATIVE LAW JUDGE BARRIS:  Let's go

2    on the record.  Good morning this is a continuation

3    of the hearing of Mr. Sanders, DA-11-08.  Today the

4    Petitioner is going to be calling, is it Ms.

5    Riggins?

6          MS. RIGGINS:  Uh-huh.

7          ADMINISTRATIVE LAW JUDGE BARRIS:  What's

8    your first name?

9          MS. RIGGINS:  Melissa.

10         ADMINISTRATIVE LAW JUDGE BARRIS:  Melissa

11   Riggins as conclusion of its case in chief.

12         And my understanding is, Respondent is

13   going to be also asking Ms. Riggins some questions,

14   and Petitioner has acknowledged that he will give

15   the Respondent some leeway in asking her questions,

16   because of the, not continuance order of the way

17   the witnesses were called in this case.

18         Is that correct, counsel?

19         MR. GINDER:  Yes.

20         ADMINISTRATIVE LAW JUDGE BARRIS:  Okay.

21   With that, Ms. Riggins, my name is Drew Barris, and

22   I'm the Administrative Law Judge in this matter.

23         Mr. Ginder is going to be asking you

24   some questions, and Mr. Wilson, and then I might

1  have some questions for you.

2              So we've got a court reporter here and

3  she's taking everything down, so let's make your

4  answers audible.

5          MS. RIGGINS:  Okay.

6          ADMINISTRATIVE LAW JUDGE BARRIS:  And if

7  there is an objection, just stop talking and let me

8  address it.

9          MS. RIGGINS:  Okay.

10         ADMINISTRATIVE LAW JUDGE BARRIS:  All

11 right.  Will you swear the witness?

12                  (The witness was sworn by the

13                  Reporter.)

14              MELISSA RIGGINS,

15 called as a witness herein, at the instance of the

16 Petitioner, having been duly sworn upon her oath,

17 testified as follows:

18         ADMINISTRATIVE LAW JUDGE BARRIS:  Mr.

19 Ginder.

20              DIRECT EXAMINATION

21 BY MR. GINDER:

22    Q.   Could I have you please state and spell

23 your name for the record?

24    A.   Melissa Riggins.  I go by Missy, and it's,

408

1          (Petitioner's Exhibit No. 9 was

2          marked for identification.)

3          MR. GINDER:  You want me to have her

4   identify the document and then go through some

5   objections?

6          ADMINISTRATIVE LAW JUDGE BARRIS:  Sure.

7   BY MR. GINDER:

8      Q.  I'm going to show you what's been marked

9   as Respondent's, I'm sorry, Petitioner's Exhibit

10  Number 9 and ask you to take a moment to look over

11  that, and let me know when you're done.

12     A.  Okay.

13     Q.  And do you recognize Petitioner's Exhibit

14  Number 9?

15     A.  Yes, I do.

16     Q.  And what is that?

17     A.  It is a letter that we received from

18  Doctor Killian after we had been notified by Doctor

19  Killian that Michael Sanders failed to attend the

20  last IME.

21         MR. WILSON:  I'm going to voice my

22  objection now, as I believe this document is

23  covered by our motion in limine.  It's

24  communications regarding the provision of mental

000623

489

1   address it.  Okay?

2           MR. PETRILLI:  Okay.

3           ADMINISTRATIVE LAW JUDGE BARRIS:  Would

4   you like to swear the witness?

5                   (The witness was sworn by the

6                    Reporter.)

7               STEPHEN PETRILLI, SR.,

8   called as a witness herein, at the instance of the

9   Petitioner, having been duly sworn upon his oath,

10  testified as follows:

11                  DIRECT EXAMINATION

12  BY MR. GINDER:

13      Q.   Can I have you please state and spell your

14  name for the record?

15      A.   Stephen A. Petrilli.  It's S-T-E-P-H-E-N,

16  A for Andrew.  Petrilli, P-E-T-R-I-L-L-I, Sr.

17      Q.   Okay.  Mr. Petrilli, are you currently

18  employed?

