1              IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS

2                 SPRINGFIELD DIVISION

3

4  MICHAEL A. SANDERS,          )
                             )

5           PLAINTIFF,     )   09-03207
                             )

6       VS.               )
                             )

7  ILLINOIS DEPARTMENT OF     )   SPRINGFIELD, ILLINOIS
  CENTRAL MANAGEMENT SERVICES, )

8                       )
          DEFENDANT,     )

9

10

11             TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE SUE MYERSCOUGH

12              U.S. DISTRICT JUDGE

13  MARCH 16, 2012

14  A P P E A R A N C E S:

15  FOR THE PLAINTIFF:         MR. MICHAEL A. SANDERS
                          APT 205

16                          400 E. JEFFERSON
                          SPRINGFIELD, ILLINOIS

17

    FOR THE DEFENDANT:         MS. AMY PETRY ROMANO

18                          MS. KELLY R. CHOATE
                          ILLINOIS ATTORNEY GENERAL

19                          500 S. SECOND STREET
                          SPRINGFIELD, ILLINOIS

20

21

22

23

24  COURT REPORTER:            KATHY J. SULLIVAN, CSR, RPR
                          OFFICIAL COURT REPORTER
                          600 E. MONROE

25                          SPRINGFIELD, ILLINOIS
                          (217)492-4810

```
 1                      I N D E X

 2    WITNESS              DIRECT  CROSS  REDIRECT  RECROSS
      (NONE.)
 3

 4

 5

 6

 7

 8

 9

10

11

12                    E X H I B I T S

13
      GOVERNMENT'S EXHIBIT
14    NUMBER              IDENTIFIED   ADMITTED

15

16

17

18

19    DEFENDANT'S EXHIBIT
      NUMBER              IDENTIFIED   ADMITTED
20

21

22

23

24

25
```

1              P R O C E E D I N G S

2       *    *    *    *    *    *    *    *    *    *    *

3          THE COURT:  All right, on the record.

4       This is 09-CV-3207.  Sanders versus the

5    Illinois Department of Central Management Services.

6    The cause is called for final pre-trial.  We have a

7    number of motions here and I'm going to ask your

8    indulgence.  I have some motions in different piles

9    here.  I want you to be sure and point out if I've

10    missed anything.

11       Let's start with the plaintiff's motion for

12    issuance of subpoenas.  I think we were down to just

13    a few objections to the issuance of subpoenas; is

14    that correct, Ms. Romano?

15          MS. ROMANO:  Yes, Your Honor.  Our office

16    did file a response to that motion.  And I believe

17    what we noted in our response -- would you prefer me

18    to sit or stand?

19          THE COURT:  Whichever you're more

20    comfortable with.

21          MS. ROMANO:  Thank you.  In the response to

22    the request for issuance of subpoena, we noted two

23    things.  One is that local Rule 42 -- 45.2 indicates

24    that a pro se plaintiff must indicate the grounds on

25    which they ask for subpoenas to be issued by the

1    Court.  I guess the subject matter of each

2    individual's testimony.  That wasn't done in this

3    instance.

4        And the second point we raised in the response

5    is that Mr. Sanders wishes to call as witnesses

6    several individuals who are no longer employed by

7    the State of Illinois.  Therefore, it's uncertain or

8    unclear if their records with the State are still

9    any good.  And our office is a little reluctant to

10   provide home addresses in this situation.

11       I did contact Mr. Sanders and advise that some

12   of these addresses I just got out of the phone book.

13   That's how I've been looking to locate people.

14   Others can't be found that way.

15       Our office -- in the past when we've handle

16   litigation with inmates, it's my understanding that

17   we provide the addresses directly to the Court and

18   the Court will issue and send the subpoena in the

19   mail.

20       So I guess we're just kind of trying to look

21   for a solution here.  That's one way to resolve the

22   matter perhaps.  I just don't -- we will comply to

23   whatever the Court thinks is appropriate in this

24   situation.

25            THE COURT:  Mr. Sanders, first of all,

```
1    let's deal with the issue of your failure to explain

2    to us why you're calling each of the specific

3    witnesses.

4            MR SANDERS:  The people I listed, they're

5    all employees.  They were either employees or former

6    employees, and they are a part of a chain of

7    command.

8            THE COURT:  Are you saying they were

9    employed directly either adjacent to you or in the

10   same department?

11           MR SANDERS:  Yes.  I think there's one,

12   Susan Twitchell, now she is not.  She was not an

13   employee of CMS.  But the nature of the job is that

14   the position that I had, we would -- on occasion we

15   would have to contact programmers and analysts from

16   a different department.  So Susan Twitchell is

17   employed by Department of Human Services as an

18   analyst.  And she reviewed some of the work that I

19   did that I was criticized for.  That's why I want

20   her.

21           THE COURT:  So were all of these witnesses

22   disclosed in your other case?

23           MR SANDERS:  Yes.  Everybody that I --

24   names I provided to this Court, they were all given

25   to her previously on that Rule 26(a)(1) disclosure.
```

1        Only change that I made was that Attorney Baker

2     wanted to include a police officer, and I removed

3     the police officer.  And I added Susan Twitchell.

4     Attorney Baker also had one of my co-workers in

5     there and I removed that co-worker from the list.

6     But otherwise, it's substantially the same.

7              THE COURT:  All right.  Ms. Romano, are you

8     asking Mr. Sanders to explain to you specifically

9     what the relevant testimony is that these witnesses

10    will provide?

11             MS. ROMANO:  Yes.  Because in discovery the

12    response was that they would just testify as to the

13    complaint.  I don't believe all of these individuals

14    have information that -- listed in the complaint.

15       And I don't know exactly what Mr. Sanders was

16    referring to regarding the individuals being in his

17    chain of command.  There's a total of I think 18

18    people here, and not all of them were in his chain

19    of command.  Dr. Killian, of course, was not.  And

20    an individual from the Illinois Department of

21    Employment Security that's not a party to this

22    action.

23       There are several people who I know to be

24    secretarial staff; I'm not certain what relevance

25    they would have to this.  Others who belong to the

1  Department of Labor Relations, where there's been no

2  indication that they've made decisions about

3  Mr. Sanders attending an IME.

4       So of this list, there are some individuals who

5  are in Mr. Sanders' chain of command, but the vast

6  majority are not.

7            THE COURT:  All right.  Mr. Sanders, can

8  you take your list of witnesses and in sum explain

9  what it is specifically that each of those

10 individuals will testify to?

11           MR. SANDERS:  If I can locate it.

12      Okay.  Victor Puckett, he's a supervisor.  He

13 was my immediate supervisor when all these events

14 occurred, so --

15           THE COURT:  What we're going to do, I just

16 want you to sit and write next to each individual's

17 name what they're going to testify to, and then

18 we'll make a copy of that to share with the Court

19 and with Ms. Romano.

20      And let me tell you, one, that's required.  And

21 two, Mr. Sanders, you understand that when you

22 subpoena a witness, you have to tender fees to the

23 witness, as well as mileage and service costs have

24 to be paid by you for the Marshal to take these

25 subpoenas to the witnesses.  And since you're not

1   proceeding informa pauperis, you will be required to

2   pay the fees for each of these witnesses.

3        Do you understand that?

4            MR. SANDERS:  Okay.  Well, I'm -- I guess

5   the other cases I'm proceeding as a poor person, but

6   in this case -- I'm still unemployed.  I don't have

7   anything except unemployment compensation.

8            THE COURT:  What other case are you

9   proceeding --

10            MR. SANDERS:  The Department of Health Care

11  and Family Services.

12            THE COURT:  Have you ever asked to proceed

13  informa pauperis in this case?

14            MR. SANDERS:  No.  When this case was filed

15  I was employed, but they discharged me, you know,

16  again.

17            THE COURT:  Ms. Romano, would there be any

18  objection at this time if Mr. Sanders, after he

19  completes his description of what each witness will

20  testify to, to him filing at this late time an

21  informa pauperis petition?

22            MS. ROMANO:  I guess not, Your Honor.

23            THE COURT:  Off the record.

24        (A discussion was held off the record.)

25            THE COURT:  Back on the record.  He asked

1  whether he should complete the description of what

2  each witness will testify to now, or would we rather

3  wait and do it after we proceed with the other

4  matters.

5          MS. ROMANO:  I don't wish to take the

6  Court's time.  If this is something that Mr. Sanders

7  can do outside of the court, that's fine with me.

8  If we have additional questions, though, or

9  additional objections, if we could raise those by

10  motions after today's date.  That's the only thing I

11  would ask.

12          THE COURT:  That would be fine.

13          MS. ROMANO:  We had one question, too.  If

14  he's proceeding; we are unclear on this; proceeding

15  informa pauperis, does that relieve a litigant of

16  the right -- or of the burden to pay the fees

17  accompanying a subpoena?

18          THE COURT:  I believe it does.  Christy?

19          THE CLERK:  I don't know for sure.  I

20  definitely understood he doesn't have to pay the --

21  in a pro se litigant case, when it comes to serving

22  the complaint on parties, we are ordered to do that.

23          THE COURT:  So that would mean there would

24  be a complete waiver of those fees?

25          MS. CHOATE:  Judge, it's not a waiver, but

1    the Court could pay out of the own court's funds.

2    The 7th Circuit has said you can not waive the fee.

3              THE COURT:  Which fee?

4              MS. CHOATE:  The service fee.

5              THE COURT:  And I know I did talk to our

6    head clerk, and she said we have never authorized

7    the payment of that fee out of the court funds,

8    because there aren't any.

9              MS. ROMANO:  Ms. Choate has advised -- Ms.

10   Choate for many years has handled a number of pro se

11   litigation cases.  And it's her understanding that

12   inmates who proceed pro se informa pauperis within

13   this district still pay the fee.

14             MS. CHOATE:  They're not released from

15   witness fee and mileage.  There are other fees the

16   Court can waive.  And if they're informa pauperis,

17   their filing fee can be paid over time, is what I

18   understand.  But just for purposes of the witnesses,

19   I think those fees are still required for a valid

20   subpoena.  Certainly he can send subpoenas and

21   people can come and testify, but I don't believe

22   that the fees or mileage are waived on witness

23   subpoenas.