19      A.   Yes.

20      Q.   And who is your employer?

21      A.   Department of Central Management Services.

22      Q.   Okay.  And do you have a job title?

23      A.   Yes.  I'm the manager of Enterprise

24  Production Operation Services.

000704

492

1      A.   Victor Puckett was a line supervisor, and

2   for a while Dennis Phipps was a shift manager, but

3   then he retired at the end of March, and then Jim

4   Davis was put in an acting position as far as

5   second shift manager, and I don't know if we had an

6   IO Control Manager at that time, because we had a

7   longstanding vacancy.

8            The overall manager involved three

9   shifts was vacant for a period of time due to

10  injury or illness, or just a vacancy.

11     Q.   And what, for lack of a better word, what

12  unit was Mr. Sanders in?

13     A.   He worked the second shift Input Unit of

14  IO Control.

15     Q.   Okay.  And what types of jobs was the

16  second shift Input Unit of IO Control responsible

17  for?

18            What were their job responsibilities?

19     A.   They're responsible, IO Control is

20  separated in two areas.  One is Input Control and

21  then Mr. Sanders whereas the other side of it was

22  Output Control.  As far as Input Control, they're

23  responsible for following the production processing

24  schedules for all of the consolidated agencies

493

1   within our control.  At that time I think it was

2   approximately 20,000 production jobs a month that

3   were processed --

4        Q.   Okay.

5        A.   -- on a nightly basis.

6        Q.   And for those of us who may not be all

7   that computer savvy, what is a production process

8   schedule?

9        A.   If you know what a flow chart is, they

10  come in a variety of forms, but probably simplest

11  term would be one or more sheets that showed

12  processing flows saying this step has to be done,

13  then this step, and then this step, and it would

14  show inputs and outputs, you know, where the inputs

15  come from, where the output is going, you know, if

16  there is any control parameters or whatever, if you

17  had problems with the job, if the job did not

18  terminate normally, if it did not go to normal

19  completion, if it abended or stopped prematurely

20  for some reason.

21             Then there was procedures either

22  within the JCL or what we call the Job Control

23  Language of the JCL or other documentation that

24  document the job as to, you know, what procedures

494

1  are as far as who to contact, what to do to try and

2  get the problem resolved, or if anybody needed to

3  be called.  Some jobs aren't critical to where they

4  could be held to the next day.

5      Q.  And you said a few phrases in there that

6  I'm going to go into a little more detail.

7      A.  Okay.

8      Q.  You used the phrase abend?

9      A.  Abend, abnormal end.  That's a data

10  process jargon where they've taken two words,

11  abnormally end and put them together and called

12  abend.  It's just slang for a job that did not

13  complete the way it should have.

14      Q.  Okay.  And what would an individual's

15  responsibility who works in the Input Unit of IO

16  concerning when a particular process had abended?

17      A.  It would depend on the level of the person

18  working in IO, because we have several

19  classifications.  We've gotten entry level, data

20  processing techs, then the more experienced or more

21  experienced data processing specialists, then what

22  we would have, a data processing admin specialist,

23  which is kind of lead worker, then your line

24  supervisor and shift manager.

495

1          So it really depended on, number one,

2  the job or the system and the individual that was

3  monitoring the schedules.

4      Q.   Are you aware of what, which one of these

5  categories Mr. Sanders was?

6      A.   Mr. Sanders was a data processing

7  technician.

8      Q.   Okay.  So what would a data processing

9  tech's responsibility be?

10      A.   Basically to follow instructions that were

11  provided to him.  They worked under close

12  supervision and direction of data processing admin

13  specialists or even a specialist if one was there.

14  Most normally it would be shift manager, shift

15  supervisor so, and it would be up to them to

16  ascertain what the individual could handle on their

17  own and what they couldn't.

18      Q.   And back up a little bit.  You also said

19  job control language or I think JCL for short.

20          What does that refer to?

21      A.   It's a command language that's -- it's a

22  computer mainframe command language that consists

23  of various key words or statements, and that's what

24  we use to tell the mainframe computer system how to

496

1  process this job.

2          You know, you would tell the computer

3  what program to execute and then it would identify

4  the files, you know, the input and the output

5  files, what files is this program supposed to take

6  as input, and what files are to be created as

7  output, and where to put them, whether they be put

8  on magnetic disc or tape or cartridge.