24             THE COURT:  Nor is the Marshal's cost.

25             MS. CHOATE:  Right.  I wouldn't believe

1   that is either.

2         THE COURT:  All right.  And Ms. Choate, I

3   apologize, I hadn't recognized you for the record.

4   That's C-h-o-a-t-e.

5      So you understand you would still be

6   responsible for those costs, even if you do proceed

7   informa pauperis?

8         MR. SANDERS:  Would that be upfront, or is

9   that something I could address at a later date?

10        THE COURT:  You have to tender those fees

11  and mileage upfront.  And after service, you then

12  have to pay the Marshal, after he has served your

13  subpoena.

14     So you may want to consider, if it won't hurt

15  your case, any duplication of testimony that might

16  be -- that might occur, you might be calling

17  additional witnesses that you don't need to call.

18        MR. SANDERS:  Okay.

19        THE COURT:  Was there not an issue as to

20  addresses the last time we were together?

21        MS. ROMANO:  Yes, Your Honor.  I don't

22  believe Mr. Sanders -- I think that's what I raised

23  previously about the home addresses for employees no

24  longer with the State.  I believe that those

25  employed with the State could be served at their

1    work address, there's no problem with that.  But

2    there's a fair number here who are no longer with

3    the State.

4         MR. SANDERS:  There's I think only about

5    four -- I think four or five of them.  Some of these

6    people are retired.  Jayme Lebshier.  Christy

7    Shewmaker.  Steve Miller.  Steve Petrilli.  Jay

8    Sergent.

9         THE COURT:  Well, what we can do is we can

10   have you complete the subpoenas and present them to

11   the Court.  The Court can then insert the addresses

12   that will be supplied in camera by Ms. Romano.  And

13   I will then give those subpoenas, upon completion

14   with the address, to the Marshals.

15       After Marshals service, then they will turn

16   those subpoenas to me and we will redact the

17   addresses, the home addresses, of those people who

18   are no longer employed by the State.

19       Is that acceptable to you, Mr. Sanders?

20        MR. SANDERS:  Yes.  I don't -- I don't need

21   their addresses.  I just don't know where they are.

22        THE COURT:  All right.  But then again,

23   we're back to you need to be aware that there's

24   substantial cost with subpoenaing 18 witnesses.

25       And Christy, again, you're going to have to

1   tell me, because I'm not aware of what those costs

2   can be.  Isn't it like up to $300 depending on where

3   they live?

4          THE CLERK:  I don't know what the costs

5   are.  I know witness fee is $40.

6          THE COURT:  But then mileage?

7          THE CLERK:  And then I think we're at $.51

8   a mile.

9          THE COURT:  And they could live in Quincy

10  or Chicago.

11         THE CLERK:  That's correct.

12         THE COURT:  And then the Marshals service

13  fee, depending on how far he has to go, or she, to

14  serve this person.  So it can be a substantial

15  amount of money to subpoena witnesses.

16         MR. SANDERS:  Okay.

17         THE COURT:  Let me ask Ms. Romano, do you

18  have an average?

19         MS. ROMANO:  We actually just prepared some

20  subpoenas.  I worked with my secretary in the other

21  matter and I was asking the same question.  And I

22  believe it's $40 flat fee, and then $.51 a mile is

23  my understanding.

24         THE COURT:  So in your experience, that

25  range is from what to what?

1          MS. ROMANO:  Well, I can tell you, I don't

2     believe -- the individuals that Mr. Sanders will

3     have to subpoena, I know for sure that at least two

4     of them not do live in Springfield.  So I don't -- I

5     think we'd be looking at a good amount of mileage.

6     Not a whole lot, not Quincy or Chicago by any means,

7     but additional mileage costs on top of the $40.

8          THE COURT:  Let me ask my clerk; and for

9     everybody, this is Lara Quivey.  When you looked at

10    this issue, do you remember what the Marshal's fee

11    is?

12         MS. QUIVEY:  Susan thought it might be

13    around 200.

14         THE COURT:  That's what I thought.  I

15    thought it was actually 300.  But it's substantial,

16    per witness, if it's in town.

17         MR. SANDERS:  Okay.  Your Honor, I'm

18    essentially indigent.  I don't have an income

19    essentially.  I just assumed that if these people

20    are on State payroll, she would be required to

21    present them.  The ones on State payroll.  They are

22    in town, they get paid for 40 hours a week.  You

23    know, I don't have --

24         THE COURT:  Let me ask, Ms. Romano, would

25    the government -- excuse me, the State, be willing

1    to accept E-service filing on those individuals who

2    still work for the State?  And you may not be

3    familiar with what E-filing is, if you would like me

4    to explain.  As best I can.  Feel free to jump in,

5    Christy, if you want to correct me.

6         We have set up a system since I've been here

7    where DHS and a pilot program at Pontiac

8    Correctional Center are accepting service by

9    E-filing.  It's by consent.  We've been doing it on

10   prisoner pro se cases.  So far it's been successful.

11   We haven't had any problems.  It has saved money for

12   everybody, and time, including our Clerk's Office.

13        You may want to confer with your client before

14   you agree to that, and you may want to go to the

15   Clerk's Office and see how that system works, or

16   even talk to the pro se clerk, Susan Gleason.

17        But at any rate, we are not going to disclose

18   to anyone the addresses.  To anyone other than the

19   Marshals.

20        MS. ROMANO:  Thank you.  If I could have a

21   little bit of time to talk to my clients about that,

22   I would appreciate that.

23        THE COURT:  I'm somewhat concerned,

24   Mr. Sanders, by the lack of completion of these

25   discovery issues, because our trial is scheduled to

1    begin April the 3rd.  And I know, Ms. Romano, your

2    plans were to be in another job.

3              MS. ROMANO:  Yes, Your Honor.

4              THE COURT:  When is your start date at your

5    new job?

6              MS. ROMANO:  I continued it so I could do

7    this trial.  I was -- it's now April 13th.

8              THE COURT:  Okay.  So we are -- this is --

9    we are under the gun.  Through no fault of Ms.

10   Romano's.

11       All right.  Let's go on to the motions in

12   limine, then.

13       Let's deal first with the plaintiff's.  And the

14   request is I determine whether the independent

15   medical exam ordered by the defendant constituted a

16   violation of the Mental Health and Developmental

17   Disabilities Confidentiality Act.

18       Ms. Romano.

19              MS. ROMANO:  Yes.  We filed a response to

20   plaintiff's motion in limine.  We filed it today.  I

21   don't know if you received a copy.

22              THE COURT:  I did.  I just read it right

23   before I came in.

24              MS. ROMANO:  I believe in the motion in

25   limine we objected for two reasons.

1    First, this doesn't appear to be a motion in

2 limine.  It's asking for a ruling as a matter of

3 law, which seems more like a motion for summary

4 judgment or even a declaratory judgment action.

5    But should the Court find -- more to that, now

6 is not the time to be raising or asking the Court to

7 make issues -- make findings on issues of law.  That

8 time, we would argue, is long past.

9    But should the Court find that this is a

10 properly filed motion in limine, I guess our

11 objection is the same as what was -- we raised the

12 same objection in our motion in limine.

13    There's no dispute here that Mr. Sanders did

14 not go to the Independent Medical Examination.  That

15 is well established in the evidence.  And from what

16 I can tell, Mr. Sanders is arguing that if he would

17 have gone to the Independent Medical Exam, then CMS

18 may have been -- may have been given certain

19 information that he believes might be in violation

20 of this Mental Health and Developmental Disabilities

21 Confidentiality Act.

22    That's a state law act, by the way.  There's no

23 pending claim in his claim alleging a violation of

24 this act.  And it's a very tenuous and speculative

25 argument.  It's not based upon any facts that are in

1    the record.  Since Mr. Sanders did not attend the

2    IME, CMS has no records about his Independent

3    Medical Exam.

4         And I think more importantly, that particular

5    act protects the confidentiality of recipients of

6    mental health services.  Virtually every section of

7    that act talks about disclosure of documents of

8    recipients.  A recipient of mental health services

9    is defined by the act as someone who has received

10   mental health services.  And Mr. Sanders didn't do

11   that.  He's not a recipient, therefore he can't

12   claim confidentiality under the act.

13        And also the Americans with Disability Act

14   anticipates that if an employer sends an employee to

15   an IME, they would then get the results of the exam

16   and determine whether or not the employee is fit for

17   duty.

18        I have citations within my motion of the

19   particular sections of the ADA, and these are the

20   particular sections that are at play in this

21   particular litigation.

22        So to allow -- I guess Mr. Sanders' argument

23   that once someone goes to an IME, the employer is

24   not allowed to learn the results of that exam, would

25   kind of render that particular section of the IME

1   basically useless or moot.  The employer would never

2   have any reason to send an employee to the IME,

3   because they couldn't learn the results.  The very

4   fact it includes that within the act is an

5   indication that employers can receive the results.

6   And the act does specifically say that employers can

7   receive information regarding the medical condition

8   or history of any employee.

9       So for those reasons, we would ask that the

10  motion in limine be denied.

11          THE COURT:  I will recognize the motion,

12  Mr. Sanders, as a motion in limine.  And I'm going

13  to deny it at this time.

14          MR. SANDERS:  May I respond to it?

15          THE COURT:  I have your motion.  You may

16  respond briefly.

17          MR. SANDERS:  Okay.  My position is that I

18  was sent six notices for these IMEs.  Each notice

19  stated a statement there wouldn't be doctor/patient

20  confidentiality.  Reason I did not attend the IME is

21  because, number one, they removed doctor/patient

22  confidentiality.  And number two, they never told me

23  why I was being sent.

24      They proceeded for two years scheduling these

25  IMEs.  There's even evidence in the record

1    indicating that they were having discussion about

2    should I be told why I'm going.

3        But my whole thing is if I had went to the IME,

4    from what they're saying is they authorized Dr.

5    Killian to remove doctor/patient confidentiality.

6    And my position would be that if I went, that Dr.

7    Killian would not have been authorized to give them

8    anything at all.  Not unless, you know, I signed a

9    consent form for release of information.