9          And it would also specify whatever

10  reports that might be produced on a particular on

11  what we call a job step.  And a production job

12  could consist of one or more job steps all grouped

13  together.  I mean, some jobs are rather complex,

14  may have a hundred job stints in them.  It really

15  depends on the program when they designed the

16  application system how complex they wanted to make

17  a particular system.

18          MR. WILSON:  I'm going to object.  This

19  testimony regarding the interrelationship between a

20  supervisor and the duties of a data processing

21  technician may have been appropriate for an

22  introduction during their case in chief, but I'm

23  not sure that there was any testimony offered

24  during our case about the level of supervision or

509

1    When DHS was legislatively formed in 1997, July 1,

2    1997, we separated from Department of Public Aid.

3    We took in all of the parts of seven different

4    agencies.  I was over the DHS operations area, and

5    I had to basically write all the job descriptions

6    for an entirely new organization that pretty much

7    mirrored what Department of Public Aid was.  But I

8    had to review and pretty much write all the job

9    descriptions, so I know what the job

10   classifications and specifications say and the job

11   descriptions are based off of that, and then the

12   person's performance evaluations are based off the

13   job descriptions.

14        Q.   Okay.  And I will turn your attention to

15   what's been a few minutes now, a question I posed

16   to you earlier concerning schedule jobs and job

17   steps, and testimony that was previously given by

18   Mr. Sanders, which you indicated you disagreed

19   with.

20             Do you recall that?

21        A.   Yes.

22        Q.   Okay.  And I asked you why you disagreed

23   with that characterization.  I believe you were cut

24   off.  I'll pose the same question to you and ask

510

1    you to answer that question.

2         A.   Well, I over the years, due to the

3    critical nature of the processing that we do,

4    because when we do our job correctly or

5    incorrectly, patients and clients, as well as state

6    employees are affected by what we do or don't do.

7              We've evolved over trial and error and

8    a lot of blood, sweat, and mistakes of developing

9    documentation on how to perform a job, how to do a

10   restart, how to follow processing schedules, that

11   when a person has questions, you know, that they

12   need to turn to their supervisor or lead worker.

13             Again, because we evolved in that,

14   just to correct, I mean, we didn't -- our

15   documentation probably still isn't perfect now and

16   it wasn't perfect then.  It's an evolving process,

17   but it's based on the best practices and being able

18   to get all the work done in a timely fashion.

19        Q.   And when you say best practice, are you

20   referring to schedules that have been created?

21        A.   Schedules created and processed

22   successfully based, as opposed to where we may have

23   had problems before, you know, where we screwed

24   something up and people go to their grocery store

511

1    and they find out that their ABT benefits, their

2    Link card benefits haven't been posted, because we

3    messed something up.

4            And the problem is, that's not

5    something you find out right away since the

6    processing that we do is normally weeks in advance.

7    So, I mean, we could make a mistake one day and it

8    may not be evident until two weeks from now when it

9    comes time for the schedule benefits to be posted

10   and, I mean, that's occurred in the past.

11       Q.   And I know you have touched on this a

12   little bit, but why is it important to follow a

13   schedule as written?

14       A.   Because through trial and error we found

15   that the procedure that we have worked the best as

16   far as, this is the sequence that the jobs have to

17   be processed in.  Actually that sequence is

18   dictated to us by the programmers that design the

19   application systems, and when stuff is put in

20   production, and then we're given processing

21   schedules as far as the job flows and what order

22   things have to be run in.  This job runs first,

23   this job runs next, this job takes inputs from

24   here, this job creates inputs from maybe another

512

1 job that's supposed to run in another system

2 tomorrow night so.

3    Q.   So if a data processing tech essentially

4 creates his own schedule and gets a program or a

5 job to work, does that mean that that is going to

6 work and there is going to be no potential problems

7 down the road?

8    A.   No.

9    Q.   And why is that?

10    A.   Because the person may not fully

11 understand the entire processing flow from start to

12 finish.  Because something works, yeah, there is

13 always, no matter what you do in life, there may be

14 two ways of doing things, you know, your way and

15 the right way.  But maybe both may work, but not

16 one hundred percent of the time, and the procedures

17 that we ask our people to follow or basically are

18 instructed to follow it, to make sure that we do it

19 that way, if there is a mistake, then we're not

20 held at fault so.