10       I'm not going to argue about the employer's

11   authority to order an IME.  I'm thoroughly convinced

12   they have the authority to do that.  But once the

13   evaluation is done, in order for the physician to

14   release anything, the employee has to give consent.

15   You know, that is basically my argument.

16           THE COURT:  Okay.  I'm showing that motion

17   denied at this time.

18       The defendant's motion in limine.

19           MS. ROMANO:  Yes, Your Honor.  We filed a

20   motion in limine based on several grounds.  I guess

21   before we get started, plaintiff's lawsuit here is

22   very, very narrow in scope.  It is alleging that the

23   defendant, CMS, violated one particular section of

24   the ADA in that it required Mr. Sanders to attend an

25   IME that was neither job related nor consistent with

1    a business necessity.

2        Throughout the course of this litigation it's

3    been like -- for the defense, it's been like we're

4    up against a moving target.  What plaintiff wants to

5    litigate in this case is ever changing and is ever

6    expanding.  We're learning of new defenses -- or new

7    claims pretty much with every filing at this point.

8        To that end, we filed a motion in limine that's

9    as expansive as we can at this time.  And we ask the

10   Court to please consider putting some firm

11   guidelines and boundaries upon this litigation.  We

12   want this to go as smoothly as possible.  And we

13   firmly believe that there will be many attempts to

14   bring in additional claims during the course of

15   trial.

16       I guess what we'll do is just go through each

17   section that's outlined in our motion.

18       The first section is identical to the one we

19   just argued in the plaintiff's motion in limine

20   regarding the Mental Health and Developmental

21   Disabilities Confidentiality Act.

22       As we previously -- as we previously noted,

23   plaintiff has raised no claim about a violation of

24   this act in his litigation.  Mr. Sanders simply

25   isn't someone who can claim confidentiality pursuant

1  to this act.  And his claim about this act is not

2  based upon facts in evidence, but instead, would be

3  based upon facts that are speculative as to what may

4  have occurred if he would have attended the IME.

5  THE COURT:  All right.  We'll show the

6  motion in limine granted as to Paragraph 1.

7  Paragraph 2.

8  MS. ROMANO:  Okay.  Going on to Paragraph

9  3.

10  THE COURT:  No, I granted it as to

11  Paragraph 2.  Paragraph 1, excuse me.  Paragraph 2,

12  I thought I said previously this would not be

13  barred.

14  MS. ROMANO:  Oh, Dr. Killian.

15  THE COURT:  Yes.

16  MS. ROMANO:  Okay.

17  THE COURT:  I'll show that denied.

18  Paragraph 4, the EEOC.

19  MS. ROMANO:  Yes, we previously raised this

20  argument in a motion to strike.  Mr. Sanders has

21  raised several new claims in his response to the

22  defendant's motion for summary judgment.  In that

23  motion to strike we outlined several new claims that

24  Mr. Sanders was attempting to pursue which we've

25  listed here.

1            And our office did attach the EEOC charge that

2    Mr. Sanders filed, along with the right to sue

3    letter, as Exhibit 1 to the memorandum of law in

4    support of the motion in limine.

5            Based upon the information we received,

6    Mr. Sanders filed a complaint under -- filed a

7    charge to the EEOC alleging a violation of the ADA,

8    and the right to sue letter gives him the right to

9    sue under the ADA.

10           During the course of this litigation, in

11   discovery and in other filings, there's been a

12   laundry list of new claims that have arisen against

13   parties who are not part of this litigation.  I've

14   included 11 here.  I am certain there are more that

15   I did not include that are found in other filings

16   that are alleging retaliation, discrimination,

17   actions against the Illinois Department of

18   Employment Security, actions against DCFS, actions

19   against the Illinois State Board of Education.

20           I think the most concerning one is found in the

21   memorandum of law, it's No. 3 under Paragraph C.

22   Mr. Sanders has made several claims that after he

23   was reinstated to his job at CMS, several months

24   later was subject to a layoff, and then in his laid

25   off -- in his layoff, he was bumped to a position at

1    the Department of Health Care and Family Services.

2    And due to his failure to follow the affirmative

3    attendance policy, failure to come to work, he was

4    discharged from that agency.

5         He's alleging over half a million dollars in

6    damages as a result of his layoff from his position,

7    which occurred many months after he was reinstated

8    to work, and years after he was asked to go to his

9    last IME.

10        We would just ask that certainly Mr. Sanders be

11   barred from raising these claims that I've outlined

12   in this memorandum of law.  But also, any additional

13   claims that do not appear in either his EEOC charge

14   or his complaint.

15        And I will note his complaint is actually much

16   more narrow than the EEOC charge.  The complaint is

17   actually on one specific section of the ADA.  And a

18   case that we cited in our motion to strike, Conner

19   versus Illinois Department of Natural Resources,

20   does provide that even if an EEOC charge does

21   contain -- does contain an additional reference to

22   other acts of discrimination, if it's not found in

23   the complaint it can't be litigated.

24        So for those reasons we would ask that

25   Mr. Sanders be barred from presenting any new claims

1    against any new clients or any new parties that

2    aren't found in his complaint that's been filed

3    before this Court.

4              MR. SANDERS:  Your Honor, I would like to

5    respond.

6              THE COURT:  Well, Mr. Sanders, I believe I

7    am bound to do that, what she requests.

8              MR. SANDERS:  Thank you.

9              THE COURT:  But now you have the amended

10   charge and you have the complaint.  And you can

11   bring up relevant evidence concerning those issues.

12      I do have a couple of questions, just because

13   I'm in the dark as to several allegations.  And one

14   is that defendant participated in illegal

15   surveillance of plaintiff.

16             MR. SANDERS:  Ms. Romano has released a

17   privileged log --

18             THE COURT:  A what log?

19             MR. SANDERS:  It's a privileged log.

20             THE COURT:  Okay.

21             MR. SANDERS:  I believe that particular log

22   comes from their Labor Relations Department.  But

23   the staff of that agency was -- they were sending

24   e-mails back and forth about "located" Michael

25   Sanders.

3:09-cv-03207-RM-BGC  # 123  Page 26 of 77

26

1     Now, at the time this e-mail had been sent, I

2   had not been to work, just off the top of my head,

3   in about two years.  In addition to that, you know,

4   you're in this time I was on this admin leave, you

5   know.

6     Not just me, but the entire neighborhood, you

7   know, you just maybe kind of describe it as a little

8   bit of ruckus, because a number of people driving

9   state vehicles with state license plates kept

10  traveling through the area.  I mean it's not

11  something that I noticed myself, it's something that

12  my neighbors noticed, my mother noticed, people down

13  the street noticed.  It was continuous.  And when

14  she releases this privileged log, she has a notation

15  in there talking about locate Michael Sanders.

16    I mean I'm not at work, what possibly could

17  they be sending e-mails to.  They have -- sent it to

18  the legal department.  The legal department turns

19  around and apparently gave them some type of advise

20  on how they can locate me when I am not physically

21  reporting to work.

22    You know, I -- my feeling, my personal feeling

23  was that they had me under surveillance outside the

24  workplace.  She has a privileged log that more or

25  less indicates that.  And you know, I -- you know, I

1    just want to throw it in.

2            THE COURT:  How does that relate to the

3    charges here?

4            MR. SANDERS:  I think what it shows is -- I

5    mean my sentiment with these -- within the agency is

6    that I don't think -- I think they are contemptuous.

7    They have shown contempt for the Civil Service

8    Commission.  They give orders out of there.  They --

9    the settlement for the circuit court, they didn't

10   follow an order of the circuit court, you know, not

11   completely.  And you know, I came into federal court

12   and next thing you know I get discharged from here.

13       It shows a pattern of contempt, you know, from

14   my point of view, you know, on the part of that

15   agency.  You know --

16           THE COURT:  Ms. Romano indicates she has a

17   response.

18           MS. ROMANO:  This is I'm hearing a charge

19   of contempt.  If Mr. Sanders truly believed that CMS

20   was not following the orders of either the Civil

21   Service Commission or the circuit court, he

22   certainly has -- had a right to pursue that in

23   circuit court.  I don't know now if he would -- if

24   there's a time limitation on that, but I would

25   certainly argue it's not proper here.  It's not been

1    raised in the complaint.

2        I don't -- with the -- I haven't looked at my

3    privilege log lately to see exactly what Mr. Sanders

4    is talking about, but if I recall correctly, CMS was

5    attempting to locate Mr. Sanders to try to find him

6    to notify him he needed to take his ethics test.

7            MR. SANDERS:  Your Honor, CMS had my

8    address the entire time this thing occurred.  I did

9    not move.  They had my address, they had my phone

10   number.  I wasn't hard to find.  You know, their log

11   in the case -- their staff is -- their staff was

12   instructed not to contact me.  But they had my

13   address.  They had my address, they had my phone

14   number.  And neither one changed.

15       You know, my opinion is they were outside of

16   work, they had certain staff members -- I mean I

17   personally have seen them.  Steve Petrilli.  Steve

18   Miller.  I've believe Veronica Tozer.  Tricia

19   Pineda.  I have personally seen them outside of my

20   home.  It is just a question of me coming in here

21   and trying to establish that.  I think it's

22   established in the privilege log.  And I'm just --

23   I'm not accepting this thing that they were trying

24   to find me about an exact address.  They had my

25   address, they had my phone number.

1          MS. ROMANO:  If I could raise one more

2     point, Your Honor.  We did get into this a little

3     bit at Mr. Sanders' deposition.  He mentioned the

4     same thing that he mentioned in court, that many

5     neighbors witnessed this as well.  I asked him to

6     provide me the names of any neighbors who saw it, he

7     refused to do so.  So I have no way to validate this

8     claim that other people saw it.

9          THE COURT:  What about the illegal

10    surveillance.  Is it in the privilege log?

11         MS. ROMANO:  No.  There is nothing about

12    illegal surveillance.