21    Q.   And if a data processing tech does follow

22 his own schedule but gets a program to work, is it

23 possible that will affect other jobs or other

24 programs later in time in an adverse way?

513

1      A.   It could depending on the change or where

2   the change was made.

3      Q.   And what would be?

4      A.   The person didn't follow instructions when

5   they're doing a JCL override to maybe do a restart,

6   and instead of changing a symbolic variable, maybe

7   the tape cartridge is coded, they end up overriding

8   it and it's physically sticking a taped cartridge

9   number in it.  That job may run fine, but

10  subsequent jobs, either that night or maybe the

11  next day or the next week, depending on which cycle

12  is used, subsequent jobs may end up using an old

13  input instead of the input that was supposedly

14  created on the job that the person created.

15     Q.   And in the situation you just gave, what

16  would be the fallout of that?

17              What are the ramifications of that?

18     A.   It really depends on what system.   It

19  could affect, I mean, it depends on whether it

20  would be a Unit Doe System, which is really where

21  the pharmacy used by mental health facilities or

22  client payroll, which takes care of the benefits as

23  far as food stamps and cash benefits, or personnel

24  payroll.

514

1    Because at that time DHS, what people
2  didn't know, we ran payroll for probably 50,000 of
3  the state employees.  CMS Personnel payroll system
4  handled very few.  I mean, it just -- that or if we
5  created a wrong input, and see we trade files with
6  other agencies, such as Department of Public Aid
7  back then, but, you know, we may create a file that
8  goes into their medical processing or their child
9  support or may create a file that is given to
10  another state or employment security.  There is so
11  much interaction between, not only the systems
12  themselves, you know, within a particular agency,
13  but with other application systems with other
14  agencies and other entities.
15    Q.  Okay.  So is it important for a schedule
16  to be followed exactly?
17    A.  Yes.
18    Q.  Would you say it's of critical importance?
19    A.  Yes.
20    Q.  And if a data process tech doesn't follow
21  a schedule precisely or refuses to follow a
22  schedule as written, whose responsibility is it to
23  make sure that the data processing tech does follow
24  it correctly?

515

1      A.    That would be up to the supervisor to

2   bring that to the employee's attention.  You know,

3   say, hey, what you've done may have worked, but

4   this is the correct way to doing it.

5      Q.    And I assume for the reasons you stated

6   earlier?

7      A.    Yes.

8      Q.    Okay.  And I know we've, and this may be

9   just my ignorance to the whole situation, but we've

10   been talking about schedules for a long time and

11   them being followed correctly.

12             Job Control Language, is that -- is

13   the term command correct?

14      A.    It would be what you would call like a

15   batch.  I don't know how familiar you are with IT,

16   but it would be like a batch command language for

17   the mainframe of our unit.  It's job control

18   language.  It's just what the name implies.  It's a

19   variety of different statements and key words and

20   stuff like that that direct the computer what to do

21   as far as inputs and outputs, where to get the

22   input from, where to place it, and what job to run

23   next.

24      Q.    And similarly to schedules, do you guys

516

1   have specific job control language that's to be

2   used in certain instances?

3       A.   Yes.   Actually the job is a production

4   control library is password protected.   You know,

5   once a job is put in production, the only person

6   that can make permanent changes to the JCL is a

7   programmer through a request.

8           They would send a request down to

9   production control saying this job needs to be

10  revised.   Production control will then make sure a

11  test has been run, and they'll make the changes,

12  and once we've run the new job, maybe a new job or

13  modified job, once the testing has been done, then

14  they submit a request to Library Services then to

15  move that JCL into production library.

16      Q.   And then like a schedule, is it possible

17  to put different -- is it possible to put one

18  command in, one JCL in, actually strike that.

19          Is it possible to put multiple JCLs in

20  and get a system to work?

21      A.   Yes, it's possible.

22      Q.   Okay.   Why is it important to use the JCL

23  that you guys have established and not to make up

24  your own JCL?

517

1      A.   Well, for the reason I stated, because the

2   person may not be aware of the full impact of what

3   they're doing.  It may have lingering effects

4   throughout the system.  It may not be discovered

5   until days, weeks, or even months later in

6   subsequent process, whether it ends up in a double

7   posting of benefits or the fact that a person gets

8   deprived of their benefits.  I mean, it really

9   depends on the different systems.  We run jobs for

10   so many different application systems, you know, I

11   can't really be specific as to what the impact

12   would be.