13         MR. SANDERS:  The log says locate Michael

14    Sanders.  And they contacted CMS legal to seek

15    advice on how to locate me.  And at the time that

16    those -- the privilege log was indicating --

17         THE COURT:  What time was it?

18         MR. SANDERS:  I believe in 2007.  But the

19    thing is that I was on administrative leave.  I had

20    been ordered not to report to work.  I was not at

21    their worksite.  They had my address, they had my

22    phone number.

23       And I'm sitting at home witnessing these people

24    doing this.  I mean, you know, I come into court

25    and, you know, I -- I may dialogue on this, but it's

1    not going to go anywhere, not unless you've got

2    proof.  And I get a privilege log and read that, you

3    know, there's -- they're sending stuff up to CMS

4    legal department.  There's dialogue about locating

5    Michael Sanders.  You know, seeking legal advise on

6    how to locate, you know, me.

7              MS. ROMANO:  We would be happy to supply

8    the Court with our privilege logs if that would

9    assist --

10             THE COURT:  Yes, that's what I was going to

11   ask.  That is my ruling, I would like to see the

12   privilege log.

13       I had one question on your page 4 allegation

14   that defendant approved a discharge against

15   plaintiff from another state agency on November 23,

16   2010.

17             MS. ROMANO:  Yes.  Mr. Sanders was -- in

18   lieu of layoff, Mr. Sanders accepted a position at

19   the Illinois Department of Health Care and Family

20   Services.  I believe that was late 2009, early 2010;

21   long after the relevant dates in this court.  To put

22   it in perspective, Mr. Sanders was last asked to

23   attend an Independent Medical Exam in 2007.

24       So two years after he was last asked to attend

25   an IME, after being reinstated to work, he -- there

1    was a layoff that occurred.  Mr. Sanders was not

2    laid off.  In lieu of layoff, he bumped into a

3    similar position at the Illinois Department of

4    Health Care and Family Services.

5        After working there less than a year,

6    Mr. Sanders -- Mr. Sanders, on numerous occasions,

7    did not come to work, did not call in timely to ask

8    for appropriate time off.  According to his

9    contract, his union contract affirmative attendance

10   policy, he missed enough times; I believe it's 12,

11   missed 12 days.  And following the progressive

12   discipline charge, the twelfth absence without a

13   call-in is a discharge.

14       And that was pursued by the Civil Service

15   Commission -- by Mr. Sanders, and the Civil Service

16   Commission upheld the discharge.

17              MR. SANDERS:  May I respond --

18              THE COURT:  You're saying this is

19   irrelevant to the cause of action?

20              MS. ROMANO:  Right.  I don't plan on

21   getting into that at the hearing.

22              MR. SANDERS:  May I respond to that?

23              THE COURT:  You may.

24              MR. SANDERS:  I mentioned earlier, you

25   know, as far as I'm concerned, I look at CMS, they

1    are an agency that does not -- they don't comply

2    with anything.

3          You know, when I was returned to work, I got a

4    three day -- I was notified I was going to be

5    disciplined.  This after being gone for four years.

6    The first day you go back -- wait, let me go back,

7    step back.

8          After I was ordered reinstated by the Sangamon

9    County Circuit Court, the first thing they did was

10   they accused me of making a bomb threat, you know.

11         Now after I got investigated by Springfield

12   Police Department, I go back to work.  On the very

13   first day I get back to work, they came up with a

14   three day suspension they wanted to put on me.  They

15   immediately initiate disciplinary proceeding, that I

16   called in a fire alarm later that day.  After that,

17   they moved to lay me off.  They were attempting to

18   discharge me.

19         The layoff was a violation of the contract.

20   The contract says that when they do a layoff, they

21   have to pick the least senior person within the

22   unit.  I was not the least senior.  I questioned

23   them about it.  They were unresponsive.  I got

24   transferred over to HFS.  When I got to HFS there

25   were a few occasions where I called in late.  There

1    was never an occasion where I never showed up.  You

2    know, I called in late.

3         The contract calls for any employee that does

4    that 12 times over a two year period is discharged.

5    There's nothing you can do about it.  I never got up

6    to 12 times.  I did it seven times, but they went

7    ahead and discharged me anyway.

8              THE COURT:  Well, that case isn't before us

9    right now.

10             MR. SANDERS:  Yes, ma'am.  But I guess, you

11   know, with this case right here, what I'm looking

12   for or what I'm looking at is the fact they put me

13   back in a position, the position they put me back

14   into was not the position from which I was

15   discharged from in 2007.  They did not put me back

16   in the same position, they put me in a different

17   position.

18        And then once they got me in that position,

19   then they subjected that position to layoff.  I am

20   the only person within that unit who got laid off.

21   I'm the only person.  I think they cheated me.  And

22   I think the way I looked at, end of the day, I'm

23   still without employment and I think they should

24   compensate me.

25        They did not put me into the same position.  My

1    old position was not subjected to layoff.  The

2    position they put me into when I was reinstated,

3    that position was subjected to layoff.

4            THE COURT:  Ms. Romano.

5            MS. ROMANO:  If Mr. Sanders -- we're not

6    conceding any of the allegations, but it sounds like

7    Mr. Sanders is trying to raise a claim for

8    retaliation.  This Court has -- the claim

9    Mr. Sanders has before this Court is for

10   discrimination, not retaliation.

11        We would also argue that should the Court find

12   that this particular claim about his layoff is

13   within the confines of the complaint, it happened

14   years later.  There's no indication that the same

15   individuals were involved in deciding his layoff

16   than were the ones who decided that he needed to

17   take a fitness for duty examination.

18        And he has every right to pursue a claim, a

19   grievance.  He has several remedies that are

20   available to him if he truly believes he was

21   aggrieved by that.  And we would again argue it is

22   not proper before this Court in this particular

23   lawsuit.

24           THE COURT:  I'm going to so rule at this

25   time.

1    I do have a question then as to Paragraph 10,

2    also, on page 5.  Various allegations against

3    non-party American Federation of State, County, and

4    Municipal Employees.

5         MS. ROMANO:  Yes.  Throughout the course of

6    discovery and filings, Mr. Sanders has raised claims

7    in this case that his union representatives at

8    AFSCME did not do all they could in order to prevent

9    him from being disciplined in this and various other

10   matters.

11   It's kind of a vague claim, kind of a broad

12   claim.  But we would again note that AFSCME is not a

13   party to this complaint.  And if he is going to

14   bring claims against AFSCME, we would not be

15   equipped to refute them.

16        MR. SANDERS:  May I respond?

17        THE COURT:  Yes.

18        MR. SANDERS:  The essential issue with

19   AFSCME is this: CMS will simply not comply.  They

20   don't follow the rules, they don't follow their

21   policies.  They won't follow the personal code.

22   When it comes to me, they won't follow anything at

23   all AFSCME has.  You have a Step 1, Step 2, and the

24   grievance.  When you go through this grievance

25   process CMS management is the one that the -- they

1    determine the outcome of the grievance.

2        The only power that AFSCME has is arbitration.

3    And AFSCME will not expend the funds to call an

4    arbitrator on my behalf.  That's basically what the

5    problem is.

6        You know, you have a contract in place, the

7    contract has certain things, they are crystal clear.

8    You know, in my experience dealing with CMS, they

9    will go in and they will deliberately violate that

10   contract in order to get, you know, a grievance

11   started.  And then once you go through the

12   grievance, AFSCME has to make a decision do we call

13   in an arbitrator, are we going to spend the money to

14   do this.  They have several thousand employees and

15   they're not going to.  CMS that is aware of that.

16           THE COURT:  Well, you understand that I've

17   limited you to issues which you've raised in your

18   complaint and your amended charge.

19           MR. SANDERS:  Yes.

20           THE COURT:  So I don't see, as we sit here,

21   AFSCME as a party.  I don't see how AFSCME

22   allegations are related in any way.

23       So in sum, I'm going to go ahead and grant the

24   defendant's motion in limine, but for Paragraph 8,

25   I'm reserving as to that issue.  And we'll wait to

1    review the privilege log that you've alleged

2    contains this information.

3           MR. SANDERS:  Okay.  So you are exempting

4    allegation 8, or page 5?

5           THE COURT:  Hm-mm.

6           MR. SANDERS:  Now, and the other testimony,

7    she's trying to -- are we at that point about

8    Michael Berk --

9           THE COURT:  No, that's our next question.

10   The testimony of Michael Berk.  Why is it you want

11   him?

12          MR. SANDERS:  Mr. Berk dealt with two

13   unemployment claims that I filed.  He was involved

14   in my 2005 unemployment compensation -- well, you

15   know, they discharged me in 2005, I got reinstated.

16   And Mr. Berk was involved in my 2005 unemployment

17   compensation.

18       Now, what happened is that in 2005, I received

19   unemployment for about, you know, about two months

20   before I got reinstated.  CMS did not make any

21   effort to recoup the unemployment.  Before they

22   fired me in 2007, someone at CMS decided they wanted

23   to recoup the funds.

24       The Department of Employment Security assigned

25   a special investigator.  His name is -- I can't

1    recall his name right now, but he's a special

2    investigator from Southern Illinois.  He reviewed my

3    unemployment claim in 2005, and he determined that

4    because CMS did not attempt to recoup the 2005

5    unemployment compensations, that they were no longer

6    entitled to it.

7        He wrote me a letter and it said, cleared,

8    cleared, cleared, cleared, cleared.  The letter says

9    Mr. Sanders correctly reported his unemployment and

10   his -- and for this period of time, this is relating

11   to 2005 unemployment.  And it says that Mr. Sanders

12   does not owe anything.

13       Now, Mr. Berk comes in the next day and he

14   unilaterally reversed that determination.  Mr. Berk,

15   in my experience dealing with him, what he does is

16   every time I deal with IDES, he will have a claims

17   adjudicator that makes a decision, and once that

18   claims adjudicator makes a decision, Mr. Berk will

19   reverse the decision.

20       Now, for 2007, which makes this -- that

21   situation right there even more egregious, Ms.

22   Romano is correct, is it follow a EEOC complaint.

23   That EEOC complaint was received in the CMS

24   personnel office on this particular day and it's

25   time stamped as being received by CMS internal

1   personnel.  CMS personnel on the very same day faxed

2   a letter over to the Department of Employment

3   Security.  And they said that they wanted to

4   challenge the claims adjudicator that had awarded

5   the unemployment compensation for this 2007

6   discharge.  On the very same day, Michael Berk

7   halted my unemployment compensation.