13          MR. GINDER:  Okay.  I don't have anything

14   further.

15          ADMINISTRATIVE LAW JUDGE BARRIS:   All

16   right.  Mr. Wilson?

17                   CROSS EXAMINATION

18   BY MR. WILSON:

19      Q.   You are Michael Sanders' supervisor,

20   right, or well, actually you were two or three

21   levels above Michael Sanders in the chain of

22   supervision, right?

23      A.   Mr. Sanders was in my organization, yes.

24      Q.   Did you provide any input or facts that

529

1  STATE OF ILLINOIS   )

2                      )

3  COUNTY OF SANGAMON )

4              C E R T I F I C A T E

5       I, DONNA M. DODD, a Certified Shorthand

6  Reporter and Notary Public, in and for said County

7  and State, do hereby certify that I reported in

8  shorthand the proceedings had on the hearing of the

9  above-entitled cause on March 18, 2008, and that

10  the foregoing is a true and correct transcript of

11  my shorthand notes so taken.

12       Given under my hand and seal this 3rd day

13  of April, A.D., 2008.

14

15

16

17                  s/Donna M. Dodd
        _____

18            Certified Shorthand Reporter

19            and Notary Public

20            CSR # 084-003912

21

22                           "OFFICIAL SEAL"
                             Donna M. Dodd
                         Notary Public, State of Illinois
23  My commission expires   My Commission Exp. 05/19/2010

24  May 19, 2010.

# Killian and Associates, S.C.

Terry M. Killian, M.D.
Wm. Arthur Forsyth, M.D.
Patrick G. O'Donnell, M.D.
J. Ewing Harris, Ph.D.
Steven Fritz, Psy.D.
Tami Skaggs-Braidwood, LCSW
Bethanie Drake, LMFT
P. Jean Follin, LCPC
Virginia Thompson, LCSW

1020 South Fifth Street • Telephone (217) 544-3143
Springfield, Illinois 62703 • Fax (217) 544-4436

Ms. Missy Riggins
Acting Human Resource Director
Central Management Services Internal Personnel
Illinois Department of Central Management Services

Wednesday, 09/05/2007

Re: Michael Sanders

Dear Ms. Riggins:

I'm writing this letter at your request to document the events of the last two years with regard to your employee, Michael Sanders. As you know, CMS has referred Mr. Sanders to me on six different occasions for an independent medical examination for fitness for duty in the last two years, but Mr. Sanders has not kept any of those appointments. In the following paragraphs, I will describe in detail my involvement in this case during the last two years, and will describe in detail all of the contact I have had with Mr. Sanders during that time. There are some documents that CMS sent to me regarding Mr. Sanders which I will only briefly mention in passing, because you already have those documents which describe some of the problems that had occurred in the workplace which led to Mr. Sanders being placed on administrative leave of absence and referred for fitness for duty exams.

***********************************

<u>10/05/2005 APPOINTMENT:</u> CMS contacted me on 09/19/2005 with regard to scheduling an IME, which was scheduled for 10/05/2007. I received a cover letter that gave a brief description of problems in the workplace, including aggressive behavior on the job site. He was placed on administrative leave effective 09/09/2005. He failed to keep the appointment with me, so I called CMS it was rescheduled for the following week.

Michael Sanders – IME letter – 09/05/2007 – Page #1



: 01478

<u>10/12/2005 APPOINTMENT</u>: This was a rescheduled appointment from the previous week, when Mr. Sanders failed to keep the previous appointment. He also failed to keep the 10/12/2005 appointment. I did not hear from Mr. Sanders prior to the 10/05/2005 appointment or the 10/12/2005 appointment.

<u>04/19/2006 APPOINTMENT</u>: I was contacted in early April regarding scheduling this appointment, and received a cover letter from Christy Shewmaker and copies of two documents describing Mr. Sanders' behavior in the workplace. I received a brief memo from Mr. Sanders dated 04/07/2006, warning me that I should "be advised that the scheduling of these appointments is not in accordance with state and/or federal law. Therefore, I am requesting that your office schedule no further appointments for me unless you verify that the appointments are in accordance with state and/or federal law." He threatened legal action against me if I were to schedule another appointment. He did not keep the appointment.