8        Now, the Unemployment Act contains a provision

9   that says that, you know, if you are discharged, or

10  whatever, you are receiving unemployment, and the

11  employer decides to challenge the decision -- the

12  adjudication giving you unemployment benefits, the

13  Unemployment Insurance Act says that you're

14  unemployment benefits are supposed to continue

15  until -- they're suppose to continue until a hearing

16  is set up.  And there has to be -- there has to be a

17  decision to reverse your unemployment.

18       Mr. Berk didn't do that.  Mr. Berk went in and

19  he unilaterally on his own halted my unemployment

20  compensation.  He did it on the very same day that

21  CMS received the EEOC complaint from the Chicago

22  District Office of EEOC.  You know, all this

23  happened within 24 hours.  They got a complaint, CMS

24  got the EEOC, they faxed a letter to Mr. Berk, and

25  Mr. Berk halted the unemployment benefits.  What he

1    did was unlawful, illegally liquidated my pension,

2    and I do have a viable pension with State of

3    Illinois.

4        Maybe these things aren't directly related to

5    the complaint, but they are arising out of what CMS

6    did.  I would not have even had to have applied for

7    unemployment if I had not been illegally discharged.

8        And Mr. Berk sits over at that office, you

9    know, over at the unemployment office, and he -- he

10   broke me.  I pulled up the statute and take a look

11   at it.  The statute says, if you have, you know, a

12   judiciary case as being eligible for unemployment,

13   and then your employer challenges your eligibility,

14   your unemployment benefits are supposed to continue

15   until a hearing is set up, and then, you know, get

16   an adverse decision made against you.  Mr. Berk

17   didn't do that.  That's why I want him brought in

18   here.  You know, my pension had been jeopardized

19   over what he did.

20            THE COURT:  Ms. Romano.

21            MS. ROMANO:  Before I respond, you

22   mentioned -- if I may go back just a second.  You

23   mentioned being an amended charge.  I want to make

24   sure I understand what you are referencing.  I think

25   you said that once or twice.

1          THE COURT:  I thought there was an

2    amendment.  Am I incorrect?

3          MS. ROMANO:  To the EEOC charge?  If you

4    would note, the right to sue letter that we've

5    attached doesn't recognize any of those amounts.

6          MR. SANDERS:  There were two --

7          MS. ROMANO:  I never received a copy of --

8    in fact, I never received any copy of any.  But I

9    certainly don't have a right to sue letter based on

10   that amended charge.

11         MR. SANDERS:  Mr. Baker was providing

12   representation at that time.  There were two right

13   to sue letters and the EEOC complaint, it was

14   amended.  The complaint that -- the amendment to the

15   complaint, it cites race, disability, and

16   retaliation.

17         MS. ROMANO:  If the Court has a copy of

18   that right to sue letter, may I get a copy?

19         THE COURT:  Do we have that?  I thought we

20   did.

21         MS. QUIVEY:  We got it from Mr. Sanders.

22   And it's in that file.

23         THE COURT:  With his -- what was it?  I've

24   got so much paper up here.

25      So this was just filed -- so there is a May 18,

1  2009 document.  And then there is a May 18, 2009,

2  response -- both of them are.  And then a charge of

3  discrimination dated -- I don't see the date on it.

4  It was received March the 4th of 2009, by Chicago

5  District Office.

6      Would you like to step up and look at these

7  documents and see if you've seen them, Ms. Romano.

8          MR. SANDERS:  I have both right to sue

9  letters, if you want to -- care to take a look at

10  them.

11          MS. ROMANO:  I don't recall -- I don't

12  recall seeing the second right to sue letter

13  regarding disability.  But nonetheless, it's outside

14  what was plead in the complaint.  We've certainly

15  been proceeding at this stage with an ADA claim.

16          MR. SANDERS:  Your Honor, what -- what I

17  intend to do --

18          THE COURT:  Hold on, Ms. Romano was

19  speaking.

20          MR. SANDERS:  I'm sorry.

21          MS. ROMANO:  And there's nothing about --

22  about discrimination referenced in the final

23  pre-trial or been raised in the supplemental or

24  amended complaint.

25      I had no idea there was a right to sue letter

1    issued based on his right to sue amendment,

2    because -- although Mr. Sanders did provide in his

3    initial disclosures a copy of both charges, both the

4    original and amended charges, I didn't get any right

5    to sue letter from Mr. Sanders even after having

6    asked for discovery.  When I went to the EEOC to get

7    a copy of it, I don't recall getting that second

8    right to sue letter or the one on Title 7

9    disability.

10        I did receive the first letter, which is

11   attached to our motion.

12             THE COURT:  Let me ask my clerk, Lara;

13   where did we get these?

14             MS. QUIVEY:  From Mr. Sanders at the last

15   hearing.

16             THE COURT:  Which would have been?

17             MS. ROMANO:  February 27th.

18             THE COURT:  February 27th.  And you didn't

19   receive those from him?

20             MS. ROMANO:  No.

21             THE COURT:  At any time?

22             MS. ROMANO:  No.

23             THE COURT:  So I assume you would like

24   leave to file something?

25             MS. ROMANO:  Sure.  Yes, yes.

1          MR. SANDERS:  I have both letters right
2    here.  If you want to see them.
3          MS. ROMANO:  It just -- we would like leave
4    to file, but I guess the long and short of it is
5    that nothing other than ADA was alleged in the
6    complaint.  So I don't believe even if, apparently,
7    Mr. Sanders does have a right to sue letter based on
8    other allegations, that wasn't alleged in the
9    complaint.
10        And like I stated before, the Conner case that
11   was cited in our motion to strike indicates that
12   even if you do have right to sue based upon other
13   claims, if it's not alleged in the complaint it's
14   not good enough just to attach your charge to the
15   EEOC.
16        THE COURT:  All right.  At this time, then,
17   I'm going to bar the testimony of Michael Berk.  So
18   I'm granting the motion in limine as to Paragraph 4
19   of defendant's motion in limine.
20        We then have the findings and rulings of the
21   Illinois Civil Service Commission in its ALJ.
22        I think this question is a little closer.  I
23   think certainly it would be admissible -- admissible
24   for purposes of perhaps impeachment, and certainly
25   we would issue a limiting instruction if it's to be

1    admitted at all.  Would that not cure --

2            MS. ROMANO:  I guess we'd have to know what

3    the limiting instruction would be.  Our concern is,

4    as we've noted in here, is that since -- since the

5    Civil Service Commission didn't even consider the

6    ADA, and since the standards are different at Civil

7    Service than before this Court, they're basing their

8    decision upon different information than will be

9    provided by us -- we're presenting a different case

10   here than we did at Civil Service, of course.

11       And the jury might be confused if they hear

12   that a tribunal of some sort has already made a

13   ruling on this, but in fact, the tribunal is

14   different than what is being --

15           THE COURT:  Well, that's the kind of

16   limiting instruction I was talking about.

17       So what I'm going to do, at this time I'm not

18   finding that this is admissible evidence, but I will

19   allow this to be addressed.  I'm reserving ruling on

20   this issue.  You will have to establish why this

21   evidence is relevant before I'll allow it to be

22   admitted.

23           MR. SANDERS:  Okay.  Well, I believe it's

24   relevant because I believe what Ms. Romano is doing

25   is she has changed the basis of these IMEs.  They

1    argued before the Civil Service Commission is what

2    they said that I had threatened to physically harm

3    someone.  She comes to court, she has affirmative

4    defense two, CMS was trying to -- trying to make an

5    inquiry into the ability to perform my job.

6        They made no argument before the Civil Service

7    Commission about my ability to perform job duties or

8    job functions.  They said that I threatened someone.

9    She comes in here, she wants to change her story.

10   And I think that the finding of the Administrative

11   Law Judge and Commission should be added because

12   it -- you know, I intend to use it to limit her.  Or

13   to limit the Attorney General in what they argue.

14       You know, I'm -- I find it a little offensive

15   that you go one place and you argue -- you know, you

16   make argument A, and then you come in here and now

17   it's about your ability to do your job.

18            THE COURT:  Well, my understanding, OEIG

19   investigation; and correct me if I'm wrong; this was

20   an investigate that the plaintiff has threatened his

21   supervisor.  Therefore, would it not be relevant to

22   whether the IME was requested for job related

23   purposes consistent with business necessity?

24            MS. ROMANO:  For the OEIG part?

25            THE COURT:  Hm-mm.

1          MS. ROMANO:  Our problem with that is that

2     we don't know what was investigated by the OEIG.  We

3     can't get that information.  We don't know what

4     documents they looked at, if any.  We don't know who

5     they interviewed, if anyone.  The OEIG information

6     that's gathered on an unfounded report is strictly

7     prohibited for disclosure.  I called over there, I

8     tried to get it, I was told I couldn't.

9          So the problem there is we have no way to

10    address the veracity of the nature -- of the

11    investigation or the nature and the scope of the

12    investigation.

13         It's been my experience as well that when the

14    OEIG starts an investigation, it can go numerous

15    different directions.  We're not exactly sure what

16    was investigated here, other than what Mr. Sanders

17    said.

18         Another point, too, is that --

19         THE COURT:  Let me ask whether Mr. Sanders

20    could waive that confidentiality and you could

21    subpoena that information into court, either the

22    witnesses or the information.

23         MS. ROMANO:  I don't think there's the

24    mechanism to do that within the -- within the State

25    Ethics Act.

1          THE COURT:  I don't know.

2          MS. ROMANO:  Yeah.  I haven't read -- I

3     looked it over.  I couldn't find -- I don't believe

4     it's Mr. Sanders' privilege to waive.  I think that

5     the act strictly prohibits disclosure of unfounded

6     reports.

7          MR. SANDERS:  Your Honor --

8          THE COURT:  Hold on.  Are you done, Ms.

9     Romano?

10         MS. ROMANO:  Also, as we've noted in our

11    motion, the fact finder here is the jury and not the

12    OEIG.  And to bring in evidence about an

13    investigation where no party really knows exactly

14    what occurred before they got to their findings,

15    would certainly mislead the jury as to -- and take

16    the place of the jury.