<u>01/30/2007 APPOINTMENT</u>: I was contacted by CMS on 01/19/2007, and another IME was scheduled for 01/30/2007, but Mr. Sanders again failed to keep this appointment. He did not contact prior to this appointment.

<u>06/13/2007 APPOINTMENT</u>: I was contacted by CMS on 05/23/2007 for a fifth appointment, which was scheduled on 06/13/2007. Mr. Sanders did not show up for that appointment, and I did not hear from him prior to the appointment.

<u>TODAY'S APPOINTMENT</u>: I was contacted again by CMS on 08/21/2007 for the purpose of scheduling a sixth appointment, which was scheduled for today, Wednesday, 09/05/2007 at 3 p.m. I received another cover letter from CMS. On 08/24/2007, Mr. Sanders hand-delivered a one paragraph memo, requesting that I cancel the appointment scheduled for 09/05/2007, and threatening "state and federal civil rights complaints, as well as potential criminal complaints" against me if I did not immediately canceled the appointment. He also threatened "severe disciplinary action against your professional license". He requested that I confirm the immediate cancellation of the appointment in writing to him. I did not respond to his letter, simply putting his letter into his chart and awaiting today's appointment.

As I told you by telephone today, about an hour prior to today's scheduled appointment, Mr. Sanders walked into my office and handed a three-page memo to one of my secretaries, requesting that she date stamp the memo, which requested again that I cancel the appointment, which I did not do. Mr. Sanders did not, of course, show up for the 3 p.m. appointment. I did wait in my office until past 3:30 p.m. on the off chance that he might show up.

I am forwarding to you a copy of the two memos Mr. Sanders wrote to me in the last month. As you can see from today's memo, he repeatedly states that these appointments were made "without my input and/or consultation and/or consent." He stated that my behavior in failing to cancel today's appointment is "unethical and illegal and demands redress by law enforcement agencies and the appropriate agencies that regulate your professional medical license." He stated that he intends to refer to this matter to law enforcement and the Department of Professional Regulation, as well as contacting the print, radio and television media. He claimed doctor-patient confidentiality with respect to whether or not he attended

Michael Sanders – IME letter – 09/05/2007 – Page #2

000801

: 01479

today's appointment, and with regard to the memo he sent to me. As I'm sure you are aware, there is no doctor patient relationship between me and Mr. Sanders, and his claims of doctor-patient confidentiality are groundless.

**************************************

I hope that the above information is helpful to you. If you need further information, please do not hesitate to contact me, though I will emphasize that I don't have much additional information than what I already included in this letter. Thank you for the opportunity to be involved in this interesting case.

Respectfully submitted,

s/Terry M. Killian

Terry M. Killian, M.D.
1020 South Fifth Street, Springfield, IL 62703
Clinical Associate Professor of Psychiatry, Southern Illinois University School of Medicine

TMK: dictated on Dragon NaturallySpeaking

Attachments: two memos written by Mr. Sanders

000802

01480

*fax* 782-3366

# MEMORANDUM

REC'D SEP 0 5 2007

Dr. Killian/Killian & Associates S.C.

DATE: SEPTEMBER 5, 2007

FROM:        MR. MICHAEL A. SANDERS

TO:          DR. TERRY KILLIAN

RE:          SEPTEMBER 5, 2007 PSYCHIATRIC EXAMINATION

Your office, at the request of the Illinois Department of Central Management Services (CMS), has scheduled several appointments for me. The purpose of these appointments has been for you to perform a psychiatric examination of me. These appointments have been made without my consent and with no form of input and/or consultation from me.

The results of your psychiatric examination, by agreement between CMS and your office, and without my input and/or consultation and/or consent, are to be delivered to CMS.

The dates of the appointments that your office scheduled for me, at the request of CMS and without my input and/or consultation and/or consent, are as follows:

> October 5, 2005
> October 12, 2005
> April 19, 2006
> January 30, 2007
> June 13, 2007
> September 5, 2007

Shortly after my refusal to attend the October 5, 2005 and October 12, 2005 psychiatric examination(s) scheduled by your office, at the request of CMS, I was terminated from employment with the State of Illinois. I received a 30-day suspension shortly after my refusal to attend the June 13, 2007 psychiatric appointment scheduled by your office at the request of CMS.