17        That's within their province to make the

18    findings of fact and to raise reasonable inferences

19    upon those findings of fact.  And we certainly don't

20    want that to happen here.  Especially in a situation

21    where there's no means for us to get any of the

22    information related to the investigation.

23         MR. SANDERS:  Your Honor, may I respond?

24         THE COURT:  Hold on just a minute.

25        I'm going to reserve ruling on this matter as

1   well, depending on what comes out in testimony.  I

2   certainly understand and agree with Ms. Romano that

3   this would be a limited amount of evidence that

4   would be coming in.  And it would have to be

5   established that it was relevant before I were to

6   allow it.  So I'm reserving again as to Paragraph 6

7   of the motion in limine.

8       So that takes us to -- let's see.  Evidence

9   regarding attorney's fees for counsel who have not

10  entered an appearance in this case.  I'm not sure

11  why you bring it at this stage, because it's only

12  after plaintiff would prevail that I would even

13  address the issue.

14          MS. ROMANO:  Yeah.  And there are, I think,

15  G, H, and I, and K.  The remainder of the motion in

16  limine does address damages.  So if the Court would

17  wish to discuss this at a later time.

18          THE COURT:  All right.  We'll reserve then

19  as to G, H, and I.  And just to be parallel with the

20  motion in limine, that would be reserving as to

21  Paragraph 7 of motion in limine, 8, 9, 10.  And then

22  K would be the same, would it not?  Damages as well?

23  That's personal injury.

24          MS. ROMANO:  Yes, K -- K and the memorandum

25  of law is Paragraph 10 in the motion.

1          THE COURT:  All right.  So that takes care

2    of the motion in limine.

3      We still have pending the objection to

4    defendant's use of docket entry from Sangamon County

5    Circuit Court.

6          MS. ROMANO:  We've withdrawn that document

7    from our final pre-trial order.

8          THE COURT:  Okay.  Withdrawn by defendants.

9      I'm just trying to make notations on all my

10   different copies as to my ruling.

11     The motion for leave to file supplemental

12   affirmative defense.  Affirmative defense, yes.

13     Did you respond to this, Mr. Sanders?

14         MR. SANDERS:  No, I did not respond.

15     I think the thing is -- oh, she says failure to

16   timely file a charge of discrimination.  Charge was

17   timely filed.  I don't -- you know, I don't think it

18   should come in, you know.  I filed the charge, the

19   complaint with EEOC, probably within 30 days of

20   being discharged on October 17th, 2007.  And I was

21   issued a right to sue letter and it was timely filed

22   with the Court.

23     I don't understand why she wants to -- why she

24   wants to argue that.

25         THE COURT:  Well, the -- technically there

1    were allegations which occurred outside the 300 days

2    before you filed your charge of discrimination.  And

3    they're not actionable unless they're continuing.

4    And that box was not checked on the EEOC charge,

5    correct?

6              MR. SANDERS:  The continuing action is not

7    checked.

8        I think what you're looking at is the amended

9    charge.  The original charge is filed within 30 days

10   of the discharge.  I think that's where the

11   confusion comes.  The original charge -- or the

12   original complaint I filed was filed within 30 days.

13   And then it was amended in 2009.

14       The complaint was timely filed with EEOC.  It's

15   just that, you know, I went through the Civil

16   Service Commission and then I amended it, amended

17   the complaint in 2009.

18             THE COURT:  Well, I'm going to grant the

19   motion to file a supplemental affirmative defense.

20             MR. SANDERS:  I may have the original

21   complaint where I filed it here with me.

22       I have the original complaint indicating

23   November 16th, 2007, is when the original complaint

24   was filed.  And it's date stamped Chicago District

25   Office of EEOC.

1        THE COURT:  Do you have that, Ms. Romano?

2        MS. ROMANO:  Yes, I do.  That's the one

3    attached as Exhibit 1.  The original charge.

4        MR. SANDERS:  I was discharged

5    October 17th, 2007.  And I filed the complaint, they

6    received it November 16th.  And it was timely filed

7    with the EEOC.

8        MS. ROMANO:  I think that's the crux of the

9    argument, Your Honor, is that it's based upon his

10   discharge.  His discharge is a retaliatory offense

11   that this Court has determined is not actionable in

12   this particular claim.

13       THE COURT:  I've made my ruling, so let's

14   proceed then with the pre-trial order of the

15   defendants.  Do you have any objection to the

16   defendant's nature of action and jurisdiction

17   statement?

18       MR. SANDERS:  No, I do not.

19       THE COURT:  All right.

20   Do you have agreement with the joint statement,

21   Roman II?

22       MR. SANDERS:  No, I do not.

23       THE COURT:  You agree.

24       MR. SANDERS:  Yes, ma'am.

25       THE COURT:  All right.  Then any objections

3:09-cv-03207-RM-BGC  # 123  Page 53 of 77

1    to the stipulation of uncontested facts?

2           MR. SANDERS:  I have No. 5, I do object to

3    that.

4           THE COURT:  So Mr. Sanders did not meet

5    with you and agree to this?

6           MS. ROMANO:  I thought we looked it over at

7    the last final pre-trial.  Maybe we didn't go

8    through everything.  That's why I included it, I

9    thought we had discussed it.  If not, we can take it

10   off.

11          THE COURT:  All right.  I'll show Paragraph

12   5 of the uncontested facts stricken.

13      We have plaintiff's witness list, which we'll

14   deal with in the plaintiff's part, which will be

15   next.

16      We have the defendant's witness list.  Any

17   objection to that?

18          MR. SANDERS:  Okay.  Can you repeat that,

19   please?

20          THE COURT:  Defendant's witness list.

21   Exhibit C, page 7 of the pre-trial --

22          MR. SANDERS:  Okay.

23          THE COURT:  -- submitted by the defendants.

24          MR. SANDERS:  I don't have a problem with

25   any of their witnesses except that -- let's see,

```
1   there were some that I want called she doesn't list.

2   But --

3            THE COURT:  Well, you're entitled to submit

4   your own list, which we'll deal with next.

5            MR. SANDERS:  Yes.

6            THE COURT:  Defendant's exhibit list.  Any

7   objection?  And this is just as to the disclosure of

8   the exhibit list.  Is there anything wrong with this

9   list of exhibits and descriptions?

10           MR. SANDERS:  Well, she has withdrawn

11  item -- the Sangamon County document No. 32.  That's

12  been withdrawn.

13           THE COURT:  Number 32?

14           MR. SANDERS:  Yes.  She -- she indicated

15  she voluntarily withdrew that.

16           THE COURT:  Incident reports by James Davis

17  would be the docket entry?

18           MR. SANDERS:  No.  She -- Ms. Romano, did

19  you not say you would withdraw that --

20           MS. ROMANO:  I believe Mr. Sanders is

21  looking at our original motion for pre-trial order

22  which we initially provided to him.  The one we

23  filed is different with exhibits.  The witnesses

24  were all the same.

25           THE COURT:  This would be document No. 85,
```

1   page 10.  There is no indication --

2          MR. SANDERS:  Okay, I'm sorry.  I had the

3   original, not the amended one.

4          THE COURT:  That docket entry is not

5   listed.

6          MR. SANDERS:  Okay.  There is one thing --

7   Item No. 1 and 2.  I don't have a problem with the

8   employee evaluation.  She's using an evaluation that

9   was made by the Department of Health Care and Family

10  Services.

11         THE COURT:  Are you objecting to No. 3?

12         MR. SANDERS:  Right.  I have no objection

13  to No. 3, but I would like No. 1 and 2 to come out

14  because it deals with discipline that was issued by

15  a different agency that, you know, I have, you

16  know --

17         THE COURT:  But this has been disclosed to

18  you.  You have no objection to its listing, you just

19  have an objection to its being used, its relevance,

20  which you can attack at trial.

21         MR. SANDERS:  Right.  I don't believe she

22  should be allowed to use that oral written

23  reprimand.

24         THE COURT:  Have you filed a motion to

25  strike?

1          MR. SANDERS:  No, I have not.

2          THE COURT:  Ms. Romano?

3          MS. ROMANO:  Well, two things.  First, No.

4    3 on our exhibit list is an employee evaluation that

5    Mr. Sanders also intends to use.  It is his

6    Plaintiff's No. 86.  Mr. Sanders intends to present

7    evidence regarding his conduct at his prior employer

8    before coming to the defendant CMS in an attempt to

9    show that basically the discipline he received at

10   CMS was unjustified based on his conduct at his

11   previous employer.

12       In reality he was disciplined by the previous

13   employer for the same things that he did while at

14   CMS.  That's what Exhibits 1 and 2 are about.

15       I would submit that if he is going to use an

16   employee -- if he's going to argue that -- if

17   Mr. Sanders intends to argue that he was treated

18   unfairly at CMS in a way that he was not treated at

19   other agencies, that simply is not the case, and we

20   need to establish that this conduct occurred long

21   before he came to CMS.

22          THE COURT:  So at this time I will let you

23   re-raise that at a later time.  I'm not going to

24   grant your oral motion to strike at this time.

25       Let's go to the jury instructions.  I'm going

1    to go through these very quickly.  So Mr. Sanders,

2    if you're going to have an objection, it needs to be

3    stated quickly.  I'm going to mark them as given

4    unless there is an objection.

5         Any objection to Defendant's 1.  No objection?

6              MR. SANDERS:  No objection.

7              THE COURT:  Defendant 2?

8              MR. SANDERS:  No objection.

9              THE COURT:  Okay, I have marked 1 and 2 as

10   given.

11        3, any objection?

12             MR. SANDERS:  No.

13             THE COURT:  Given, so marked.

14        4.

15             MR. SANDERS:  No objection.

16             THE COURT:  Given and so marked.

17        5.

18             MR. SANDERS:  No objection.

19             THE COURT:  Given and so marked.

20        6.

21             MR. SANDERS:  No objection.

22             THE COURT:  Given and so, marked.

23        7.