As you know (and as you have communicated to CMS), I have not attended any of the appointments that have been scheduled by your office, at the request of CMS, as each of these appointments have been scheduled without my input and/or consultation and/or consent. In

000803

: 01483

addition, a conflict of interest exists regarding the scheduling of these appointments with your office...........as I am certain that you are aware of.

On April 7, 2006 I faxed a letter to your office and requested that you not schedule any further psychiatric appointments for me due to the manner in which your office and CMS arranged these appointments.

On August 24, 2007 I hand delivered a memorandum to your office, which was stamped as received by your office, regarding the September 5, 2007 psychiatric examination that your office had scheduled for me at the request of CMS.

The August 24, 2007 memorandum requested that your office cancel the September 5, 2007 psychiatric appointment that your office had scheduled for me, at the request of CMS, and notify me in writing that this psychiatric appointment had been cancelled. CMS made this appointment with your office without my input and/or consultation and/or consent. **You failed to do so!**

**Obviously, a written contractual agreement exists between CMS and your office which strips me of my right to medical confidentiality and which has authorized you to receive payments from the State of Illinois based upon my refusal to attend the psychiatric examinations requested by CMS and scheduled by your office and which were made without my input and/or consultation and/or consent.**

Your conduct in this matter, in failing to cancel the September 5, 2007 psychiatric examination (upon my request) which you have scheduled for me, at the request of CMS, and which was made without my input and/or consultation and/or consent is unethical and illegal and demands redress by law enforcement agencies and the appropriate agencies that regulate your professional medical license.

Equally abhorrent is the conduct of CMS, in scheduling these psychiatric examinations without my input and/or consultation and/or consent.

As a matter of record, this memorandum was delivered to your office prior to 3:00 P.M. on September 5, 2007. Your office is again requested to cancel the psychiatric examination that you have scheduled for me on September 5, 2007 at 3:00 P.M.

This matter will be referred to law enforcement, and the agencies that regulate your professional medical license, on September 5, 2007 if your office does not cancel this psychiatric appointment that was made at the request of CMS and scheduled by your office without my input and/or consultation and/or consent. Once this matter is referred to law enforcement I will make every effort to ensure that you are a party to any potential criminal and/or ethical charges.

In addition, I will certainly seek the publication of this matter in the print, radio and television media. I will relocate from this city (in order to remove myself from the harmful influences of this employer, etc.), however, this matter will not remain concealed within the files of CMS or

the files of your office. CMS **will** conduct itself in an adult manner, by establishing contact

with its employee and resolving the current employment issue, or this matter will become known to the public at large.

Further, I claim doctor-patient confidentiality with respect to whether or not I attend the September 5, 2007 psychiatric examination, scheduled by CMS without my consent and/or input and/or consultation.  You are **NOT AUTHORIZED** to disclose, orally or in writing, whether or not I attended the September 5, 2007 psychiatric examination that was scheduled by CMS, without my input and/or consultation and/or consent, with CMS or any other entity.

Lastly, I claim doctor-patient confidentiality with respect to this memorandum and it's contents.  You are **NOT AUTHORIZED** to release this memorandum to CMS or to discuss the contents of this memorandum with CMS or any other entity.

Sincerely yours,

s/Michael A. Sanders
Mr. Michael A. Sanders

000805
: 01485

# MEMORANDUM

AUGUST 24, 2007

TO:        DR. TERRY KILLIAN

FROM:    MR. MICHAEL SANDERS

RE:        SEPTEMBER 5, 2007 APPOINTMENT

I request that you immediately cancel the September 5, 2007 appointment that your office has made for me at the request of CMS (an agency of the State of Illinois). State and Federal civil rights complaints, as well as potential criminal complaints, will be made against you and the State of Illinois if this appointment is not immediately cancelled. Further, I will seek a severe disciplinary action against your professional license if this appointment is not cancelled. Please confirm the immediate cancellation of this appointment to me, in writing, at the address below:

Mr. Michael A. Sanders
1430 Loveland Avenue
Springfield, Illinois 62703

Sincerely your,

Mr. Michael A. Sanders

REC'D AUG 2 4 2007

Dr. Killian/Killian & Associates S.C.