24             MR. SANDERS:  No objection.

25             THE COURT:  Given and so marked.

1      8.

2          MR. SANDERS:  No objection.

3          THE COURT:  Given and so marked.

4      9.

5          MR. SANDERS:  No objection.

6          THE COURT:  That is given, so marked.

7      10.

8          MR. SANDERS:  No objection.

9          THE COURT:  Given and so marked.

10     11.

11         MR. SANDERS:  No objection.

12         THE COURT:  Given and so marked.

13     12.

14         MR. SANDERS:  No objection.

15         THE COURT:  Given and so marked.

16     13.

17         MR. SANDERS:  No objection.

18         THE COURT:  Given and so marked.

19     14.

20         MR. SANDERS:  No objection.

21         THE COURT:  Given and so marked.

22     15.

23         MR. SANDERS:  No objection.

24         THE COURT:  Given and so marked.

25     16.

1       MR. SANDERS:  No objection.

2       THE COURT:  Given and so marked.

3   17.

4       MR. SANDERS:  No objection.

5       THE COURT:  Given and so marked.

6   18.

7       MR. SANDERS:  No objection.

8       THE COURT:  Well, I think I have an

9   objection.  Not to make your case for you, but I was

10  under the impression it was defendant's burden.

11      MS. CHOATE:  That's what I noticed as I was

12  going through this as well, Your Honor.  And I

13  believe that the Court has -- had put that in the

14  ruling on the summary judgment, that it was

15  defendant's burden.  I don't know that that is well

16  established, certainly not in the 7th Circuit, as to

17  whose burden it is.  Generally it is the plaintiff's

18  burden to show his rights were violated.  It's his

19  burden to show that the defendant violated the law.

20      To that extent, we would tender the instruction

21  that it's his burden to show that these -- that the

22  IMEs were not done for a business purpose, as is

23  required.  But to the extent we do acknowledge, as

24  the Court acknowledged in its summary judgment, that

25  there are cases in other circuits that put that

1  burden the -- on the employer, but to preserve the

2  issue, we want to tender it.  It's not well

3  established in the 7th Circuit.  We want to tender

4  these instructions.

5          THE COURT:  Okay.  At this time I'm going

6  to reserve.  The Court may submit its own

7  instruction on that issue or other parties may

8  submit a revision.

9      Did you find any case law in support,

10  Ms. Choate?

11          MS. CHOATE:  I didn't.  And I've looked.

12  And I've tried to find something in the 7th Circuit

13  and the -- certainly the District Courts within the

14  7th Circuit, it seemed to dance around the issue.

15  They didn't talk about whose burden it actually was.

16  And I did read the case Your Honor cited and -- I

17  think out of the 6th Circuit.  And it did clearly

18  state that.  But to the extent it's not

19  well-established in this circuit, we wanted to --

20          THE COURT:  All right.

21      Defendant's 19.  Any objection?

22          MR. SANDERS:  No objection.

23          THE COURT:  Given, no objection, so marked.

24          MR. SANDERS:  I have no objection to any of

25  her jury instructions.

1          THE COURT:  Well, this is not a pattern

2    IPI.  Is this really necessary, counsel?  I mean it

3    is consistent with case law.

4          MR. CHOATE:  Well, we believe it is, and

5    especially to the extent that the Court might give

6    the burden instruction that it's our burden.  We

7    need to educate the jury to what the rights of the

8    employer are related to sending someone under the

9    ADA for an IME.

10          THE COURT:  Okay.  Given my ruling on 19,

11    I'm going to reserve as to 20.  And we'll address

12    these two issues before we begin trial.

13      21.  I think 21 needs to be modified.  I think.

14    EEOC compliance manual actually states employee will

15    pose a direct threat.  You may want to look at that.

16    I will reserve and allow you to object at a later

17    time.

18          MS. CHOATE:  That's where the EEOC --

19          THE COURT:  Uh-huh.

20          MS. CHOATE:  Okay.

21          THE COURT:  So I will reserve as to 21.

22      22, any objection?

23          MR. SANDERS:  No objection.

24          THE COURT:  Given, no objection, so marked.

25      23.

1          MR. SANDERS:  No objection.

2          THE COURT:  Again, I ask is this one really

3     necessary?

4          MS. CHOATE:  We believe so to the extent

5     that the jury should be aware that the employer

6     could face liability for allowing an employee it

7     believes to be dangerous or -- in its employ.  So to

8     the extent it goes to the reasonableness of the

9     employer sending an employee for an IME, the jury

10    should know this is in the back of the employer's

11    mind, for what it's worth.

12         THE COURT:  I think I will reserve on this

13    one as well.  I think it will depend on what the

14    evidence shows.

15         MS. CHOATE:  Okay.

16         THE COURT:  Is this the pattern

17    instruction?  It is.  Has it been modified?

18         MS. CHOATE:  23?

19         THE COURT:  We're on 24.

20         MS. CHOATE:  Oh, 24.  I'm sure it's been

21    modified -- okay, yes, I believe it is modified.

22         THE COURT:  Okay.  I'd like to see the

23    actual pattern instruction, because I thought there

24    was some language about reasonable belief included.

25         MS. ROMANO:  We might have it, Your Honor,

1    if you could just give us one second.

2            THE COURT:  I will show that 24 has been

3    amended by interlineation to show 7th Circuit

4    Pattern Instruction 3.07 modified.

5            MS. CHOATE:  Yes, you're right.  I do know

6    it's modified.  I'm looking at it again.  This is

7    one generally we use when it talks about rules and

8    regulations of an agency, for example.  That you may

9    have -- no, I'm sorry, strike that.  I was thinking

10   of a different one.

11           THE COURT:  I'll just reserve as to 24 and

12   we'll address it before trial again.

13       Defendant's 25.

14           MR. SANDERS:  No objection.

15           THE COURT:  Given, no objection, so marked.

16           MS. CHOATE:  That probably should have to

17   be reserve as well, because it has the burden as the

18   plaintiff.  And if that's -- if that's what's being

19   reserved on the others.

20           THE COURT:  All right.  We will reserve as

21   to 25.

22       26A modified.

23           MR. SANDERS:  I have no objection, Your

24   Honor.

25           THE COURT:  Ms. Choate.

```
1            MS. CHOATE:  I'm sorry, yes, this was
2    modified.  3.10 modified.
3            THE COURT:  You still wish to give it, I'll
4    show it given, no objection.
5        26B --
6            MS. CHOATE:  Again, we would have to --
7            THE COURT:  -- is an alternate?
8            MS. CHOATE:  I'm sorry.  This should
9    probably be reserved because it has the plaintiff
10   has prove.  To the extent we're reserving.
11           THE COURT:  We will reserve as to 26B.
12       27.
13           MR. SANDERS:  No objection.
14           THE COURT:  Given, no objection.  So
15   marked.
16       28.
17           MR. SANDERS:  No objection.
18           THE COURT:  Given, no objection, so marked.
19       29.
20           MR. SANDERS:  No objection.
21           THE COURT:  Given, no objection, so marked.
22       Verdict Form A.
23           MR. SANDERS:  No objection.
24           THE COURT:  Given, no objection.  And so
25   marked.
```

1    Verdict Form B.

2         MR. SANDERS:  No objection.

3         THE COURT:  Given, no objection, so marked.

4    All right.

5         MS. CHOATE:  I don't know if you reserved

6    26A as well, it has the same problem as 26B.

7         THE COURT:  No, I had shown it as given, no

8    objection.  And I will strike the mark that it is

9    given and show it reserved.

10    I'm making sure that all of the instructions

11    there was no objection and they were given are

12    properly marked as such.

13    Okay.  I'm done with the defendant's

14    instructions, but for those reserved.

15         Plaintiff's.  We need to look at the

16    Defendant's Exhibit A stipulation of uncontested

17    facts will not need to be given because we've

18    modified Defendant's Joint Stipulation by striking

19    your paragraph 5, Defendant's paragraph 5.

20    What about the exhibit list of plaintiff?

21         MS. ROMANO:  Oh, I'm sorry, plaintiff.

22    Your Honor, I have attempted to try to gather

23    as many of these as possible.  And I guess at this

24    point in time on many of these I'm unable to give an

25    objection because I'm not really sure if I have the

1   right documents or not, because there's so much

2   documentation.  But there are some that I know off

3   the bat we would have issues with.

4       I don't believe that we've been provided

5   Exhibit 90.  91 --

6               THE COURT:  Hold on.

7               MS. ROMANO:  I'm sorry.  I'll start with

8   90.

9               THE COURT:  All right.  Has 90 been

10  provided?

11              MR. SANDERS:  I -- I don't think so.  I may

12  have.  I'm -- I'm not quite certain.  But all it is,

13  I asked the Comptroller to give me the dates and the

14  amounts of all the involuntary coding that was

15  placed against me.  So they gave me a list showing

16  this date, this amount was involuntarily withheld

17  and disbursed to this agent.

18              THE COURT:  Mr. Sanders, I know you've been

19  in this Court long enough to know that the documents

20  have to be provided to the other side timely in

21  order to be admitted.

22      Is there an objection to 90?  If that is, in

23  fact, what it appears to be.

24              MS. ROMANO:  Yes.  We would object if we

25  haven't been provided it at this point in time.

1          THE COURT:  All right.  We'll show an

2    objection.  And you're going to try to work out this

3    discovery dispute between the two of you --

4          MR. SANDERS:  I can give it to her.  It's

5    no problem.

6          THE COURT:  That doesn't make it

7    admissible.  If it's not a timely produced document,

8    it may still not be admissible.  I just want to make

9    sure she has an opportunity to look at it and make

10   her record.

11         MR. SANDERS:  Yes.

12         THE COURT:  91 you objected to?

13         MS. ROMANO:  I don't know what that is.

14         THE COURT:  Why don't you state all of your

15   objections that you hadn't received.

16         MS. ROMANO:  Okay.  90, 91, 92, 94, 95, 97,

17   98, 99, 108.  I think there's a few others here.

18       65, 66, 67.  59, 60.

19     I'm sorry I'm going out of order.

20         THE COURT:  That's all right.

21         MS. ROMANO:  Those at this point in time

22   are the ones I have identified as us not receiving.

23   There may be more.

24         THE COURT:  All right.  Ms. Romano, I want

25   you to make sure you've, by Monday, noted all of

1    your objections and told the Court all of those

2    objections.  And then by Tuesday, Mr. Sanders,

3    you're to confer with her about whether those were

4    previously produced in a timely fashion.

5        And then advise the Court, Ms. Romano, of

6    status, by e-mail.

7            MR. SANDERS:  Okay.  Your Honor, can -- do

8    you mind if I kind of dialogue on a few of these

9    right now?

10            THE COURT:  No.  The question is just were

11    they produced.  She's objecting they weren't

12    produced.  And I want you two to confer, because we

13    don't have time to do all of that today.  And that's

14    why I've told her to identify for you specifically

15    which documents they are, all of them.  And that's

16    by Monday.  And by Tuesday, you're to correspond

17    with her about whether you produced them before or

18    why you didn't produce them before; they were

19    unavailable, didn't exist.  And then she will notify

20    the Court whether we're going to have to have

21    objections -- arguments on the objections.

22            MR. SANDERS:  Some of the things she's

23    identified, they're like 59 and 60, for example,

24    those are not documents that have been put in

25    evidence.  Those are just going to be handmade

1  exhibits that I'm going to make so --

2       THE COURT:  Well, that's called

3  demonstrative evidence.  And that's why you two are

4  going to confer.  Because we don't have time to get

5  that done today.  So demonstrative evidence is a

6  completely different issue.  If it's prepared for

7  use as a visual in the courtroom at the trial.

8  Okay?

9       MR. SANDERS:  Yes.

10       THE COURT:  So you're going to have to tell

11  her that in this conversation and show them to her

12  at some point.

13       MR. SANDERS:  Okay.

14       THE COURT:  Because she may have objections

15  that they're misleading, prejudicial.  There are all

16  kinds of objections she can have.

17       MR. SANDERS:  Okay.  I think she also --

18  she mentioned -- well, some of this stuff she

19  already had.  Has.  94 in particular, these books

20  that I keep bringing in here, those books contain

21  e-mails that were generated by supervisory staff.  I

22  have a time line --

23       THE COURT:  Mr. Sanders, I've already ruled

24  that you're to confer with her on these issues.

25       MR. SANDERS:  Do I have to give her a time

1    line?  Because that's part of my strategy.  I mean

2    she wants to argue something by the documents they

3    produced.  You know, this -- this is -- I don't know

4    if this would harm my case for me to give this to

5    her.  All it does it just give me dates of what

6    happened, what occurred.

7              THE COURT:  You're intending to use it at

8    trial?

9              MR. SANDERS:  Yes.  But it contains, you

10   know, very serious information where I can prove or

11   disprove what occurred.

12             THE COURT:  Well, if you intend to use it

13   at trial you have to share it with her.  If there's

14   some privilege, you have to assert that privilege.

15   I can't assert it for you.

16       I've already -- you know, I've told you before,

17   I can't treat you differently.  Now, I've already

18   bent over backwards as to these jury instructions.

19   I've made some objections because I want to make

20   sure that the jury is properly instructed.  But

21   you're suppose to be the one that's making those

22   objections, not me.

23       So you're going to deal with Ms. Romano.

24   Unless your documents are privileged in some

25   fashion, but if they're privileged in some fashion

1    and you intend to use them at trial, you have to

2    waive your privilege to use them at trial.  She's

3    entitled to see them if you're going to use them at

4    trial.

5        All right.  The statement of plaintiff's

6    damages we'll reserve on as well.

7            MS. ROMANO:  Your Honor, if I may.  You

8    requested that we confer on Tuesday.  Tuesday is

9    election day and all Assistant Attorney Generals are

10   required to monitor polling places to see there's

11   compliance with election law.  I'm going to be in a

12   very remote area of the state.  I don't know if

13   we -- can we confer on Wednesday?

14           THE COURT:  You could.

15           MS. ROMANO:  Thank you.

16           THE COURT:  Okay.  And then we've got the

17   witness list.  And there are no unexpected witnesses

18   on that list, Ms. Romano?

19           MS. ROMANO:  I didn't think -- I believe

20   Mr. Sanders submitted his witness -- here it is.

21       No, Your Honor.  Nothing unexpected.

22           THE COURT:  All right.  We'll show no

23   objection to the list.

24       Then on the plaintiff's proposed jury

25   instructions.  Ms. Romano.

1          MS. ROMANO:  Ms. Choate will do that.

2          THE COURT:  Ms. Choate.

3          MS. CHOATE:  Yes.  Plaintiff's 1, we would

4   object to because I believe it is covered under

5   Defendant's 16 that's to be given, which basically

6   says what the ADA allows.

7          THE COURT:  Which number was your's?

8          MS. CHOATE:  It's our 16 -- it's actually

9   incorporated in several of our's.  And the Court has

10  reserved on some.

11         THE COURT:  That's what I was going to say.

12  I thought that was the one I reserved.

13         MS. CHOATE:  Right.

14         THE COURT:  We will show an objection and

15  reserve.

16      I will say, though, I will not give the

17  proposed jury instruction in this form.  The jury

18  instructions have to be all in the same font and in

19  the same format.  And Mr. Sanders, your's is not in

20  the proper font.  You have seen what the defendants

21  have done and that's how yours has to be submitted.

22      Number 2, plaintiff's.

23         MS. CHOATE:  I believe we would object to

24  No. 2 because it talks about retaliation under the

25  ADA, which this case is not retaliation under the

1  ADA.

2      THE COURT:  I'll show 2 as refused.

3      MR. SANDERS:  Your Honor, I have a

4  question.  I -- you know, I've been listening and I

5  keep hearing references to retaliation and how the

6  case is not retaliation.  What actually occurred

7  here --

8      THE COURT:  This is not the opportunity for

9  you to argue your case.  Do you have something to

10  say about this specific No. 2?  I will make the

11  comment that this is not the claim that you've made

12  in this case.

13      MR. SANDERS:  Okay.  Well, I guess the

14  bottom line is is that I feel that the -- the IMEs

15  are not job related and consistent with business

16  necessity because they are retaliatory in nature.

17  That's what makes them not job related and not

18  consistent with any business necessity.  I don't

19  plan to argue, you know, retaliation, but --

20      THE COURT:  Well, then it doesn't need to

21  be instructed on, okay.

22      Paragraph 3.  Any objection?

23      MS. CHOATE:  Yes.  We would object to the

24  burden being on the defendant.  We would object also

25  to paragraph -- the fourth paragraph that talks

1    about the doctor/patient confidentiality.

2    Confidentiality is not at issue in this case.

3    Certainly to be instructed that if they find a

4    violation of any state or federal law, that's not

5    consistent with what this case is about.

6        The case is whether the ADA has been violated.

7    And the ADA anticipates that an employer will

8    receive medical information from a doctor on an IME,

9    and anticipates that and explains to the employer

10   how that information must be kept and to whom it can

11   be provided.

12       So we would say this isn't consistent with

13   certainly the law, or with what this case is to be

14   about.

15           THE COURT:  Well, I agree with you there

16   are certain defects and its format is incorrect.

17   There is some language that might be pertinent when

18   ruling on the prior instructions of the defendant.

19       So I will not be giving this instruction, but I

20   may be using some of the language that's included in

21   the instruction.  So I will show it as reserved as

22   to No. 3.

23       Now, in terms of planning, the number of

24   witnesses in this case are phenomenal.  What do you

25   anticipate the time for the trial?

1          MS. ROMANO:  Well, as we noted in our final

2    pre-trial order, I guess as far as our witness list,

3    at least roughly half of our witnesses that we

4    intend to call -- not that -- several witnesses we

5    intend to call are just to damages.  And we've noted

6    that in the witness list.

7        Several of our exhibits are only for damages,

8    too; which I did not note in the final pre-trial

9    order, but I question if that would help the Court

10   to note which exhibits.

11       And I did notice some typographical errors in

12   my exhibit list as well.  I did not know whether or

13   not the Court wished for me to verbally tell the

14   Court perhaps --

15          THE COURT:  No, just submit a revised

16   document.

17          MS. ROMANO:  As far as timing, I don't

18   know.  I don't -- I can't even begin to guess.  I

19   guess it would just depend on Mr. Sanders' case in

20   chief.  It appears that Mr. Sanders intends to call

21   many of the same witnesses we do.  Perhaps our role

22   in defense would be just to clean up minor

23   additional information that wasn't testified to.

24   But I guess we just can't say for sure.

25          THE COURT:  Hm-mm.

1          MS. ROMANO:  That would be ideal.  I just

2    don't know.

3          THE COURT:  Two weeks?

4          MS. ROMANO:  We previously had April 3rd

5    through the 6th.  Correct, four days.  We don't

6    anticipate our case taking more than two days.  From

7    our side.  But it's just when we get here --

8          THE COURT:  And it could actually come out

9    during his case in chief.

10          MR. CHOATE:  If we could have latitude to

11    go into our case to a small amount.  If that would

12    help also with timing, we would ask leave to do that

13    as it comes up.

14          THE COURT:  All right.  We will leave it

15    for the four days.

16          THE CLERK:  Friday of that work is Good

17    Friday.  I don't know if you want to plan on that as

18    a day of trial or not.

19          THE COURT:  Christy points out that the

20    Friday of that week is Good Friday.  I do not know

21    what plans are in terms of my staff.  I will inquire

22    as to that.  The Court is usually open.  So we'll

23    just leave it on for that period of time.  And I

24    will look forward to hearing from you on Wednesday

25    as to what the status is.

1        All right.  Court is adjourned.

2        (Whereupon court was recessed in this case.)

3

4

5  I, KATHY J. SULLIVAN, CSR, RPR, Official Court

6  Reporter, certify that the foregoing is a correct

7  transcript from the record of proceedings in the

8  above-entitled matter.

9

10

11

12

13                This transcripts contains the

14                digital signature of:

15

16                Kathy J. Sullivan, CSR, RPR

17                License #084-002768

18

19

20

21

22

23

24

25